UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:05-cv-30087-MAP

| | |
|---|---|
| CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC. ) ) ) | |
| Plaintiff, ) | |
| ) | MEMORANDUM IN SUPPORT OF |
| v. ) | PLAINTIFF'S MOTION FOR |
| ) | PRELIMINARY INJUNCTION |
| DONALD McLEOD; McLEOD ) PACKAGING SYSTEMS, INC. and ) MORTEN HAZZARD ) ) | |
| Defendants. ) | |

## <u>INTRODUCTION</u>

This case follows the termination and removal by the plaintiff Carter-McLeod Paper and

Packaging Company, Inc. ("Plaintiff" or "Carter-McLeod Packaging") of Donald McLeod as an

officer, director and shareholder of the Plaintiff, following its discovery of Donald McLeod's

fraudulent and unlawful misappropriation and conversion of funds, and other egregious and

unlawful breaches of his fiduciary duty and duty of loyalty to the company.  In response to the

Plaintiff's termination action, Donald McLeod and the other defendants (hereinafter collectively

("Defendants") have sought to capitalize on Carter-McLeod Packaging's established reputation

and goodwill by adopting and using a name virtually identical to Carter-McLeod Packaging's

former entity name, McLeod Packaging Systems, LLC, and current trademark, McLeod

Packaging Systems.  Therefore, Carter-McLeod Packaging seeks to enjoin Donald McLeod and

his new company from identifying itself as McLeod Packaging Systems, Inc. ("McLeod

Packaging Systems").

Donald McLeod's wrongful behavior is not inadvertent or innocent.  He adopted the

name "McLeod Packaging Systems" after he had conducted business on behalf of the Plaintiff

and its predecessor entity, McLeod Packaging Systems, LLC, selling the same products in the same channels of trade to the same customers as his new business. The only conceivable reason for adopting the identical name is to confuse customers and to capitalize on the goodwill developed and paid for by the Plaintiff. Indeed, the name, as evidenced herein, has caused substantial confusion.

The Plaintiff also seeks an injunction precluding the Defendants from using confidential and proprietary information converted from the Plaintiff and to cease making defamatory and disparaging statements about the Plaintiff to vendors, customers and others. Specifically, contrary to the representation made by the Defendants through counsel that neither "one of them removed, transferred or converted confidential and proprietary information from Carter-McLeod," a forensic analysis of Morten Hazzard's hard drive, which the Plaintiff paid an expert in the field to conduct, reveals that Morten Hazzard emailed highly sensitive documents to his personal email account just prior to resigning and going to work for Donald McLeod's new company. Additionally, vendors and the Plaintiff's bank have taken adverse action against the Plaintiff based on false statements made by the Defendants regarding the Plaintiff's financial standing.

The Plaintiff does not seek to preclude or limit the Defendants from conducting their business, using the same channels of trade or even soliciting or profiting from the Plaintiff's customers. The Plaintiff's sole purpose in bringing this motion is to require the Defendants to conduct their business in a lawful manner without damaging the Plaintiff's business through unlawful means, confusing their overlapping customer base, or capitalizing on the Plaintiff's established goodwill.

## FACTS

The facts supporting this motion are set forth in the Affidavit of Robert H. McLeod, President of Carter-McLeod Packaging (**Exhibit A**, referenced as "R. McLeod Aff."), along with supporting exhibits attached thereto at **Tabs 1** through 8.

## ARGUMENT

### I. PRELIMINARY INJUNCTION STANDARD.

The moving party seeking a preliminary injunction must meet four criteria before the injunction can issue:  (1) that the party seeking the injunction has exhibited a likelihood of success on the merits; (2) that the party seeking the injunction will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which granting injunctive relief would inflict on the party against whom the injunction is sought; and (4) that the public interest will not be adversely affected by the granting of the injunction.  *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987).  The evidence provided by the Plaintiff meets each of the four criteria and requires that the Defendants be enjoined as follows:  (1) to cease using the name and mark "McLeod Packaging Systems" or otherwise representing that they are associated or affiliated with the Plaintiff when they are not; (2) to account for all copies of the confidential documents converted by the Defendants from the Plaintiff and to return, destroy, and cease or refrain from using them; and (3) cease and refrain from making false and disparaging statements or remarks either orally or in writing about the Plaintiff.

### II. THE COURT SHOULD ENJOIN THE DEFENDANTS FROM USING THE TRADEMARK "McLEOD PACKAGING SYSTEMS."

#### A. Likelihood Of Success On Trademark And Unfair Competition Claims.

Section 43(a) of the Lanham Act provides that "any person who . . . uses in commerce any word, term, name, symbol or device, or any combination thereof . . . which is likely to cause

confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of

[defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [defendant's] goods,

services or commercial activities by [plaintiff] . . . shall be liable in a civil action . . . ."  § 43(a)

of the Trade Marks Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125(a) (2000).  This legal wrong

is generally referred to as "likelihood of confusion."

In a claim of this type, the trademark owner is required to prove the following three

elements to succeed: (1) the ownership of a distinctive mark entitled to trademark protection; (2)

its use by another in a manner likely to cause confusion as to the origin of the goods or services;

and (3) the use of that mark in interstate commerce.  *Calamari Fisheries, Inc. v. Village Catch,*

*Inc.*, 698 F. Supp. 994, 1006 (D. Mass. 1988).  Infringement of a trademark under Massachusetts

state law is congruent to the federal cause of action.  *Pignons S.A. de Mecanique de Precision v.*

*Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir. 1981).  The Plaintiff is likely to prove each of these

elements based on the information it has at this early stage in the litigation.

(1) Distinctiveness of the Mark.

Trademarks are classified on what is commonly called the *Abercrombie* spectrum.  The

*Abercrombie* spectrum divides the world of trademarks into four or five categories in increasing

degrees of distinctiveness, (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5)

fanciful.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed.

2d 615 (1992); *see S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir.

1979) (dividing into four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary

and fanciful).  Generic "marks" are terms that have passed into common usage to identify a

product, such as aspirin, and can never be protected.  *Boston Beer Co. v. Slesar Bros. Brewing*

*Co.*, 9 F.3d 175, 180 (1st Cir. 1993).  "Descriptive" terms, such as a geographical term, can be

protected, but only if they have acquired "secondary meaning," indicating that consumers

associate the term with a particular producer or source. *Id.* A mark perceived as a surname also falls into this category. *Donoghue v. IBC/USA (Publications), Inc.*, 886 F. Supp. 947, 952 (D. Mass. 1995). Suggestive," "arbitrary" and "fanciful" terms that can be protected without proof of secondary meaning and are considered "inherently distinctive." *Boston Beer*, 9 F.3d at 180 (internal citations omitted).

When placing a mark on the *Abercrombie* spectrum, the mark must be considered in its entirety, with a view toward what the purchasing public would think when confronted with the mark as a whole. *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995). Thus, a trademark consisting of descriptive terms may nevertheless create a non-descriptive whole. *Id.* at 545 n.4 (stating that Defendant's claim that EQUINE TECHNOLOGIES was merely descriptive was "unsupported by case law, and lacking in basic common sense" and holding that the mark was inherently distinctive); *see In re Hutchinson Technology Inc.*, 852 F.2d 552 (Fed. Cir. 1988) (holding that, although "Hutchinson" was a surname and "Technology" commonly used in the industry, the mark as a whole was inherently distinctive); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 395 (S.D.N.Y. 1998) (holding that on surname challenge to LANE CAPITAL MANAGEMENT, the Court was required to "view the mark in its complete form rather than dissect it into its component parts."), *aff'd*, 192 F.3d 337 (2d Cir. 1999).

"Secondary meaning" refers to words' ability to tell the public that the words serve a special trademark function, namely, that they denote a product or service that comes from a particular source. In contrast, words in ordinary, non-trademark, use normally refer to particular individual items that exhibit the characteristics that the word or phrase connotes, without specific reference to the item's source. *Boston Beer*, 9 F.3d at 181. For example, one court held that

5

"Boston" and "Boston Beer" for a brewery were descriptive without secondary meaning and therefore the terms did not function as trademarks. *Id.*

If proof of secondary meaning is required, "[t]here is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party. . . ." *President & Trustees of Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 807 (1st Cir. 1975). The relevant public for which a mark must have secondary meaning is not the public at large, but the purchasers and potential purchasers of the mark owner's goods and services. *Id.* at 808.

There are a number of ways to prove secondary meaning. Intentional copying is persuasive evidence of secondary meaning, "because there is no incentive for a competitor to copy a design that has no recognition among consumers." *McNeil-PPC, Inc. v. Merisant Co.*, Civ. No. 04-1090 (JAG), 2004 WL 3316380, at *13 (D.P.R. July 29, 2004), citing *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 32 (1st Cir. 1989). In addition, actual confusion is also strong evidence of secondary meaning. *Boustany v. Boston Dental Group, Inc.*, 42 F. Supp. 2d 100, 107 (D. Mass. 1999). Secondary meaning may also be proven through the length and manner of the use, the nature and extent of advertising and promotion of the mark, and efforts made to promote a conscious connection by the public between the trademark and the product's source. *Boston Beer*, 9 F.3d at 182.

The Plaintiff's marks, "McLeod Packaging Systems" and "Carter-McLeod Paper and Packaging," are both inherently distinctive. The purchasing public, when confronted with the mark "McLeod Packaging Systems" as a whole, recognizes that the unitary phrase is a trademark. Although the composite mark contains a surname as one component of it, the mark, taken as a whole with the addition of "Packaging Services," is inherently distinctive. *See Lane*

*Capital Mgmt.*, 15 F. Supp. 2d at 395 ("Under the present circumstances, where only one element of the mark has both a strong surname and a non-surname significance, an average member of the purchasing public would not view the mark as a whole as primarily merely a surname or as a personal name"), *aff'd* 192 F.3d 337 (2d Cir. 1999); *Ex parte Norquist Prods., Inc.*, 109 U.S.P.Q. (BNA) 399, 400 (Comm'r Pat. 1956) (composite mark NORQUIST CORONET inherently distinctive: "A word which is primarily merely a surname may lose that significance when it appears in a distinctive composite")*; compare Flynn v. AK Peters, Ltd.*, 377 F.3d 13 (1st Cir. 2004) (holding that an author had to prove secondary meaning in her personal name in a claim against a publisher that used her name without permission on a second edition of a book).

The same is also true of the mark "Carter-McLeod Paper and Packaging."  The mark is not a "surname" at all; it is a combination of two different surnames combined with additional words.  The combination of two surnames, when considered as a whole, is not perceived as a surname.  *See In re Standard Elektrik Lorenz Aktiengellschaft*, 371 F.2d 870, 873 (C.C.P.A. 1967) (holding that mark SCHAUB-LORENZ was not primarily merely a surname despite the fact that both words were surnames).  The addition of the "Paper and Packaging" component further confirms that the mark is inherently distinctive.

In addition to being inherently distinctive, both "McLeod Packaging Systems" and "Carter-McLeod Paper and Packaging" also have secondary meaning as representing the Plaintiff.  Indeed, the Defendants themselves have established secondary meaning in "McLeod Packaging Systems" by their intentional copying of that mark.  *See Boston Athletic Ass'n*, 867 F.2d at 32.  Donald McLeod's choice of the name "McLeod Packaging Systems" for his new company is no coincidence.  He has been an officer, director and shareholder of the Plaintiff

from its inception as McLeod Packaging Systems, LLC, in September of 1998, through the name

change, and was terminated only a few months ago, in mid-December 2004. R. McLeod Aff. at

¶¶ 2, 4, 8, 12, 20. During that period, Donald McLeod dealt with customers, vendors and others

under the marks at issue and participated in and was paid to develop the goodwill on behalf of

the Plaintiff in those marks. *Id.* Based on the infinite number of options available to Donald

McLeod, the only conceivable basis for adopting the exact mark of the Plaintiff was to capitalize

on the goodwill it developed and paid for over a six-year period.

Donald McLeod then set about deliberately creating actual confusion, additional evidence

of secondary meaning in "McLeod Packaging Systems." He misled at least one supplier by

representing to it that he was with "McLeod Packaging Systems" while trying to re-open an

account the Plaintiff previously held under its McLeod Packaging Systems, LLC name. *See* R.

McLeod Aff. at ¶ 29(d). Donald McLeod could not have done so if the supplier did not

recognize the name "McLeod Packaging Systems" and believe it was the same company as

Carter-McLeod Packaging. Donald McLeod did the same with a financing company, obtaining a

line of credit based on "the last 12 months" of credit history when McLeod Packaging Systems

had not been in business for twelve months. R. McLeod Aff. at ¶ 29(b) and Tab 7. Donald

McLoed's deliberate copying and successful exploitation of the mark "McLeod Packaging

Systems" to capitalize on the Plaintiff's goodwill is compelling evidence of secondeary meaning.

*See Boustany*, 42 F. Supp. 2d at 107.

Lastly, "McLeod Packaging Systems" has gained secondary meaning through the length

and manner of the use, the nature and extent of advertising and promotion of the mark, and

efforts made to promote a conscious connection by the public between the trademark and the

product's source. *See Boston Beer*, 9 F.3d at 182. Specifically, from its inception in September,

8

1998 until October, 2001, McLeod Packaging Systems, LLC grew to a $3 million company, with approximately 150 customer accounts. R. McLeod Aff. at ¶ 5. During that same period, McLeod Packaging Systems, LLC advertised in the Springfield, Holyoke, Hampshire County, Northampton, Amherst, and Easthampton Area Yellow Pages and had directory listings in these publications. R. McLeod Aff. at ¶ 6. In addition, McLeod Packaging Systems, LLC advertised through the publishing of brochures, business cards, literature labels, machine labels, letterhead stationary, envelopes, and lettering on two service vans, as well as sponsored various charitable organizations and participated in trade shows. R. McLeod Aff. at ¶¶ 6, 7. McLeod Packaging Systems, LLC also was recognized in at least one national trade publication, Packaging Digest, for its role in the sale of packaging machinery to the Wright Line company of Worcester. R. McLeod Aff. at ¶ 7.

That Plaintiff changed its corporate name from "McLeod Packaging Systems" to "Carter-McLeod Paper and Packaging" is of no moment. Carter-McLeod Packaging is still known by its vendors and customers as "McLeod Packaging Systems" and will be for some time. For example, companies still send goods to "McLeod Packaging Systems" at the Carter-McLeod Packaging address. *See* R. McLeod Aff. at ¶ 13 and Tab 3. This dual identity will continue for years; packaging equipment installed by Plaintiff's predecessor McLeod Packaging Systems, LLC bears plates identifying "McLeod Packaging Systems" as the source with a Carter-McLeod phone number. *See* R. McLeod Aff. ¶ 14 and Tab 4. The labels are on equipment that is in service today with an expected life span of up to 20 years. R. McLeod Aff. at ¶ 14. In addition, Carter-McLeod Packaging, on its acquisition of Carter Paper Company, deliberately merged the two names in order to capitalize on the goodwill that existed in each of the names and customers are fully aware that Carter-McLeod Packaging is a continuation of McLeod Packaging Systems,

9

LLC.  R. McLeod Aff. at ¶ 9.  As a result, they will continue to identify "McLeod Packaging Systems" with Carter-McLeod Packaging for many more years.  R. McLeod Aff. at ¶ 10.

With respect to the mark "Carter-McLeod Paper and Packaging," not only is the mark inherently distinctive, but it also has strong secondary meaning, making it a mark with a high degree of distinctiveness.  The company has now grown, after its acquisition of Carter Paper Company, to a $14 million company.  R. McLeod Aff. at ¶ 15.  It continues to advertise through Yellow Pages and event sponsorship, R. McLeod Aff. at ¶ 16, becoming one of New England's medium size independent packaging distributors.  R. McLeod Aff. at ¶ 17.

Thus, the marks "McLeod Packaging Systems" and "Carter-McLeod Paper and Packaging" are distinctive marks entitled to trademark protection.

(2) Likelihood of Confusion.

In the First Circuit, courts consider the following factors when deciding whether there is likelihood of confusion:  the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; defendants' intent in adopting its mark; and the strength of plaintiff's mark.  *Pignons S.A.*, 657 F.2d at 487; *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 15 (1st Cir. 2004).  Any other factors that have a tendency to influence the impression conveyed to prospective purchasers by the allegedly infringing conduct may also be considered.  *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996).  No one factor is determinative, but each must be considered.  *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir.1989).  In this case, <u>all</u> factors weigh in favor of Plaintiff, leaving no question whatsoever as to likelihood of confusion.

First, it is clear that Donald McLeod's intent in adopting the mark was to create as much confusion as possible. He did not independently devise the name of his new company; instead, he used the exact name by which the Plaintiff has been known for over six years, a name that Plaintiff used while Donald McLeod himself served as officer, director, shareholder and salesperson. R. McLeod Aff. at ¶¶ 2, 4, 12, 18. This intentional conduct creates a rebuttable presumption of likelihood of confusion. *See Boston Athletic Ass'n*, 867 F.2d at 34 (holding that "in cases of intentional copying, the second comer is generally presumed to have intended a confusing similarity of appearance and to have succeeded in doing so.").

The legitimacy of the presumption is validated by Donald McLeod's and Morten Hazzard's overt and intentional acts designed to take advantage of this deliberately created confusion. For example, Donald McLeod led a Carter-McLeod Packaging supplier to believe that he was still affiliated with Carter-McLeod Packaging, so that the supplier would reopen an account. R. McLeod Aff. at ¶ 29(d). By doing so, he avoided the difficulty and time involved with opening a legitimate account in his own name, on the merits of his own business trustworthiness. Donald McLeod also appears to have used the same tactic with a financial credit organization, Nationwide; Carter-McLeod Packaging received a letter that "McLeod Packaging System" was pre-qualified for a $100,000 equipment line of credit because "for the last 12 months, you have maintained an excellent score." R. McLeod Aff. at ¶ 29(b) and Tab 7. Carter-McLeod Packaging did not speak with Nationwide, did not request a line of credit from Nationwide, and McLeod Packaging Systems has also not been in business for twelve months, so it could not have its own "excellent score" based on the past 12 months. R. McLeod Aff. at ¶ 29(b). It appears that McLeod Packaging Systems is taking calculated advantage of the credit

worthiness of Carter-McLeod Packaging and the confusion over the similarity in the names to its own unfair advantage.

Defendants also tried to do the same with customers. An email sent out by Morten Hazzard soliciting business for McLeod Packaging Systems over a month after he left Carter-McLeod Packaging contains a signature block with the Plaintiff's name and address. R. McLeod Aff. at ¶ 29(f) and Tab 8. A customer could reasonably interpret that there is some association or affiliation between Carter-McLeod Packaging and McLeod Packaging Systems as a result of Morten Hazzard's deliberate disinformation. R. McLeod Aff. at ¶ 29(f).

Second, the Plaintiff's mark "McLeod Packaging Systems" and Defendants' mark "McLeod Packaging Systems" are identical. Defendants' use of "McLeod Packaging Systems" is also similar to the "Carter-McLeod Paper and Packaging" mark. As already noted, Carter-McLeod Packaging deliberately retained the words "McLeod" and "Packaging" in the mark in order to keep and build on the already-existing goodwill when combined with the well-recognized "Carter Paper" identity. R. McLeod Aff. at ¶ 9. Defendants' infringing mark is incorporated virtually in full within the longer "Carter-McLeod Paper and Packaging" mark, sharing both the distinctive word "McLeod" and the distinctive word "Packaging" with Plaintiff's mark. Thus, Defendants' mark "McLeod Packaging Systems" is identical to one of Plaintiff's marks, "McLeod Packaging Systems," and very similar to the other, "Carter-McLeod Paper and Packaging." This factor favors Plaintiff.

Third, the parties' goods are identical. Plaintiff Carter-McLeod Packaging sells packaging supplies, equipment and related services. R. McLeod Aff. at ¶ 24. Defendant McLeod Packaging Systems sells exactly what Carter-McLeod Packaging sells, packaging

supplies and equipment, along with related support services.  *Id.*  There is an identity of goods and services and this factor therefore favors Plaintiff.

Fourth, the two companies' channels of trade, advertising, classes of customers and actual customers are identical.  These three categories are often considered together because they are closely related.  *Boustany*, 42 F. Supp. 2d at 108, citing *Pignons S.A.*, 657 F.2d at 488; *R.J. Toomey Co. v. Toomey*, 683 F. Supp. 873, 877 (D. Mass. 1988).  It is beyond dispute that two companies located the same geographic area selling the same products have overlapping channels of trade, advertising and prospective purchasers.  In this case, not only are the prospective purchasers the same, but, indeed, Robert McLeod and Morten Hazzard have actively solicited Carter-McLeod Packaging customers, including Ken's Foods, Kraft Foods (Veryfine), H.P. Hood, and Milton Bradley.  R. McLeod Aff. at ¶ 28.  These factors also favor Plaintiff.

Fifth is actual confusion.  When a preliminary injunction is sought shortly after the infringing mark first appears, proof of actual confusion is frequently not available.  *McNeil-PPC*, 2004 WL 3316380, at *13, citing *DeCosta v. Columbia Broadcasting Sys., Inc.*, 520 F.2d 499, 512 (1st Cir. 1975).  Here, however, there is a significant amount of actual confusion, which is highly probative.  "Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion.  Actual confusion is such persuasive evidence of the likelihood of confusion that even a minimal demonstration of actual confusion may be significant."  *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 45 (D. Mass.1995) (internal citations omitted).

As already described, Donald McLeod and Morten Hazzard have diligently worked to create confusion in the marketplace.  *See* p. 11-12, *supra*.  There is further evidence of actual confusion:

- In January, 2005, Robert McLeod received a telephone call from Grif-Bak Warehouse in Holyoke, Massachusetts, Carter-McLeod Packaging's outside warehouse for more than six years, calling to ask what to do with a shipment it had received for "McLeod Packaging Systems." Apparently, McLeod Packaging Systems began warehousing product at the same warehouse and Grif-Bak thought that the product belonged to Carter-McLeod Packaging. R. McLeod Aff. at ¶ 29(a).

- Carter-McLeod Packaging has received misdirected mail intended for McLeod Packaging Systems, Inc., including an April 5, 2005 payment from Ben & Jerry's sending payment to Carter-McLeod Packaging's address made payable to McLeod Packaging Systems, LLC. Carter-McLeod Packaging returned the check to Ben & Jerry's, but nevertheless received another payment on April 14, 2005, sent to Carter-McLeod Packaging's address made payable to McLeod Packaging Systems, LLC. Therefore, despite having once corrected Ben & Jerry's, it sent another payment a second time with the same error. R. McLeod Aff. at ¶ 29(b).

- Carter-McLeod Packaging has received numerous telephone calls either intended for Donald McLeod or Morten Hazzard at McLeod Packaging Systems or otherwise seeking clarification regarding the relationship between the two companies. R. McLeod Aff. at ¶ 29(c).

- On May 10, 2005, Robert McLeod received a telephone call from a customer service representative at Country Bank for Savings and was informed it was returning a check for insufficient funds that had been drawn on an account of McLeod Packaging Systems, LLC that had a zero balance. The check was written by Jennifer Cushman, Donald McLeod's wife and a former employee of both McLeod Packaging Systems, LLC and Carter-McLeod Packaging, and who now works for McLeod Packaging Systems. Most charitably McLeod Packaging Systems itself was confused by the similarity of the names McLeod Packaging Systems, LLC and McLeod Packaging Systems, Inc., although quite possibly McLeod Packaging Systems, Inc. made a deliberate attempt to convert funds of Carter-McLeod Packaging. R. McLeod Aff. at ¶ 29(e).

Given the deliberate confusion intentionally generated by Defendants, along with this evidence of actual confusion, this factor, like all of the rest, favors Plaintiff and demonstrates the necessity of an immediate injunction.

Sixth, as noted *supra* at p. 4-10, Plaintiff's marks are strong because they are inherently distinctive with secondary meaning. This factor favors Plaintiff.

14

Lastly, there are also factors outside of the *Polaroid* framework that are relevant to a likelihood of confusion here. *See International Ass'n of Machinists*, 103 F.3d at 201 (noting that court may consider relevant factors other than the *Polaroid* factors). Here, in addition to the fact that Donald McLeod adopted the name "McLeod Packaging Systems" to deliberately trade on the goodwill of the Carter-McLeod Packaging name, as already discussed, he and Morten Hazzard are also in personal contact with customers. R. McLeod Aff. at ¶ 4, 12, 25. It is therefore a situation where, first, Donald McLeod and Morten Hazzard were salesmen working on behalf of McLeod Packaging Systems, then were working for Carter-McLeod Packaging, and are now working for McLeod Packaging Systems, an entirely different company. Customers are therefore being contacted by the same Donald McLeod and Morten Hazzard they dealt with before, and may reasonably assume that they are dealing with the same "McLeod Packaging Systems" as they had dealt with in the past when they are decidedly not.

The fact that the original McLeod Packaging Systems is the predecessor to what is now known as "Carter-McLeod Paper and Packaging" is also a factor that contributes to likelihood of confusion. Consumers are familiar with the name change of the company, R. McLeod Aff. at ¶ 10, and would therefore be less apt to distinguish that Donald McLeod's new company is different from Carter-McLeod Packaging. *See Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 413 (7th Cir. 1994) (in a suit brought nine years after the team moved, finding that BALTIMORE CFL COLTS was confusingly similar to INDIANAPOLIS COLTS in part because the predecessor team of the INDIANAPOLIS COLTS was the BALTIMORE COLTS).

In summary, every single factor overwhelming favors Carter-McLeod Packaging. Defendants' use of "McLeod Packaging Systems" cannot be allowed to continue.

15

(3) <u>Use of the Marks in Interstate Commerce.</u>

Because the Lanham Act is federal law arising under the Commerce Clause, a plaintiff must demonstrate that its use is in interstate commerce for this Court to have subject matter jurisdiction. Plaintiff sells goods in Massachusetts, as well as to New York, New Jersey, and Virginia. R. McLeod Aff. at ¶ 3. It is therefore in interstate commerce. *See Boustany*, 42 F.Supp.2d at 107 (stating that "commerce" is defined as broadly as the definition of commerce employed in any other federal statute).

**B. <u>Irreparable Harm.</u>**

In cases involving a trademark harm, the harm is necessarily irreparable: "[b]y its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law." *Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992). Therefore, on a motion for preliminary injunction, if the plaintiff successfully shows a likelihood of success on the merits, the irreparable harm prong of the analysis is presumed. *Keds Corp.*, 888 F.2d at 220.

As described above in detail, Plaintiff is suffering harm to its goodwill every day that suppliers and customers are confusing McLeod Packaging Systems with Plaintiff Carter-McLeod Packaging. Defendants have obtained credit to which they are not entitled and confused customers and vendors alike. Everyone is confused, and this confusion will redound on Plaintiff to its great harm. The incident with Ben & Jerry's is one example; although Ben & Jerry's was advised that the companies were different, it nevertheless made the same error again. R. McLeod Aff. at ¶ 29(b). The situation will not improve; Defendants have only been in business for a short period and the frequency of incidents can only increase. Defendants must be enjoined

so that Plaintiff can recover from the damage already caused and recoup its reputation before it is too late.

**C.  The Injury Outweighs The Harm Of Granting The Injunction.**

Defendants here will not be harmed.  Donald McLeod deliberately adopted the name "McLeod Packaging Systems" in order to reap what he has not sown, that is, to take advantage of the confusion he causes by trading on the goodwill of the "McLeod Packaging Systems" name.  Donald McLeod and Morten Hazzard may engage in fierce competition with Plaintiff for market share and for customers, but simply must do it fairly.  All that Defendant company must do is change a name that it adopted only a few months ago.  It does not have to cease doing business, but only compete on a level field instead of on one it has unfairly tipped to its advantage.

**D.  The Injunction Will Not Adversely Affect The Public Interest**

The only public interest involved here is the right of consumers to not be confused about the true source of goods and services that they receive.  The public interest is served by enjoining Defendants.  *See Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F. Supp. 120, 122 (D. Mass. 1996).

Thus, there is no reason whatsoever that Defendants should be allowed to continue to trade on Plaintiff's goodwill, confusing consumers and harming the good name that it worked so hard to develop.

**III. THE COURT SHOULD ENJOIN THE DEFENDANTS FROM USING CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION.**

**A.  Likelihood Of Success On Plaintiff's Conversion Claim.**

In order to prove conversion, a plaintiff must show that defendant(s) have intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which

they had no right of possession at the time. *Grand Pacific Fin. Corp. v. Brauer*, 57 Mass. App. Ct. 407, 412, 783 N.E.2d 849, 857 (2003) (conversion of funds in escrow account). Contrary to the emphatic denial through counsel that the Defendants had not "removed, transferred or converted confidential and proprietary information from Carter-McLeod," a forensic analysis of Morten Hazzard's hard drive, which the Plaintiff paid an expert in the field to conduct, reveals that Morten Hazzard emailed highly sensitive documents to his personal email account just prior to resigning and going to work for Donald McLeod's McLeod Packaging Systems. R. McLeod Aff. at 26 and Tab 6. The analysis by Carter-McLeod Packaging's forensic computer expert establishes a clear likelihood of success on the merits of its conversion claims against Defendants.

### B. **Irreparable Harm.**

This information includes highly sensitive and confidential customer data, data that Donald McLeod has converted to his advantage as a formula presumably to steal Carter-McLeod Packaging's clients. Specifically, the information removed consists of the deviated price lists for Carter-McLeod Packaging's largest and most valued clients. R. McLeod Aff. at 27. The deviated price lists, include, among other information, the varying prices of product provided by vendors to Carter-McLeod Packaging based on the intended purchaser from Carter-McLeod Packaging. *Id.* This information gives a Carter-McLeod Packaging competitor clear advantages in negotiating with vendors for prices and pricing product for targeted customers. *Id.* Additionally, such deviations, if shared with Carter-McLeod Packaging's customers could have a substantially adverse impact on its relationships with customers who believe that they have been unfairly charged as compared with other customers. *Id.*

To the extent that Defendants were to use the converted documents in an unfair and unlawful manner, it would be virtually impossible for the Plaintiff to prove or place a value on

the resulting lost profits or other damages from such conduct. *Frank D. Wayne Assocs., Inc. v. Lussier*, 16 Mass. App. Ct. 986, 988-89, 454 N.E.2d 109, 111-12 (1983) (stating that lost profits are notoriously difficult to prove and that it was "wholly appropriate" for the trial judge to "seek to minimize the harm that final relief can not redress" by issuing a preliminary injunction).

### C.  The Injury Outweighs The Harm Of Granting The Injunction And The Public Interest Will Be Served By Injunctive Relief.

The requested injunction seeks merely to preclude the Defendants from using documents unlawfully converted from Carter-McLeod Packaging. While the Plaintiff stands to lose potentially substantial but immeasurable profits if the injunction is not issued, the Defendants will merely be precluded from capitalizing on the use of misappropriated proprietary information. Precluding the use of unlawfully acquired information also serves the public interest.

### IV.  THE COURT SHOULD ENJOIN THE DEFENDANTS FROM FURTHER DEFAMING OR DISPARAGING THE PLAINTIFF.

### A.  Likelihood Of Success On Plaintiff's Defamation Claim.

To prevail on a claim of defamation, a plaintiff must establish that the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionaable without proof of economic loss. *White v. Blue Cross and Blue Shield of Mass., Inc.*, 442 Mass. 64, 66, 809 N.E.2d 1034, 1036 (2004), citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30, 782 N.E.2d 508, 511-12 (2003). Where, as here, the words prejudice a plaintiff in its profession or business, there is slander *per se* and economic loss need not be proven. *Ravnikar*, 438 Mass. at 630, 782 N.E.2d at 512; *Lyman v. New England Newspaper Publ'g Co.*, 286 Mass. 258, 261, 190 N.E. 542, 543 (1934).

19

At or around the time Donald McLeod formed McLeod Packaging Systems, he told at least two of Carter-McLeod Packaging's vendors that the Plaintiff was experiencing financial difficulty and could not meet various obligations to its customers, vendors and creditors.  R. McLeod Aff. at  30.  As a result, one of Carter-McLeod Packaging's vendors, Malpack, refused to ship product on credit to one of our customers, demanding payment up front.  *Id.*  At the time Malpack demanded the up front payment, Carter-McLeod Packaging had a zero balance and had given it no reason to question the company's credit worthiness.  *Id.*  In addition, immediately after Donald McLeod left the company, Phil Gonsalves, a Vice President with Country Bank for Savings, froze Carter-McLeod Packaging's operating line of credit.  *Id.*  Donald McLeod's conduct and the resulting adverse economic consequences is sufficient to establish a likelihood of success on Plaintiff's defamation claim.

**B.  <u>Irreparable Harm.</u>**

As a consequence of the Defendants action, the Plaintiff has been impaired in its business dealings, by the loss of credit and damage to its reputation as a trustworthy and sound business. R. McLeod Aff. at 30.  The harm caused by the Defendants' defamation is unquantifiable and potentially fatal to the Plaintiff, if not enjoined.

**C.  <u>The Injury Outweighs The Harm Of Granting The Injunction And The</u>**
**<u>Public Interest Will Be Served By Injunctive Relief.</u>**

The requested injunction seeks merely to preclude the Defendants from continuing in conduct that the law prohibits.  The only impact on the Defendants of the requested injunction is the loss of any competitive advantages that they may gain by unlawfully damaging Carter-McLeod Packaging's competing business.  This impact is far outweighed by the potential damage to Carter-McLeod Packaging's business that may result from ordering the Defendants to

refrain from making further unlawful defamatory statements about the Plaintiff.  Precluding such unlawful conduct also serves the public interest.

## **CONCLUSION**

Defendants must be ordered to cease using the name and mark "McLeod Packaging Systems," cease using Plaintiff's proprietary business information, and cease slandering Plaintiff. Plaintiff therefore respectfully asks that this Court order Defendants to:

(1) cease using the name and mark "McLeod Packaging Systems" or otherwise representing that they are associated or affiliated with the Plaintiff when they are not;

(2) account for all copies of documents converted by the Defendants from the Plaintiff and to return, destroy, and cease or refrain from using them; and

(3) cease and refrain from making false and disparaging statements or remarks either orally or in writing about the Plaintiff.

Respectfully submitted,
Plaintiff
CARTER-MCLEOD PAPER &
PACKAGING COMPANY, INC.
By Its Attorneys:

Dated: May 24, 2005

/s/ Jeffrey E. Poindexter
Francis D. Dibble, Jr. – BBO No. 123220
Jeffrey E. Poindexter – BBO No. 631922
Pamela S. Chestek – BBO No. 647124
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115-5507
Tel:  (413) 781-2820
Fax:  (413) 272-6805
fdibble@bulkley.com
jpoindexter@bulkley.com
pchestek@bulkley.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
|  |  | Civil Action No. 3:05-cv-30087-MAP |
| CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC. | ) |  |
|  | ) |  |
|  | ) |  |
| Plaintiff | ) |  |
|  | ) | AFFIDAVIT OF ROBERT H. McLEOD |
| v. | ) |  |
|  | ) |  |
| DONALD McLEOD; McLEOD PACKAGING SYSTEMS and MORTEN HAZZARD | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| Defendants. | ) |  |

I, Robert H. McLeod, being duly sworn, depose and say:

I currently am the President of Carter-McLeod Paper and Packaging Company, Inc. ("Carter-McLeod Packaging").  I submit this affidavit in support of Carter-McLeod Packaging's Motion for Preliminary Injunction.

1.      I am the current President and a founder of Carter-McLeod Packaging.  Donald McLeod, one of the defendants, is my nephew.

2.      McLeod Packaging Systems, LLC was formed in September 1998 and was located in West Springfield, Massachusetts.  The company was a closely-held limited liability company with four shareholders and officers: myself (Chief Executive Officer), Donald McLeod (President), Alan Chadwick (Vice President), and Robert Carver (Vice President).  The stated purpose of the company was to "supply packaging material supplies and equipment and any business related thereto or in useful connection therewith . . . ."  A copy of the McLeod Packaging Systems, LLC Certificate of Organization is attached hereto at **Tab 1**.

3.     Beginning in September 1998, McLeod Packaging Systems, LLC used in interstate commerce the mark "McLeod Packaging Systems" in association with the distribution, sale, servicing and supplying of packaging materials, packaging equipment, and parts for packaging equipment in the Greater Springfield area and other parts of New England.  McLeod Packaging Systems, LLC also sold goods to customers in New York, New Jersey, and Virginia and Carter-McLeod Packaging continues to sell to customers in these states and others today.

4.     Donald McLeod, as a salesperson and President of McLeod Packaging Systems, LLC, conducted business on behalf of that company.  McLeod Packaging Systems, LLC compensated Donald McLeod and other employees to provide services and develop business and goodwill for the benefit of McLeod Packaging Systems, LLC.

5.     From September 1998 to October 2001, sales of McLeod Packaging Systems, LLC grew from $0 to over $3,000,000, and developed approximately 150 customer accounts based on the investment of time and money devoted by the company to develop the company and its goodwill.

6.     In addition to time and other investments in the goodwill of the company, McLeod Packaging Systems, LLC spent in excess of $15,000.00 on advertising between September, 1998 and October, 2001.  From 1998 to October 2001, McLeod Packaging Systems, LLC advertised in the Springfield, Holyoke, Hampshire County, Northampton, Amherst, and Easthampton Area Yellow Pages, plus directory listings in these publications.  In addition, McLeod Packaging Systems, LLC advertised through the publishing of brochures, business cards, literature labels, machine labels, letterhead stationary, envelopes and lettering on two service vans.  McLeod Packaging Systems, LLC sponsored various charitable organizations such

as the "Hole in the Wall Gang" through our customer Ken's Foods, the John LeClair Foundation, Knights of Columbus golf tournament and the Vermont Pure Springs Bob Bierley Memorial Golf Tournament.

7.      McLeod Packaging Systems, LLC also was recognized in at least one national trade publication, Packaging Digest, for its role in the sale of packaging machinery to the Wright Line company of Worcester.  The company also participated in trade shows and the like, including participation and marketing efforts at the New England (Northeast) Packaging Show in Marlboro, Massachusetts in the Spring of 2000.

8.      In or around October 2001, McLeod Packaging Systems, LLC purchased an entity known as Carter Paper Company**,** a smaller company in sales that had been in business for approximately 107 years.  On or around October 12, 2001, the principals of McLeod Packaging Systems, LLC formed Plaintiff Carter-McLeod Packaging, a closely held corporation, to continue the businesses of both McLeod Packaging Systems, LLC and Carter Paper Company. Carter-McLeod Packaging continued to maintain its principal place of business in West Springfield Massachusetts.  Specifically, Carter-McLeod Packaging's stated purpose in its Articles of Incorporation is "[t]o engage in the distribution and sale of industrial paper products and package films and supplies; the distribution, sale, servicing and supplying of parts for packaging equipment, and to carry on any business incidental or related thereto."  Carter-McLeod Packaging's primary shareholders and officers were myself (Chief Executive Officer); Donald McLeod (President), and Alan Chadwick (Vice President).  Each of these individuals were also officers and shareholders of McLeod Packaging Systems, LLC.  Copies of the Articles of Incorporation for Carter-McLeod Packaging are attached hereto as **Tab 2.**

9.     The principals of McLeod Packaging Systems, LLC merged the names of the two predecessors Carter Paper and McLeod Packaging Systems when creating the new company name "Carter-McLeod Paper and Packaging Company, Inc." in order to retain and continue to benefit from the goodwill developed and/or purchased in both companies.

10.     Although Carter-McLeod Packaging was a newly-formed corporation, its public identity was as the continuation of McLeod Packaging Systems, LLC.  Most of the customers who knew us as McLeod Packaging Systems, LLC are still with us as Carter-McLeod Packaging. Carter-McLeod Packaging retained the main telephone and facsimile numbers that it had used as McLeod Packaging Systems, LLC.

11.     The name of the entity originally formed as McLeod Packaging Systems, LLC was changed to McLeod, McLeod and Chadwick, LLC.  It still exists today as a real estate holding company.

12.     In or around October 2001, Donald McLeod became a 40% shareholder, director and President of Carter-McLeod Packaging.  Following the organization of Carter-McLeod Packaging, McLeod Packaging Systems, LLC's officers, shareholders and salespeople, including Donald McLeod, continued to buy from, sell to and otherwise deal with its clients, customers, vendors and suppliers on behalf of Carter-McLeod Packaging.

13.     Carter-McLeod Packaging is still known today as McLeod Packaging Systems. We still receive invoices from companies sent to our current address and addressed to "McLeod Packaging Systems."  Two examples are attached at **Tab 3**.

14.     By October 2001, McLeod Packaging Systems, LLC, in addition to other products, goods and equipment, had sold approximately 100 packaging machines with metal

placards attached containing the  name "McLeod Packaging Systems," its logo (consisting of a rectangular box with the letters "MPS" in a diagonal orientation) and contact telephone number. The telephone number on the "McLeod Packaging Systems" placards is a current Carter-McLeod Packaging telephone number.  The purpose of the placards is to identify the seller of the equipment, as a continuing advertisement for the maintenance and servicing of the machine and as a contact for future machine and equipment needs.  The machines on which placards are attached range in life from five to twenty years.  Carter-McLeod continues to maintain and service machines with the referenced placard.  A true and accurate copy of a placard identical in all material respects to the placards placed on the referenced packaging machines is attached hereto as **Tab 4**.

15.    From October 2001 to present, Carter-McLeod Packaging has substantially grown its customer base and has grown from approximately $6,000,000.00 to approximately $14,000,000.00 in 2004 based, in part, on the time and money expended by the company on building its customer base and goodwill.

16.    From October 2001 to present, Carter-McLeod Packaging has spent approximately $16,000 in advertisements, sponsorships and contributions.  Carter-McLeod Packaging has advertised in the Greater Springfield and Holyoke Area Yellow Pages, plus directory listings in these publications.  In addition, Carter-McLeod Packaging advertises through the publishing of brochures, business cards, literature labels, machine labels, letterhead stationary, envelopes and lettering on three service vans and four delivery trucks.  Carter-McLeod Packaging is a sponsor, through our customer Ken's Foods, of the Hole in the Wall Gang, The United Way and the New England Air Museum.

17.     From October 2001 to present, Carter-McLeod Packaging would be classified, based on dollars sales, as a medium size independent packaging distributor in New England.

18.     Donald McLeod remained an officer, director and shareholder of Carter-McLeod Packaging until December 15, 2004.

19.     In or around December of 2004, Carter-McLeod Packaging and its other officers, shareholders and directors learned that Donald McLeod had converted substantial funds from the company, paid himself inflated commissions, purchased substantial amounts of personal items with company funds and/or on company credit and had otherwise defrauded Carter-McLeod Packaging and breached his fiduciary duties as officer, director and shareholder.

20.     On December 15, 2004, Carter-McLeod Packaging's Board of Directors, in accordance with the bylaws of Carter-McLeod Packaging, voted to terminate the employment of Donald McLeod, effective immediately, to redeem his shares and to appoint me as President. Donald McLeod was required under the corporate bylaws to turn his stock certificates over to the Secretary of Carter-McLeod Packaging by January 14, 2005.

21.     On or around December 23, 2004, Shortly after Carter-McLeod Packaging terminated Donald McLeod's employment and called his shares, but while Donald McLeod was still a director of Carter-McLeod Packaging and a shareholder in redemption, Donald McLeod formed the Defendant company McLeod Packaging Systems, Inc. ("McLeod Packaging Systems").  A copy of the McLeod Packaging Systems' Certificate of Organization is attached hereto at **Tab 5.**

22.     According to its Articles of Organization, Donald McLeod was named President, Treasurer and Secretary of McLeod Packaging Systems and is its sole shareholder.  See **Tab 5.**

23.    McLeod Packaging Systems' business purpose according to its Articles of Organization is "[t]o deal in all types and kinds of packaging materials, supplies, and equipment and any business related thereto or useful in connection therewith, and other lawful business." See **Tab 5.**

24.    McLeod Packaging Systems' business purpose is the same as or similar to Carter-McLeod Packaging's business purpose and, to the best of my knowledge, McLeod Packaging Systems currently sells the same items Carter-McLeod Packaging sells – packaging supplies and equipment, along with related support services.

25.    On January 3, 2005, Morten Hazzard, a Carter-McLeod Packaging purchasing manager who was hired and supervised by Donald McLeod, resigned from his position at Carter-McLeod Packaging and went to work for McLeod Packaging Systems.  Morten Hazzard's resignation immediately followed a one-week vacation from Carter-McLeod Packaging.

26.    Records reflect that on December 20, 2004, just prior to his vacation and subsequent resignation, Morten Hazzard transferred proprietary and confidential business records, files and documents from Carter-McLeod Packaging's computer system to his own personal email account and/or computer.  Specifically, Carter-McLeod Packaging retained a computer specialist to conduct a forensic computer analysis of the computer hard drive used by Morten Hazzard at Carter-McLeod Packaging, the results of which revealed the referenced transfer of confidential information.  The information taken is confidential, highly sensitive, and potentially very damaging to Carter-McLeod Packaging in the hands of a competitor.  A copy of the email, without the attached confidential documents, is attached hereto at **Tab 6.**

27.    Some of the information removed consists of the deviated price lists for Carter-McLeod Packaging's largest and most valued clients.  The deviated price lists include, among other information, the varying prices of product provided by vendors to Carter-McLeod Packaging based on the intended purchaser from Carter-McLeod Packaging.  If a Carter-McLeod Packaging competitor has this information, it can use the information to negotiate with vendors for more favorable prices and in pricing product for targeted customers.  Additionally, such deviations, if shared with Carter-McLeod Packaging's customers, could have a substantially adverse impact on our relationships with our customers, who might believe that they have been unfairly charged as compared with our other customers.

28.    McLeod Packaging Systems conducts business in the same area and through the same channels of trade as Carter-McLeod Packaging.  Carter-McLeod Packaging has learned from the following customers that they have been solicited by and or have conducted business with Donald McLeod and/or Morten Hazzard following their departure from Carter-McLeod Packaging and the formation of McLeod Packaging Systems:  Kens Foods, CPF, Catania Spagna, Little Rill, Sullivan Paper, Tube Products, Jen-Coat, Kraft Foods (Veryfine), Southern States, Jaffco, H.P. Hood, Mayer Brothers, Olympic Manufacturing, John R. Lyman, Data Mail, OK Pet Supply, Heat Fab, Bozzuto's, Milton Bradley, American Disposables, Country Pure Foods, Vertis, Curtis Business Forms, Vermont Pure/Clear Source, Omya, Capital City Press, and Dartmouth Printing.

29.    The use by Donald McLeod and McLeod Packaging Systems of Carter-McLeod Packaging's name and mark has caused and continues to cause actual confusion as evidenced by

the following examples of specific instances of confusion and attempts by the defendants to capitalize on the established goodwill in that name:

a.  In January 2005, I received a telephone call from Grif-Bak Warehouse in Holyoke, Massachusetts, Carter-McLeod Packaging's outside warehouse for more than six years, calling us to ask what to do with a shipment it had received for McLeod Packaging Systems.  Apparently, McLeod Packaging Systems began warehousing product at the same warehouse and Grif-Bak thought that the product belonged to Carter-McLeod Packaging.

b.  We have and continue to receive misdirected mail intended for McLeod Packaging Systems.  Upon advice of counsel, we have copied some of the misdirected mail (attached at **Tab 7**).  This mail includes (1) an April 5, 2005 payment from our customer, Ben & Jerry's (and apparently now McLeod Packaging Systems's customer) sending payment to Carter-McLeod Packaging's address, directed to the attention of Donald McLeod, and made payable to McLeod Packaging Systems, LLC.  We returned this check to Ben & Jerry's.  (2) Another payment on April 14, 2005 from Ben & Jerry's enclosing payment to Carter-McLeod Packaging's address, directed to the attention of Donald McLeod, and made payable to McLeod Packaging Systems, LLC.  Therefore, despite having once corrected Ben & Jerry's, it sent us another payment a second time with the same error.  (3) Correspondence dated May 18, 2005 from Nationwide Finance to the attention of Donald McLeod but directed to Carter-McLeod Packaging's address and fax machine, and naming "McLeod Packaging System."

The letter states that "McLeod Packaging System" was pre-qualified for a $100,000 equipment line of credit because "for the last 12 months, you have maintained an excellent score," meaning a Dunn & Bradstreet score. Carter-McLeod Packaging did not speak with Nationwide and did not request a line of credit from Nationwide. McLeod Packaging Systems has also not been in business for twelve months, so could not have its own "excellent score" based on the past 12 months. It appears that McLeod Packaging Systems is taking advantage of the credit worthiness of Carter-McLeod Packaging and the confusion over the similarity in names to build its own business.

c. Carter-McLeod Packaging has received numerous telephone calls either intended for Donald McLeod or Morten Hazzard at McLeod Packaging Systems or otherwise seeking clarification regarding the relationship between the two companies.

d. In January 2005, I was informed by a customer service representative, Will Moore, of Laddawn Manufacturing that Morten Hazzard reactivated an account that was originally in the name of McLeod Packaging Systems, LLC. I informed Mr. Moore that McLeod Packaging Systems, LLC and McLeod Packaging Systems, Inc. were two separate and unrelated companies and that our credit history with Laddawn Manufacturing was not be used and our old account was not to be reactivated.

e. On May 10, 2005, I received a telephone call from a customer service representative at Country Bank for Savings and was informed that it was returning

a check to us for insufficient funds drawn on an account of McLeod Packaging Systems, LLC that now has a zero balance.  The check was written by Jennifer Cushman, Donald McLeod's wife and a former employee of both McLeod Packaging Systems, LLC and Carter-McLeod Packaging and who now works for McLeod Packaging Systems.  The only reasonable explanations for such conduct I believe are that McLeod Packaging Systems made a deliberate attempt to convert funds of Carter-McLeod Packaging or that the company itself was confused by the similarity of the names McLeod Packaging Systems, LLC and McLeod Packaging Systems, Inc.

f.  Attached at **Tab 8** is a copy of an April 7, 2005 email sent by Morton Hazzard to one of Carter-McLeod Packaging's largest customers, which was given to me by the customer.  Although the email was sent more than a month after Morten Hazzard's departure from Carter-McLeod Packaging, the signature line reads "Morten Hazzard Carter-McLeod Paper and Packaging, Inc."  Because of the misleading signature line, I believe that purchasers may believe that there is a connection between Carter-McLeod Packaging and McLeod Packaging Systems, for example, that "McLeod Packaging Systems" is the packaging subsidiary of Carter-McLeod Packaging.

30.  Donald McLeod also told people, falsely, that Carter-McLeod Packaging was experiencing financial difficulty and could not meet various obligations to its customers, vendors and creditors.  For example, Donald McLeod told Nancy McElvoy, a sales representative for AEP Films, that our company was in financial difficulty.  He also told another vendor of ours,

Malpack, and as a result they refused to ship product on credit to one of our customers, demanding payment up front. At the time they demanded the up front payment we had a zero balance and had given them no reason to question our credit worthiness. In addition, immediately after Donald McLeod left the company, Phil Gonsalves, a Vice President with Country Bank for Savings, froze our operating line of credit.

Signed under the pains and penalties of perjury this _24_ day of May, 2005.

Robert H. McLeod

TAB 1

## MCLEOD PACKAGING SYSTEMS, LLC

## CERTIFICATE OF ORGANIZATION

Pursuant to the Massachusetts Limited Liability Company Act (the "Act"), the undersigned hereby certifies that a limited liability company has been organized under the Act as follows:

1. **Name:** The name of the limited liability company is:

    McLeod Packaging Systems, LLC

2. **Office:** The street address of the office of the LLC in Commonwealth for purposes of the Act is:

    12 Crescent Street, Holyoke, MA 01040

3. **Business of the LLC:** The general character of the business of the LLC is to supply packaging material supplies and equipment and any business related thereto or useful in connection therewith, and any other lawful business purpose or activity permitted by the Act.

4. **Date of Dissolution:** The LLC has no specific date of dissolution.

5. **Resident Agent:** The name and address of the resident agent of LLC for service of process is:

    Donald McLeod
    45 Meadowbrook Lane
    Palmer, MA 01069

6. **Managers:** The LLC will be managed by its members and will have no Managers for purposes of the Act.

7. **Execution of Documents:**

Donald McLeod
45 Meadowbrook Lane
Palmer, MA 01069

Robert McLeod
12 Heritage Circle
Clinton, CT 06413

8. **Authority to Convey Title:**

Any one of the following persons is authorized execute, acknowledge, deliver and record any recordable instrument purporting to effect an interest of real property of the LLC under Section 66 of the Act:

Donald McLeod
45 Meadowbrook Lane
Palmer, MA 01069

Robert McLeod
12 Heritage Circle
Clinton, CT 06413

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Organization as of September 18, 1998.



DONALD MCLEOD

630862

*115*

## COMMONWEALTH OF MASSACHUSETTS

## LIMITED LIABILITY COMPANY
### (General Laws, Chapter 156C)

Filed this ____ 2 4 ___ day of _____ Sept _____

19 __ 98 __.

FEE PAID
$ 500.00
SEP 24 1998

CASHIERS
SECRETARY'S OFFICE

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH

— Lithryn Faratelas

413 - 525 - 5555

TAB 2

**D**



Examiner

Name
Approved

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

### ARTICLES OF ORGANIZATION
(General Laws, Chapter 156B)

012.10216

### ARTICLE I
The exact name of the corporation is:

**CARTER–McLEOD PAPER AND PACKAGING COMPANY, INC.**

### ARTICLE II
The purpose of the corporation is to engage in the following business activities:

To engage in the distribution and sale of industrial paper products and packaging films and supplies; the distribution, sale, servicing and supplying of parts for packaging equipment, and to carry on any business incidental or related thereto.

To have and exercise all powers conferred upon corporations by the laws of the Commonwealth of Massachusetts and to do everything suitable or necessary to accomplish the foregoing purposes, including all acts incidental to or connected therewith, so far as the same be not inconsistent with the laws of the Commonwealth of Massachusetts.

C  ☐
P  ☑
M  ☐
R.A. ☑

P.C.

*Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on one side only of separate 8 1/2 x 11 sheets of paper with a left margin of at least 1 inch. Additions to more than one article may be made on a single sheet so long as each article requiring each addition is clearly indicated.*

108460-1

## ARTICLE III

State the total number of shares and par value, if any, of each class of stock which the corporation is authorized to issue.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| Common: | 200,000 | Common: | None | N/A |
| | | | | |
| Preferred: | None | Preferred: | None | N/A |
| | | | | |

## ARTICLE IV

If more than one class of stock is authorized, state a distinguishing designation for each class. Prior to the issuance of any shares of a class, if shares of another class are outstanding, the corporation must provide a description of the preferences, voting powers, qualifications, and special or relative rights or privileges of that class and of each other class of which shares are outstanding and of each series then established within any class.

N/A

## ARTICLE V

The restrictions, if any, imposed by the Articles of Organization upon the transfer of shares of stock of any class are:

**See ARTICLE V annexed hereto and made a part hereof.**

## ARTICLE VI

**Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or stockholders, or of any class of stockholders:

**See ARTICLE VI annexed hereto and made a part hereof.**

*If there are no provisions state "None".
Note: The preceding six (6) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.

108460-1

## ARTICLE V
### CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC.

Each share of common stock of the corporation is subject to the requirements and restrictions upon the transfer of such shares as hereinafter set forth, which shall be binding upon each stockholder and his or her heirs, assigns, executors, administrators or other legal representatives.

Any stockholder, before transferring any of his or her shares of common stock by sale or otherwise, shall first give written notice thereof to the corporation through the Board of Directors, stating the nature of the proposed transfer, the name of the proposed transferee and the consideration to be received, if any, and shall at the same time offer in writing to sell such shares to the corporation at the book value thereof as hereinafter defined or, in the case of a sale, at the price which he or she has been offered if lower than book value. Book value shall be the book value at the end of the corporate fiscal year next prior to the time of said offer and shall be determined by the accountant then servicing the corporation, using the customary accounting methods of the corporation.

The corporation shall have thirty days from the receipt of such offer to accept it or reject it and if such offer is not accepted within said thirty days it shall be deemed to be rejected. If such offer shall be accepted as above, then the shares so offered shall be sold and transferred to the corporation or its nominee and the transferring stockholder shall be paid the price determined in the manner set forth herein.

If at the end of said thirty days the directors shall not have exercised their right to purchase, then the shares shall be offered to existing stockholders on a pro rata basis and such stockholders shall have the same right as the corporation for an additional thirty days to purchase the stock of such transferring stockholder upon the same terms and conditions, including price, as contained in these restrictions in favor of the corporation.

If at the end of said sixty-day period neither the directors of the corporation nor the stockholders shall have exercised their right to purchase then the transferring stockholder may transfer the stock in the manner and to the person described in the written notice of the transferring stockholder to the Board of Directors.

No shares of stock in the corporation shall be sold or transferred until these provisions have been completely and accurately complied with, but the Board of Directors and stockholders may in any particular instance waive, by written instrument, the requirement for first offering such shares to the corporation and stockholders as set forth herein and the transferring stockholder may transfer the stock in the manner and to the person described in the written notice of the transferring stockholder to the Board of Directors.

**ARTICLE VI**

CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC.

Other lawful provisions for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining or regulating the powers of the corporation, or of its directors or stockholders, or any class of stockholders:

(a)    Meetings of the stockholders of the corporation may be held anywhere in the United States.

(b)    The rights of a stockholder shall not be considered adversely affected by any amendment of the Articles of Organization of the corporation which creates or alters any restriction on transfer of stock and any such amendment is hereby expressly permitted.

(c)    The directors may make, amend or repeal the by-laws in whole or in part, except with respect to any provision thereof which by law or the by-laws requires action by the stockholders.

(d)    The corporation may be a partner in any business enterprise it would have power to conduct by itself.

(e)    A director shall have no personal liability to the corporation or to its stockholders for monetary damages for breach of fiduciary duty as a director notwithstanding any provision of law imposing such liability; but this provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under General Laws Chapter 156B, Section 61 (relating to a distribution to a stockholder while the corporation is insolvent or thereby rendered insolvent) or Section 62 (relating to loans to an officer, director, or a stockholder with 1% of the voting power), or (iv) for any transaction from which the director derived an improper personal benefit.

## ARTICLE VII

The effective date of organization of the corporation shall be the date approved and filed by the Secretary of the Commonwealth. If a *later* effective date is desired, specify such date which shall not be more than *thirty days* after the date of filing.

## ARTICLE VIII

**The information contained in Article VIII is not a permanent part of the Articles of Organization.**

a. The street address (*post office boxes are not acceptable*) of the principal office of the corporation *in Massachusetts* is:

163 Doty Circle, West Springfield, MA 01089

b. The name, residential address and post office address of each director and officer of the corporation is as follows:

| | NAME | RESIDENTIAL ADDRESS | POST OFFICE ADDRESS |
|---|---|---|---|
| President: | Donald D. McLeod | 45 Meadowbrook Lane | |
| | | Palmer, MA 01069 | Same |
| Treasurer: | Robert H. McLeod | 12 Heritage Circle | Same |
| | | Clinton, CT 06413 | |
| Clerk: | Robert H. McLeod | (See above for address) | Same |
| Directors: | Donald D. McLeod | (See above for address) | Same |
| | Robert H. McLeod* | (See above for address) | Same |
| | Thomas Dingman** | 71 Lancashire Road | |
| | | Springfield, MA 01104 | Same |
| | Alan Chadwick*** | 1493 Tarte Road | |
| | | Highgate, VT 05459 | Same |

| | |
|---|---|
| * | Chairman of the Board |
| ** | Vice President Service |
| *** | Vice President Sales |

c. The fiscal year (i.e., tax year) of the corporation shall end on the last day of the month of: December.

d. The name and business address of the resident agent, if any, of the corporation is:

David J. Martel    One Monarch Place — 19th Floor
Springfield, MA 01144-1900

## ARTICLE IX

By-laws of the corporation have been duly adopted and the president, treasurer, clerk and directors whose names are set forth above, have been duly elected.

IN WITNESS WHEREOF AND UNDER THE PAINS AND PENALTIES OF PERJURY, I/we, whose signature(s) appear below as incorporator(s) and whose name(s) and business or residential address(es) *are clearly typed or printed* beneath each signature do hereby associate with the intention of forming this corporation under the provisions of General Laws, Chapter 156B and do hereby sign these Articles of Organization as incorporator(s) this \_\_11\_\_ day of _____October,\_\_\_\_\_ 2001

David J. Martel, Esq.
DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.
One Monarch Place — 19th Floor
Springfield, MA 01144-1900

*Note: If an existing corporation is acting as incorporator, type in the exact name of the corporation, the state or other jurisdiction where it was incorporated, the name of the person signing on behalf of said corporation and the title he/she holds or other authority by which such action is taken.*

210441

## THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF ORGANIZATION
### (General Laws, Chapter 156B)

I hereby certify that, upon examination of these Articles of Organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $ _200.00_ having been paid, said articles are deemed to have been filed with me this _12th_ day of _OCTOBER_ 19 _2001_.

Effective date: _____

*William Francis Galvin*

**WILLIAM FRANCIS GALVIN**
*Secretary of the Commonwealth*

**FILING FEE:** One tenth of one percent of the total authorized capital stock, but not less than $200.00. For the purpose of filing, shares of stock with a par value less than $1.00, or no par stock, shall be deemed to have a par value of $1.00 per share.

### TO BE FILLED IN BY CORPORATION
### Photocopy of document to be sent to:

David J. Martel, Esq.
Doherty, Wallace, Pillsbury and Murphy, P.C.
One Monarch Place – 19th Floor
Springfield, MA 01144-1900

Telephone: _____ (413) 733-3111 _____

108460-1

TAB 3

Olsen's Packaging & Parts Inc.
300 Bryant Lane
Woodbury TN  37190
Tel: (615)563-6318 Fax: (615)563-6321

```
I N V O I C E
No. 144042
```

Page:    1

Sold To: CARTER-MCLEOD PAPER & PKG, INC  Ship To: McLEOD PACKAGING SYSTEMS, LLC
         136 WAYSIDE AVE                          ATTN: TOM
         WEST SPRINGFIELD, MA 01089               136 WAYSIDE AVE
                                                  WEST SPRINGFIELD, MA 01089

         (413)736-1000 Fax:(413)736-2500

| Invoice Date: 02/18/05 | Customer No.: 11746 |
| Ship Date    : 02/18/05 | Sales Person: KB |
| Shipped Via : UPS GROUND | Terms       : NET 30 |
| Order Number: 54102 | FOB         : WOODBURY, TN |

| ID NUMBER | QTY | DESCRIPTION | DSCNT | PRICE | TOTAL |
|-----------|-----|-------------|-------|-------|-------|
| 1350-052 | 2.00RL | 6" x 18 YDS x .003 | 20.00% | 49.860 | ▬▬▬ |
| 1350-035 | 4.00RL | 2" x 36 YDS x .003 | 20.00% | 35.000 | ▬▬▬ |
|  |  | UPS TRACKING #1Z3065770347330847 |  |  |  |

Placed On Account:  ▬▬▬

NO RETURNS AFTER 30 DAYS. NO RETURNS WITHOUT RA #.
A service charge of 1.5% per month may be added to
past due accounts. Customer is responsible for any
legal fees. Shipping may include handling fee.

| Sub Total | : | ▬▬▬ |
| Tax- | : | 0.00 |
| Tax- | : | 0.00 |
| Shipping | : |  |
| Total | : | ▬▬▬ |
| Amount Tend: | 0.00 |
| Balance Due: | ▬▬▬ |

03/01/2005 12:44   14137362500   CARTER INGLES/2   PAGE   02/04

COMPLAINANT
Ex. 11

P.O. Box 689163
Des Moines IA 50368-9163

Return Service Requested


TM

BILLING
DOCUMENTS
ENCLOSED

Presorted
First Class Mail
U.S. Postage Paid
C.C.  S.P.

LAHHSP1 01049

Make Address Changes Below

MC LEOD PACKAGING SYSTEM
ACCOUNTS PAYABLE
136 WAYSIDE AVE
W SPRINGFIELD MA 01089-1316

0012601
B
XIRCE

| | | | | | | |
|---|---|---|---|---|---|---|
| Previous Balance | $ | ▨▨▨ | Closing Date | 02/18/05 | MC LEOD PACKAGING SYSTEM | |
| Payments | -$ | 0.00 | Next Closing Date | 03/22/05 | ACCOUNTS PAYABLE | |
| Credits | -$ | 0.00 | Payment Due Date | 03/15/05 | 136 WAYSIDE AVE | |
| Purchases | +$ | 0.00 | | | W SPRINGFIELD MA 01089-1318 | |
| Debits | +$ | 0.00 | | | | |
| FINANCE CHARGES | +$ | 0.00 | Current Payment Due | $ 0.00 | | |
| Late Fees | +$ | 0.00 | Past Due | $ 0.00 | Credit Limit | $ ▨▨▨ |
| New Balance | =$ | ▨▨▨ | Total Payment Due | $ 0.00 | Credit Available | $ ▨▨▨ |

PAYMENTS, CREDITS, FEES, and ADJUSTMENTS

Total Finance Charges billed in 2004 were    $41.58.

COPY

.......................................................................................................................

Make checks payable to: DELL COMMERCIAL CREDIT          Payment must be received by 2:00 p.m. local time on Payment Due Date.

| 03/15/05 | ▨▨▨ | 0.00 |
|---|---|---|

For proper credit, please write  6011500039148302  on your check & enclose with your payment stub.

MAIL PAYMENTS TO:                          Make Address Changes Below

                                                                    0002601

DEPT. 50 - 0039148302                       MC LEOD PACKAGING SYSTEM        B
DELL COMMERCIAL CREDIT                  ACCOUNTS PAYABLE                XDCR
PO BOX 9020                                    136 WAYSIDE AVE
DES MOINES IA 50368-9020               W SPRINGFIELD MA 01089-1318



6011500039148302008350400000000000000

TAB 4



TAB 5

**D**

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

FORM MUST BE TYPED          **Articles of Organization**          FORM MUST BE TYPED
**(General Laws Chapter 156D; Section 2.02; 950 CMR 113.16)**

### ARTICLE I
The exact name of the corporation is:

MCLEOD PACKAGING SYSTEMS, INC.

### ARTICLE II
Unless the articles of organization otherwise provide, all corporations formed pursuant to G.L. C156D have the purpose of engaging in any lawful business. If you wish to specify more limited purposes, state them below.

To deal in all types and kinds of packaging materials, supplies, and equipment and any business related thereto or useful in connection therewith, and other lawful business.

### ARTICLE III
State the total number of shares and par value, * if any, of each class of stock that the corporation is authorized to issue. All corporations must authorize stock. If only one class or series is authorized, it is not necessary to specify any particular designation.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| | 1,000 | | N/A | |
| | | | | |
| | | | | |

*General Laws Chapter 156D eliminates the concept of par value, however, a corporation may specify par value in Article III. See section 6.21 and the comments relative thereto.*

P.C.

### ARTICLE IV

Prior to the issuance of shares of any class or series, the articles of organization must set forth the preferences, limitations and relative rights of that class or series. The articles may also limit the type or specify the minimum amount of consideration for which shares of any class or series may be issued. Please set forth the preferences, limitations and relative rights of each class or series and, if desired, the required type and minimum amount of consideration to be received.

N/A

### ARTICLE V

The restrictions, if any, imposed by the articles or organization upon the transfer of shares of any class or series of stock are:

See Attachment Sheet - Article V attached hereto and made a part hereof.

### ARTICLE VI

Other Lawful Provisions; if there are no such provisions, this article may be left blank or state "None."

See Attachment Sheet - Article VI attached hereto and made a part hereof.

*Note: The preceding six (6) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment*

### ARTICLE VII

Unless otherwise provided in the articles of organization, the effective date of organization of the corporation is the date and time the articles were received for filing if the articles are not rejected within the time prescribed by law. If a later effective date is desired, specify such date, which may not be later than the 90th day after the articles are received for filing:

January 3, 2005

### ARTICLE VIII

The information contained in this article is not a permanent part of the articles of organization.

    a.  The street address of the initial registered office of the corporation in the commonwealth:
        16 East Hill Road, Brimfield, MA 01010

    b.  The name of its initial registered agent at its registered office:
        Donald D. McLeod

    c.  The names and addresses of the individuals who will serve as the initial directors, president, treasurer and secretary of the corporation:

| | NAME | ADDRESS |
|---|---|---|
| President: | Donald D. McLeod | 16 East Hill Road, Brimfield, MA 01010 |
| Treasurer: | Donald D. McLeod | 16 East Hill Road, Brimfield, MA 01010 |
| Secretary: | Donald D. McLeod | 16 East Hill Road, Brimfield, MA 01010 |
| Director(s): | Donald D. McLeod | 16 East Hill Road, Brimfield, MA 01010 |

    d.  The fiscal year end of the corporation: December 31

    e.  A brief description of the type of business in which the corporation intends to engage: Packaging services

    f.  The street address of the principal office of the corporation is:
        16 East Hill Road, Brimfield, MA 01010

    g.  The street address where the records of the corporation required to be kept in the commonwealth are located:

16 East Hill Road, Brimfield, MA 01010 _____, which is

*(number, street, city or town, state, zip code)*

☑ its principal office;

☐ or an office of its transfer agent;

☐ its secretary/assistant secretary;

☐ or its registered agent.

Signed this 22nd day of December , 2004 by the incorporators whose name and address are listed below:

Signature: _Donald D. McLeod_

Name: Donald D. McLeod _____

Address: 16 East Hill Road, Brimfield, MA 01010 _____

12/27/2004 14:03 FAX 413 785 4658          ROBINSON DONOVAN,P.C.                    ☑006/007

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

### Attachment Sheet to Articles of Organization
of
### MCLEOD PACKAGING SYSTEMS, INC.

ARTICLE V. Restrictions:

(a) Any stockholder, including the heirs, assigns, executors or administrators of a deceased stockholder, desiring to sell or transfer such stock owned by him or them, shall first offer it to the corporation through the Board of Directors in the following manner:

He shall notify the directors of his desire to sell or transfer by notice in writing, which notice shall contain the price at which he is willing to sell or transfer and the name of an independent and impartial arbitrator. The directors shall, within thirty (30) days thereafter, either accept the offer or by notice to him in writing, name a second independent and impartial arbitrator, and these two shall name a third. It shall then be the duty of the arbitrators to ascertain the value of the stock, and if any arbitrator shall neglect or refuse to appear at any meeting appointed by the arbitrators, a majority may act in the absence of such arbitrator. After the acceptance of the offer, or the report of the arbitrators as to the value of the stock, the directors shall have thirty (30) days within which to purchase the same at such valuation, but if at the expiration of thirty (30) days, the corporation shall not have exercised the right to so purchase, the owner of the stock shall be at liberty to dispose of the same in any manner he may see fit. No shares of stock shall be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may in any particular instance waive the requirement. In addition, if an agreement executed by the stockholders contains restrictions on transfer, the terms of such agreement shall control.

(b) Unless otherwise authorized by at least two-thirds of the stockholders of the corporation, no stockholder shall sell or otherwise transfer any shares of stock of the corporation if such sale or transfer shall cause the corporation to cease to be qualified under Subchapter S of the Internal Revenue Code, as amended.

(c) Notwithstanding the foregoing, in the event the stockholders of the Corporation enter into an agreement among themselves or among themselves and the Corporation which imposes restrictions on the transfer of stock or provides for terms and conditions of the sale or transfer of stock of the Corporation, then the restrictions, terms and conditions of such agreement shall control so long as such agreement is in effect.

387108

MA SOC   Filing Number: 200495628400   Date: 12/27/2004 1:53 PM

THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

December 27, 2004 1:53 PM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

121179-1-0

TAB 6

**Poindexter, Jeffrey**

| | |
|---|---|
| **From:** | Morten Hazzard [mhazzard@cartermcleod.com] |
| **Sent:** | Monday, December 20, 2004 4:48 PM |
| **To:** | mortenhaz@yahoo.com |
| **Subject:** | FW: CARTERMCLEOD Summary Deviation Report |

-----Original Message-----
**From:** Gangi, Steve [mailto:steve.gangi@AtlantisPlastics.com]
**Sent:** Monday, December 06, 2004 7:55 AM
**To:** mhazzard@cartermcleod.com
**Subject:** FW: CARTERMCLEOD Summary Deviation Report

Mort,
Here is you updated pricing; Any questions call me or Gwen1
Thank you,
SLG

STEPHEN GANGI
AREA SALES REP.
OFFICE 781-834-5252
FAX    781-834-7272
CELL   918-605-4657

**From:** Henry, Gwen
**Sent:** Tuesday, November 30, 2004 7:22 PM
**To:** Gangi, Steve
**Subject:** CARTERMCLEOD Summary Deviation Report

TAB 7

BEN AND JERRY'S HOMEMADE, INC.   30 COMMUNITY DRIVE, SO. BURLINGTON, VT  05403-6826

DATE   05-APR-05  CUST. ACCT. NO.              VENDOR NAME  MCLEOD PACKAGING SYS  VENDOR NO. 004008140

| INVOICE NO. | INVOICE DATE | DESCRIPTION | DISCOUNT AMOUNT | NET AMOUNT |
|---|---|---|---|---|
| 20109 | 28-FEB-05 | *WP121636 GEARBOX,MOTOR,BRAKE B | 0.00 | 1,584.68 |

| CHECK NUMBER | 303432 | TOTALS | 0.00 | 1,584.68 |
|---|---|---|---|---|

PLEASE DETACH HERE                                    RETAIN THIS PORTION AS YOUR RECORD OF PAYMENT

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT.  CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM.

**BEN & JERRY'S**
VERMONT'S FINEST • ICE CREAM & FROZEN YOGURT.
30 Community Dr.
South Burlington
Vermont
05403-6826

| CHECK DATE | 64-975 | 303432 |
|---|---|---|
| 05-APR-05 | 612 | CHECK NO. |

AMOUNT
******$1,584.68

PAY ONLY

■ ONE THOUSAND FIVE HUNDRED EIGHTY-FOUR DOLLARS AND 68 CENTS **********

TO THE
ORDER OF       **MCLEOD PACKAGING SYSTEMS LLC**

Wachovia Bank
Augusta, GA              VOID OVER $1,584.68

*Edward W. Melomer*

⑈"000030343 2"⑈ ⑆:06 1209756⑆: 20799004 22898⑈"





**MCLEOD PACKAGING SYSTEMS LLC**
136 WAYSIDE AVENUE
WEST SPRINGFIELD, MA 01089-1318
USA





BEN AND JERRY'S HOMEMADE, INC.   30 COMMUNITY DRIVE, SO. BURLINGTON,  VT  05403-6826

DATE    14-APR-05  CUST. ACCT. NO.              VENDOR NAME   MCLEOD PACKAGING SYS   VENDOR NO. 004008140

| INVOICE NO. | INVOICE DATE | DESCRIPTION | DISCOUNT AMOUNT | NET AMOUNT |
|---|---|---|---|---|
| 20130 | 16-MAR-05 | *WP121696 GEARBOX, MOTOR | 0.00 | 1,369.38 |

| CHECK NUMBER | 303667 | TOTALS | 0.00 | 1,369.38 |
|---|---|---|---|---|

PLEASE DETACH HERE                                                                  RETAIN THIS PORTION AS YOUR RECORD OF PAYMENT

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT.  CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM.

**BEN & JERRY'S**
VERMONT'S FINEST • ICE CREAM & FROZEN YOGURT •
30 Community Dr.
South Burlington
Vermont
05403-6828

CHECK DATE
14-APR-05

64-975
612

CHECK NO.
303667

AMOUNT
******$1,369.38

PAY ONLY   ONE THREE SIX NINE   38 CTS CTS

■ ONE THOUSAND THREE HUNDRED SIXTY-NINE DOLLARS AND 38 CENTS *********

TO THE
ORDER OF          MCLEOD PACKAGING SYSTEMS LLC

Wachovia Bank
Augusta, GA

VOID OVER $1,369.38                          Edward W. Melvin

⑈⑈0000303667⑈⑈  ⑈061209756⑈  20799004 22898⑈⑈





04/05/20
$00.3
04/14/20
Mailed From  (
US POST.

**MCLEOD PACKAGING SYSTEMS LLC**
136 WAYSIDE AVENUE
WEST SPRINGFIELD, MA 01089-1318
USA

01089+1318 13     



 **Finance**

NEG-230169

Mc Leod Packaging System
Attn:Don Mcleod
163 Doty Cir
West Springfield, MA 01089

Hi Don,

I'm just touching base with you regarding the $100,000 equipment line of credit that we have Pre-Qualified for Mc Leod Packaging System

We contacted your company earlier this year and and were informed that you may be considering purchasing some equipment. As a reminder, the Pre-Qualified Equipment line of credit that we have available for you is based on your excellent Dunn & Bradstreet credit rating. The scoring system within Dunn & Bradstreet is called a "Paydex" score, and for the last 12 months, you have maintained an excellent score. If you are still considering purchasing any equipment, please call my direct line at 714-214-3101, and reference your NEG-230169

Rates are still holding at record lows so please let me know if there is anything I can do and I look forward to working with you.

As always, Nationwide is committed to helping your business grow!

Sincerely,
Jake Marshall
Senior Account Manager
Direct 714-214-3101

Nationwide Equipment Finance, Inc. is a nationwide lender financing all types of equipment. Our rates are extremely competetive so don't hesitate to call no matter what your equipment needs are.
     Please fax this letter back to 1-208-379-8664 if you wish to be removed from our list.

TAB 8

| From: | Morten Hazzard [mortenhaz@yahoo.com] |
|---|---|
| Sent: | Monday, February 07, 2005 1:35 PM |
| To: | |
| Subject: | Left Carter-McLeod |



Morten
Introduction.doc

Wanted to let you know that I left Carter-McLeod. I am now working for a new company called McLeod Packaging Systems, Inc. The attached is our introduction letter. If I can ever be of any assistance, please let me know.

Thanks
Morten

Morten Hazzard
Carter-McLeod Paper and Packaging, Inc.
136 Wayside Avenue
West Springfield, MA 01089
Phone: (413) 736-1000
Fax: (413) 736-2500

Do you Yahoo!?
Yahoo! Mail - Easier than ever with enhanced search. Learn more.
http://info.mail.yahoo.com/mail_250