UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DISTRICT

CIVIL ACTION NO: 05-30087-MAP

| | |
|---|---|
| CARTER-McLEOD PAPER and | ) |
| PACKAGING, INC., | ) |
|     Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| DONALD McLEOD; | ) |
| McLEOD PACKAGING SYSTEMS, INC.; | ) |
| AND MORTEN HAZZARD, | ) |
|     Defendants | ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

NOW COME the defendants and respectfully oppose the Plaintiff's Motion for Preliminary Injunctive Relief. As reasons for this opposition, the defendants state as follows.

**INTRODUCTION**

The plaintiff, Carter-McLeod Paper and Packaging Company, Inc. ("Carter-McLeod"), brings this Motion arguing that it is entitled to injunctive relief under § 34 of the Trademark Act of 1946, 15 U.S.C. § 1116, and under the State Trademark statute, M.G.L. c. 110B, § 12, barring Donald McLeod (hereinafter "Donald"), Morten Hazzard (hereinafter "Hazzard") and McLeod Packaging Systems, Inc. (hereinafter MPS, Inc.) (collectively, the "defendants") from using the company name and trademark, McLeod Packaging Systems ("MPS"). The plaintiff also seeks injunctive relief to bar the defendants from using the plaintiff's proprietary information and from disseminating false information about the plaintiff. For the reasons which follow, the plaintiff's Motion should be denied because it will be unable to sustain its burden of proving a likelihood of

403459

success on the merits and further because the plaintiff is not entitled to equitable relief based on the doctrine of "unclean hands".

## STANDARD OF REVIEW

A District Court may grant a preliminary injunction in a trademark case when it concludes that the plaintiff has demonstrated (1) that it will suffer irreparable injury if the injunction is not granted; (2) that any such injury outweighs any harm which granting the injunction would cause the defendant; (3) a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. See *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 220 (1st Cir. 1989), *citing Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir. 1981).

## FACTS

The pertinent facts of this case and all supporting documents are described in the Affidavit of Donald McLeod ("Donald") attached hereto and hereinafter referred to as Exhibit 1.

## LEGAL ARGUMENT

### A.    There Should be No Trademark Protection Afforded Carter-Mcleod For the Trademark MPS.

"Trademark law seeks to present one seller from using the same mark as, or one similar to, that used by another in such a way that he confuses the public about who really produced the goods (or service)."  See *Decosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 605 (1st Cir. 1992); *WCVB-TV v. Boston Athletic Ass'n.,* 926 F.2d 42, 43 (1st Cir. 1991).  Carter-McLeod brings this action claiming that it is entitled to injunctive relief against MPS for its use of the unregistered trademark MPS. See plaintiff's Memorandum of Law at 1. (Memorandum of Law hereinafter referred to as "Memorandum" and attached as Exhibit 2).  The general principles qualifying a mark for registration under the Trademark Act are for the most part applicable in determining

whether an unregistered mark is entitled to protection under the Trademark Act. See *Two Pesos,*

*Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992). In order for an unregistered trademark to

be provided protection, the putative owner is required to prove three things: (1) the ownership of

a distinctive mark entitled to trademark protection; (2) its use by another in a manner likely to

cause confusion as to the origin of goods or services; and (3) the use of that mark in interstate

commerce. See *Calamari Fisheries, Inc. v. Village Catch, Inc.,* 698 F. Supp. 994, 1006 (D.

Mass. 1988). Before considering any substantive arguments, this Court should be made aware of

the fact that Carter-McLeod demonstrated its intent to abandon the name MPS after it acquired

Carter Paper Company (hereinafter Carter Paper). Instead, the principles of MPS, LLC elected to

change its business name in favor of Carter-McLeod. See Donald McLeod's Affidavit, ¶¶ 12-13

attached as Exhibit 1. A new company was formed called McLeod, McLeod & Chadwick, LLC

which continues to exist today strictly as a holding company for the real estate in which Carter-

McLeod operates its business. Id. ¶ 17. In other words, the trade name MPS was effectively

abandoned by Carter-McLeod which never renewed the business name MPS, LLC. Given this

undisputed fact, the defendants submit that the veracity of the plaintiff's position that it not only

owns the trademark MPS, but that through its use it is so interwoven with Carter-McLeod so as

to warrant injunctive relief, is questionable at best.

Notwithstanding the above, for the purposes of arguing the substantive law, the plaintiffs

have correctly identified what is known as the "*Abercrombie* spectrum". This spectrum provides

a way of categorizing trademarks in increasing degrees of distinctiveness: (1) generic; (2)

descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. See *Two Pesos, Inc. v. Taco Cabana,*

*Inc.,* 505 U.S. at 768.

The defendants submit that MPS and Carter-McLeod are descriptive terms and can be protected only if they have acquired "secondary meaning" by which consumers associate it with a particular product or source. See *Equine Technologies, Inc. v. EquiTechnology, Inc.,* 68 F.3d 542, 544 n.2 (1st Cir. 1995). The plaintiff argues that the facts require a finding that MPS and Carter-McLeod are eligible for protection both because (1) they are inherently distinctive marks; and (2) they have also acquired secondary meaning as representing the plaintiff, Carter-McLeod. See Exhibit 2 at 7.

**1. The Names Are Not Inherently Distinctive**

The plaintiff argues that the marks Carter-McLeod and MPS must be afforded protection under the Trademark Act because of their inherent distinctiveness. The defendants' state that both of these names are merely descriptive and therefore, must have a acquired secondary meaning in order to be protected. A term is descriptive if it "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Equine Technologies, Inc. v. EquiTechnology, Inc.,* 68 F.3d 542 at 544 *quoting Blinded Veterans Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035, 1040 (D.C.Cir.1989). Merely descriptive terms generally are not entitled to protection under trademark law "both because they are a poor means of distinguishing one source of services from another and because they are often necessary to the description of all goods or services of a similar nature." *A.J. Canfield Co. v. Vess Beverages, Inc.,*796F.2d 903, 906 (7th Cir.1986). In determining whether a particular mark is merely descriptive of a product, a reviewing court must consider the mark in its entirety, with a view toward "what the purchasing public would think when confronted with the mark as a whole." *In re Hutchinson Technology Inc., 852 F.2d 552, 552-54 (Fed.Cir.1988).* Only if a plaintiff has registered its mark with the PTO on the Principal Register, is it entitled to a legal presumption of

validity. *See* 15 U.S.C. § 1115(a). *See Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 161 (1st Cir.1977).

The plaintiff has not provided sufficient evidence that the purchasing public, when presented with any of its product's under the name Carter-McLeod necessarily knows anything more about the business for which the name stands than is described in the words within the name. Certainly, there is a complete lack of evidence that the purchasing public would associate the name MPS as being inherently distinctive of the business known by the name Carter-McLeod.

### 2. The Names Have Not Acquired Secondary Meaning

More is often told about the strength of a party's legal argument by what that party has omitted from its argument than by what it has provided to the Court. In the instant action, the plaintiff fails to disclose that it brought a state administrative claim against the defendants pursuant to M.G.L. c. 156D, § 4.01 for a violation of its trade name which was unsuccessful. See Administrative Complaint and Notice of Decision attached as Exhibit 3 and Exhibit 4, respectively. The Hearing Officer reviewed the administrative claim to determine if the alleged trade name violation was "that which would mislead a person of average intelligence taking into account all of the facts and similarities." See Exhibit 4. Under M.G.L. c. 156D, § 4.01, if there had been a finding that the corporate name, MPS, violated the statute, the Hearing Officer would have ordered its Articles of Incorporation withdrawn as to the name and would have been enjoined MPS from doing business under that name or making any claim to a right to such name. See M.G.L. c.156D, § 4.01. See also, Exhibit 4. Such relief is precisely what the plaintiff seeks in the instant action. Presumably, the plaintiff is hoping for a different result in this Court despite the fact that its administrative complaint made many identical allegations and its evidence was

essentially the same as is offered to this Court. Further, in analyzing whether such similarity existed the Hearing Officer applied principles from common law similar to those used in analyzing trademark infringement. *Id.* See also, Exhibit 3. The Hearing Officer found sufficient differences in the services provided by MPS and Carter-McLeod as well as sufficient evidence that MPS adequately notified vendors and suppliers of the name change to avoid confusion as between Carter-McLeod and MPS. She also found that the plaintiff had provided "no evidence" that MPS "had acquired a secondary meaning such that the consuming public associates the name exclusively with {Carter-McLeod] as a single source." *Id.* [1] While arguably not preclusive, the defendants ask this Court to use the Hearing Officer's Decision as persuasive evidence that the plaintiff does not have a likelihood of success on the merits on the issue of secondary meaning. See *University of Tennessee v.Elliott,* 478 U.S. 788, 795 (1986).

Having examined what the plaintiff failed to tell this Court, the defendants now turn to the substance of the plaintiff's argument.

To begin, the plaintiff's allegation that Donald McLeod ("Donald") intentionally copied the name MPS to take unfair advantage of the goodwill established by MPS, LLC (hereinafter referred to as "LLC")[2] and that such an action is evidence of secondary meaning is not supported by the undisputed facts. See Exhibit 2 at 6. LLC existed for three years prior to the purchase of Carter Paper Company (hereinafter "Carter Paper") in 2001. See Exhibits 1 and 2. Donald had been an owner and officer of LLC as well as an owner and officer of Carter-McLeod and was aware that after the purchase of Carter Paper, LLC decided to change its name and use Carter as

---

[1] The administrative decision was appealed by the plaintiff, pursuant to M.G.L c. 30A, § 14 and is currently pending in the Hampden County Superior Court, Docket Number HDCV2005-00480. See Hampden Superior Court Docket Sheet attached hereto and hereinafter referred to as Exhibit 5.

[2] As stated *supra,* LLC was abandoned in favor of the name Carter-McLeod and a new company was formed, McLeod, McLeod & Chadwick to operated merely as the holding company for the real estate in which Carter-McLeod operates its business. See Exhibit 1 and Affidavit of Robert H. McLeod attached hereto and hereinafter referred to as Exhibit 7.

the first name of the new entity in order to capitalize on Carter paper's 107 year history and goodwill. Exhibit 1.

The facts are clear that Donald was abruptly terminated by the plaintiff in December of 2004[3] after being accused of misappropriating from Carter-McLeod and left with no income to support his family. See Exhibit 1. In order to produce income as quickly as possible, Donald made the decision to go into the line of work which he knew and in which he had professional contacts. Id. It is undisputed that there was no non-compete agreement between Donald and Carter-McLeod. Id. When Donald was terminated by Carter-McLeod, he was well aware that he could not, nor did he desire to, compete with Carter-McLeod in several of the areas of business in which Carter-McLeod operated. *Id.* As evidenced by the product list attached hereto as Exhibit 6, Carter-McLeod, in addition to some packaging services, is in the business of selling janitorial services, food services, safety supplies, staples, copying paper and batteries. None of these services or supplies is provided by MPS. Id. Notably, the word "paper" does not appear in MPS' name because it does not, unlike Carter-McLeod, sell or distribute paper products. Donald's decision was to operate a packaging supply business only. Id.

Given these facts, it is an obvious overstatement by the plaintiff to suggest that there were "an infinite number of options available" to Donald when he was considering a name for his business. See Exhibit 2 at 8. To the contrary, Donald was forced out of the only business he knew and left to quickly begin to generate income. Under the circumstances, it was logical and necessary for him to use the most descriptive name he could for his new company. That name included his surname, which was known to the customers he had worked with for many years, as well as the specific type of business which he was operating, to distinguish it from Carter-

---

[3] This termination is the subject of the defendants' "unclean hands" argument made *infra* as well as an arbitration which will take place in the next few months. See Exhibit 1 and Demand For Arbitration attached hereto and hereinafter referred to as Exhibit 8.

McLeod, which sold more than packaging services and which was intended to be associated with Carter Paper. Id. Donald's decision to take the name MPS is, therefore, not evidence of "secondary meaning" as argued by the plaintiff.

As the plaintiff states in its brief, there are other indicia of secondary meaning including actual confusion, the length and manner of the use, the nature and extent of advertising and promotion of the mark, and efforts made to promote a conscious connection by the public between the trademark and the product's source. See Exhibit 2 at 6, (citations omitted). With regard to each of these factors, the plaintiff has precious little evidence of actual confusion between the two companies. See Exhibit 7 at ¶ 29. See also Exhibit 1 at ¶¶ 36 and 41. By Robert's own Affidavit, the money expended by LLC and Carter-McLeod during the period of time between 1998 to present has been miniscule. See Exhibit 7 ¶ 5. Less than 1% of the total revenues generated by either of these companies was actually used to promote their business in advertising. Id. Notably, the plaintiff provides not one advertisement that was placed to promote its company. And, contrary to the allegation in Robert's Affidavit, LLC was not recognized in at least one national trade publication, Packaging Digest. Rather, McLeod & Dewey, a separate entity entirely from LLC is recognized. See Exhibit 7 at ¶ 7; Exhibit 1 and Article from Packaging Digest attached hereto and hereinafter referred to as Exhibit 9.

The plaintiff states that the fact that it changed its corporate name from McLeod Packaging Systems to Carter-McLeod Paper and Packaging "is of no moment." See Exhibit 2 at 9. That is a convenient position to take without any evidence to support it. Donald, on the other hand, in his Affidavit, states that there was an explicit and specific intention to take advantage of Carter Paper's good will and 107 year history by placing Carter in front of McLeod and to

include the word "Paper" in its new name as indicative of the expansion of its product line and its association with Carter Paper. See Exhibit 1 at ¶ 12.

Another allegation that is unsupported in Robert's Affidavit is that placards bearing LLC's name continue to be used and seen on Carter-McLeod machines. See Exhibit 7 at ¶ 14. This allegation is undermined by the fact that after LLC acquired Carter Paper and changed its name to Carter-McLeod, it printed new placards to be put on all existing and new machinery bearing the name Carter-McLeod. See Exhibit 1 at ¶ 19. See also Carter-McLeod Replacement Placard attached hereto and hereinafter referred to as Exhibit 10.

Equally unavailing is the allegation that Donald set about to deliberately cause or create actual confusion between the names as additional evidence of secondary meaning. See Exhibit 2 at 8. Neither Donald nor anyone on Donald's behalf ever tried to reopen an account that the plaintiff had previously held. See Exhibit 1. Nor did Donald ever try to obtain or obtain financing through a company based on the last 12 months of credit history of Carter-McLeod. *Id.* at ¶ 38. To the contrary, Carter-McLeod's credit history earned them a reputation in the industry, as well as in their Dunn & Bradstreet credit rating, for being slow payers. (See June 6, 2005 Letter from Nancy McEvoy attached hereto and hereinafter referred to as referenced as Exhibit 11; See June 2, 2005 Letter From Troy Wolf to Don McLeod and Payment History attached hereto and hereinafter referred to as Exhibit 12; and Dun & Bradstreet database attached hereto and hereinafter referred to as Exhibit 13). Donald was well aware of these credit issues and never tried to use Carter-McLeod's credit in order to obtain a credit line for MPS. See Exhibit 1. The "evidence" which Robert uses to support this accusation are nothing more than standard solicitations received every day by businesses, including Carter-McLeod and MPS. See Exhibit 14.

403459

As demonstrated *supra*, the evidence that the plaintiff has provided with respect to secondary meaning is woefully inadequate and the Court should find that MPS did not acquire secondary meaning associated with Carter-McLeod sufficient for Carter-McLeod to be entitled to trademark protection.

### 3. No Likelihood of Confusion.

Even if this Court rules that the marks are sufficiently distinctive or that they have acquired secondary meaning and are entitled to protection under the Trademark Act, the likelihood of confusion between the two marks is simply not proven by the evidence. Once the determination has been made that a name is entitled trademark protection, the next critical inquiry becomes whether the allegedly infringing trademark is likely to cause consumer confusion. See *Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir. 1993). In making this determination, the First Circuit uses eight separate factors, each of which requires its own factual findings. See *Aktiebolaget Electrolux v. Armatron Int'l., Inc.,* 999 F.2d 1, 2-3 (1st Cir. 1993). Those eight factors are summarized as follows: (1) similarity of marks; (2) similarity of goods; (3), (4), (5) channels of trade, advertising and class of prospective buyers; (6) evidence of actual confusion; (7) defendant's intent in adopting the mark; and (8) strength of the mark. See *Equine Technologies, Inc. v. EquiTechnology, Inc.,* 68 F.3d at 542, 546 (1st Cir. 1995).

1. <u>Similarity of Marks.</u> As the Hearing Officer found in the administrative action, the name "Carter-McLeod Paper and Packaging, Inc." is simply not so similar to McLeod Packaging Systems, Inc. so as to cause confusion. See Exhibit 4. Further, this Circuit has stated that similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,*

657 F.2d 482, 487 (1st Cir.1981)) (quoting *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440 (9th Cir.1980)).

2.    Similarity of Goods.    Here again, it is notable to think about what Carter-McLeod has failed to this Court about the services and products it provides.  While it is true that MSP and Carter-McLeod do operate in some of the same product areas, it is also true that Carter-McLeod is a much larger company in terms of its revenue and has a much broader base of products that it distributes than MSP.[4]  The Hearing Officer below found this to be true as well and the undisputed evidence demonstrates the same.  MPS does not provide janitorial services, food services, bleach, staples, copying paper or batteries.  As such, it simply cannot be said that the similarity of goods is so close so as to cause confusion with the public.

3.    Channels of Trade, Advertising and Class of Prospective Purchasers.  As has been demonstrated, the plaintiffs advertising budget at both Carter-McLeod and LLC was miniscule relative to its annual sales.  The plaintiff has provided no evidence of its level of advertisement nor has it provided evidence of its class of prospective purchasers or channels of trade.  As was stated previously, although the plaintiff and the defendants do operate in some of the same channels of trade, there was never a non-compete agreement between the parties and there is no evidence that the fact that they operate in the same channels of trade has caused confusion. Clearly, MPS is not going to be competing or targeting the same group of consumers for the whole range of products that it does not sell, which Carter-McLeod does.  In addition, Carter-McLeod has provided no evidence to this Court that even in the channels of trade in which they share, there has been significant or even slight confusion. In contrast, the defendants have provided a statement from the very customer the plaintiff claims were confused stating that this

---

[4] Even though the evidence fully supports that Carter-McLeod is in the business of providing janitorial services and food services in addition to its packaging and paper services, its Articles of Organization do not reflect this business. See Exhibit 4 at 4 and 6.

simply was not the case. See June 14, 2005 Letter from Griffin Express attached hereto and hereinafter referred to as Exhibit 15.

4.    <u>Evidence of Actual Confusion.</u>   The plaintiff's case revolves to a large extent on the allegation that there has been actual confusion between the two company's names. However, almost all of these allegations are factually inaccurate. As has been described previously, no one at MPS ever tried to reactivate an account with a former supplier by implying that he was still affiliated with Carter-McLeod. There is no admissible evidence other than Robert's assertion that this is true. In Donald's Affidavit, he states that MPS tried to activate a <u>new</u> account with that supplier and in fact has done so. Next, the plaintiff continues to argue that Donald tried to avail himself of the good credit of Carter-McLeod in order to be provided with credit for MPS. As has been previously demonstrated, Carter-McLeod did not have a good credit history nor a good reputation with vendors for timely payment. See Exhibits 11, 12 and 13. Donald was well aware of that and never tried to use Carter-McLeod's credit history for the advantage of MPS.

The email to which the plaintiff refers sent out by Hazzard in which the Carter-McLeod signature block appears has a logical and much less nefarious explanation than the one offered by Robert. (See email from Morton Hazzard attached hereto and hereinafter referred to as Exhibit 16). A reasonable person need only read the text of the email that is being offered as evidence of "bad acts" to understand that Hazzard clearly was informing prior associates that he had moved as an employee of Carter-McLeod to MPS. The fact that he inadvertently left on the signature block in no way explicitly or implicitly suggested that he or MPS was associated with Carter-McLeod. The signature block has long since been corrected and is simply a non-issue.

There is no evidence that the incorrect signature block inadvertently left on these emails created confusion in even one person.

The next suggestion of actual confusion made by the plaintiff is that the respective marks are identical. Again, there is no evidence other than Robert McLeod's assertion of same that this is true. The defendants offer as a comparison a copy of the Brochure used by MPS to illustrate the mark that it is using, and attach it hereto as Exhibit 17.

The plaintiff states that in January, 2005, Robert McLeod received a telephone call from a warehouse regarding product of MPS. He states that this is evidence of actual confusion. See Robert's Affidavit at ¶ 29A. As evidenced by Exhibit 15, there was no confusion and this allegation fails.

The defendants cannot explain the situation involving Ben & Jerry's that is raised in Robert's Affidavit at ¶ 29B. Suffice it to say, that even if it is true that Ben & Jerry's on April 5 and April 14 mistakenly directed mail to Carter-McLeod instead of MPS, in the absence of an explanation as to why this actually happened, it is simply not sufficient to merely conclude that it was because of confusion between the names. It is equally as logical that someone forgot to update the automated mailing address when informed of MPS' existence. Beyond that, the defendants respectfully submit that evidence of two pieces of misdirected mail does not constitute sufficient actual confusion to be entitled to injunctive relief.

Without the benefit of anything more than a vague generalization that Carter-McLeod has received "numerous telephone calls" intended for Donald or Hazzard, there is no further evidence provided that this is true or that these phone calls were placed as a result of confusion between the company names. Nor does the plaintiff provide any identities of the people seeking "clarification regarding the relationship between the two companies." See Exhibit 7 at 29. Even

if it were true, a request to understand the relationship between the two companies does not constitute actual confusion of trade names. It was well known that Donald was an integral part of LLC and Carter-McLeod and the fact that he was now operating MPS as an independent corporation would have been of interest to anyone who knew the entities prior to the split. Probably most important to this issue is Robert's testimony from the administrative hearing that Carter-McCleod receives approximately one hundred phone calls a day or, on average, 2000 phone calls a week.[5] Despite the fact that such a number would translate into more that one twenty thousand phone calls a year, Carter-McLeod can only provide vague references to unidentified callers as evidence of actual confusion.

Donald has no information, nor has he been able to verify the allegation, of a check being returned for insufficient funds as alleged in ¶ 29E of Robert's Affidavit. In the absence of any evidence that this is true and because the assertion is based only on hearsay evidence, the defendants ask this Court to refuse to give evidentiary weight to the assertion.

For all these reasons, the evidence that the plaintiff has provided in support of actual confusion is simply insufficient.

5.    The Plaintiff's Goods are not Identical Despite the Continuing Allegation of Same. At the risk of redundancy, the plaintiff merely repeats that Carter-McLeod operates in a far larger universe of products than does MPS.

6.    Defendants' Intent in Adopting the Mark. As has been demonstrated, Donald was unexpectedly left without an income. He had to act immediately in order to begin to earn a living and support his family. He, therefore, used his name and a description of the business in which he had been operating and well known for many years prior to his termination.

---

[5] The transcript of the Administrative Hearing has been ordered but is not yet available. The defendant will certainly provide same to the Court as soon as it receives the transcript. In the interim, Donald has stated in his Affidavit that he heard Robert answer this question. See Exhibit 1, ¶ 58.

7.    <u>Strength of the Mark</u>.  The plaintiff has simply failed to provide any evidence that that when LLC changed its name to Carter-McLeod that the association between LLC (i.e. MPS, LLC) and Carter-McLeod remained strong.

In sum, when taking all eight of these considerations into account, the plaintiff will fail to be able to demonstrate that, even if the marks were entitled to protection, that there would be a likelihood of confusion.   This, coupled with the Administrative Officer's Decision in the administrative action more than overcomes the plaintiff's contention that it has a substantial likelihood of success on the merits of this case.

### 4. Harm to the Defendants and Lack of Public Interest to be Served

If the Court were to grant injunctive relief to Carter-McLeod, the injury that would result to MPS far outweighs the harm to Carter-McLeod.  In Robert's Affidavit, he has indicated that Carter-McLeod has doubled its size since it has been in existence and has not provided a scintilla of evidence that the use of MPS has caused any actual damage to Carter-McLeod, economically or otherwise.   To the contrary, Robert's Affidavit indicates that Carter-McLeod continues to grow and continues to be a business leader in the Northeast corridor.  See Exhibit 7.

On the other hand, should MPS be enjoined from continuing to use the only name by which it has been known and under which all of his existing business now exists, would disrupt his fledgling business, potentially with serious economic impact. Additionally, there is no public interest to be served by enjoining MPS, who has already prevailed in an administrative action on virtually the identical issue, from using a name where there has been no proof of actual confusion or of any damage to the plaintiff's business.

403459

**B.    THERE IS NO EVIDENCE THAT THE DEFENDANTS
DEFAMED OR DISPARAGED THE PLAINTIFF AND, THEREFORE,
INJUNCTIVE RELIEF IS INAPPROPRIATE**

Although the plaintiff's ask this Court to enjoin the defendants from further defaming or disparaging the plaintiff, they have offered no evidence that the defendants have either defamed or disparaged them. The allegations that Donald told two of Carter-McLeod's packaging vendors that Carter-McLeod was experiencing financial difficulties is without merit. See Exhibit 7 at ¶ 30; See Exhibit 1 at ¶ 38. As is evidenced by the exhibits attached, both of the allegations made by Robert are explained by the lack of credit worthiness that Carter-McLeod suffered at the time these alleged conversations took place. See Exhibits 11, 12 and 13. Phil Gonsalves did not freeze Carter-McLeod's operating line of credit because of anything Donald said to him, but rather because by the terms of the Line of Credit Agreement, any substantial change, including a change to the principles of the company, could result in the termination of the line of credit. See Revolving Line of Credit Contract attached hereto and hereinafter referred to as Exhibit 18. There is no evidence that Donald ever had a conversation with Phil Gonsalves regarding the financial stability of Carter-McLeod. Inasmuch as the plaintiff be unable to support its allegations of defamation or disparaging comments, it will not be able to demonstrate a likelihood of success on the merits. Notwithstanding this, defendants respectfully submit to this Court that they do not need to be enjoined from making defamatory or disparaging comments regarding the plaintiff as they have never engaged in such and do not intend to do so in the future.

**C.    THE PLAINTIFF HAS "UNCLEAN HANDS" AND IS, THEREFORE, NOT
ENTITLED TO EQUITABLE RELIEF.**

"He who seeks equity must do equity". Here, the plaintiff, who seeks equitable relief from this court in the form of a preliminary injunction, has violated this well-known maxim.

403459

And, once again, the plaintiff has left out relevant facts for this Court to consider. Among those facts is that a Stock Agreement existed among the shareholders of Carter-McLeod which would have forced Robert to retire on December 31, 2004 as he reached age 65 in June of 2004.  (See Stock Agreement attached hereto and hereinafter referred to as Exhibit 19).  By the terms of the Stock Agreement, Robert's retirement would have required Carter-McLeod to purchase the shares that he held upon his retirement and that those shares be distributed *pro rata* to the existing shareholders.  *Id.*  The result of this would have made Donald the majority shareholder, a situation which Alan Chadwick wanted to avoid.  See Exhibit 19.  Additionally, Robert wanted to continue to work and could not do so under the existing Stock Agreement.  *Id.* The alternative theory as to why Donald was terminated is that because Robert did not want to retire and Alan did not want Donald to become the majority shareholder, they invented the notion of "conversion" and conveniently fired Donald just two weeks prior to Robert's mandatory retirement.  Robert and Alan then voted to change the Stock Agreement, despite the fact that Donald still held shares in the company, so that 65 was no longer a mandatory retirement age and Robert was elected President and continues to work to this day.  *Id.* Although the plaintiff has alleged that Donald converted large sums of money to his benefit and that was the reason he was terminated abruptly, when the Board voted to terminate him, it chose to do so without cause. *Id.*  This bad faith termination is the basis of the defendants' unclean hands argument and the basis upon which they ask this Court to refuse to award equitable relief.  *See Fed. Folding Wall* Corp., 340 F.Supp. at 146; *cf. J Bar H, Inc. v. Johnson,* 822 P.2d 849, 861-62 (Wyo.1991) (rejecting, on equitable grounds, plaintiff's case for breach of non-compete clause where defendant had been shut out of participation in jointly-held corporation and refusing to award injunctive relief).

403459

**D.**    **The Instant Action Could Be Rendered Moot If Donald Is Successful at Arbitration**

Another notable fact which the plaintiff has failed to tell this Court is that pursuant to the Stock Agreement, there is a mandatory arbitration clause which Donald has invoked and the arbitration process is underway between the parties.    See Exhibit 19. The evidence will demonstrate that the financial and accounting systems at Carter-McLeod were "open book" systems, that all financial transactions were transparent, that all payments made to Donald were approved and that the principles knew or should have known of any financial compensation, loans or other payments made to Donald including the explicit reason for which Donald was receiving the money.    *Id.*   If Donald is correct, the Arbitrator could rule that Donald remain a shareholder of Carter-McLeod and that Robert's shares must be redeemed upon his immediate mandatory retirement which would result in Donald becoming the majority shareholder. Of course, should this happen, the instant action would be rendered moot.

## CONCLUSION

For all the aforementioned reasons, the defendants respectfully ask this to deny the plaintiff's Motion for Preliminary Injunctive Relief.

THE DEFENDANTS,
DONALD McLEOD; McLEOD
PACKAGING SYSTEMS, INC.; AND
MORTEN HAZZARD

By ____*/s/ James F. Martin*_____

By____*/s/ Dorothy Varon*_____
Dorothy Varon, Esq., both of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
JFM BBO No.: 322480
DV BBO No.:  629609

403459

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-30087-MAP

| | |
|---|---|
| CARTER-McLEOD PAPER AND PACKAGING, INC., Plaintiff | ) ) ) ) |
| vs. | ) ) |
| DONALD McLEOD; McLEOD PACKAGING SYSTEMS, INC.; and MORTEN HAZZARD, Defendants | ) ) ) ) ) |

## AFFIDAVIT OF DONALD McLEOD

I, Donald McLeod, on oath, hereby do swear and depose:

1.      I am over the age of 18 and understand and appreciate the meaning of an oath.

2.      I am the current President and shareholder of McLeod Packaging Systems, Inc. ("MPS") located in East Longmeadow, Massachusetts.

3.      Robert H. McLeod, ("Robert"), the president of the plaintiff, Carter-McLeod Paper and Packaging Company, Inc. is my uncle.

4.      In or around September of 1998, I was one of four individuals who formed McLeod Packaging Systems, LLC ("LLC").

5.      LLC was a closely held company with four shareholders including Robert, myself, Alan Chadwick, and Robert Carver.

6.      LLC supplied packaging materials, supplies and equipment throughout the Northeastern geographic area.

7.      I served as the President of LLC as well as the primary sales person.

401747

8.     During the time that I served as President and sales person of LLC, I was responsible for between sixty to seventy percent of all of the new business that was developed.

9.     LLC engaged in Interstate Commerce.

10.     LLC had a minuscule budget for advertising between 1998 and 2001, equivalent to approximately less than one percent of sales over those three years. See Robert's Affidavit, ¶ 5, hereinafter referred to as Exhibit 7.

11.     It was McLeod & Dewey and not LLC which recognized in a national trade publication called "Packaging Digest" nor did LLC participate in the New England Northeast Packaging Show in Marlboro, Massachusetts in the spring of 2000 as asserted in ¶ 7 of Robert's affidavit. *Id.* See also Article from *Package Digest*, hereinafter referred to as Exhibit 9.

12.     In or around October of 2001, LLC purchased an entity known as "Carter Paper Company." ("Carter Paper").  Carter Paper had been in existence for approximately 107 years prior to our acquisition of it and had sales essentially equal to that of LLC.  The principals of LLC formed a new entity called Carter-McLeod Paper and Packaging, Inc. which continued to maintain a principal place of business in West Springfield, Massachusetts. ("Carter-McLeod").

13.     I have personal knowledge that the principals of Carter-McLeod made a conscious decision to use the name "Carter" in front of the name "McLeod" in order to capture the 107 year history of Carter Paper including the name recognition and goodwill associated with Carter Paper.

14.     As a new entity, and ongoing to the present, Carter-McLeod engaged in and engages in a far more diverse business than indicated in ¶ 8 of Robert's affidavit.  Exhibit 7. Specifically, Carter-McLeod, in addition to those areas of business articulated in ¶ 8 of Roberts's affidavit, also engaged in janitorial services, food services, supplying of bleach, staples, copying

paper and batteries. None of the aforementioned services are provided by MPS. See Brochure of Products Sold and Distributed by MPS, hereinafter referred to as Exhibit 17; See Product Card from Carter McLeod, hereinafter referred to as Exhibit 6.

15.    The original shareholders of Carter-McLeod were myself (40%), Robert (40%) and Alan Chadwick (15%). The remaining original 5% shareholders are not mentioned in this affidavit and, on information and belief, do not have any implication in the instant action.

16.    On information and belief, two additional individuals are currently small Carter-McLeod shareholders; Jim Pollard and Tom Dingman, each owing less than 5% of the total Carter-McLeod shares.

17.    LLC was changed to McLeod, McLeod and Chadwick, LLC and still exists today strictly as a real estate holding company for the building in which Carter McLeod operates.

18.    At Carter-McLeod, I continued to act as a sales person and as President.

19.    Contrary to Robert's assertion ¶¶ 9-10 of his affidavit, Carter-McLeod is not still known today as McLeod Packaging Systems and, in fact, when Carter-McLeod formed, it replaced the placard referred to in ¶14 of Robert's affidavit with the a new placard bearing the name Carter-McLeod Paper and Packaging Systems specifically in order to distinguish it from McLeod Packaging Systems, LLC. See Carter-McLeod Replacement Placard, hereinafter referred to as Exhibit 10.

20.    Carter-McLeod has spent a miniscule amount of money relative to its annual sales in advertising as witnessed by ¶¶ 15 and 16 of Robert's affidavit. See Exhibit 7.

21.    I and all shareholders of Carter-McLeod were part of a Stock Agreement at all times relevant to this action. See Copy of Stock Agreement, hereinafter referred to as Exhibit 19.

22.     By the terms of the Stock Agreement, the principals were to retire on their 65th birthday and all shares held were to be purchased by Carter-McLeod with the shares going back to shareholders on pro-rata basis. *Id.*

23.     I have personal knowledge that Robert attained his 65th birthday on June 20, 2004.

24.     Under terms of the Stock Agreement, the effect of Robert's retirement would have made me the majority shareholder . *Id.*

25.     On information and belief, Robert did not want to retire and Alan Chadwick did not want me to become the majority shareholder.

26.     On information and belief, the sole reason that Robert and Alan Chadwick terminated me from Carter-McLeod was to avert the inevitable, namely Robert's retirement and my becoming a majority shareholder in Carter-McLeod.

27.     I was terminated by a vote of the Board of Directors on or about December 15, 2004 but, contrary to the assertions in ¶ 19 of Robert's affidavit that I had converted substantial funds from the company, my termination was without cause.

28.     All financial transactions for Carter-McLeod, including but not limited to any of my compensation or other payments made to me by Carter-McCleod were subject to "open book" accounting, were approved by Alan Chadwick and Jim Pollard, were transparent and were or should have been well known to all of the shareholders.

29.     On information and belief, immediately after terminating me, the Board voted to remove the mandatory retirement age from the Stock Agreement.

30.     Despite the fact that the Stock Agreement called for Robert's retirement from Carter-McLeod by December 31, 2004, Robert continues to the present date as its President.

401747

31.     Despite the fact that the original Stock Agreement called for Robert's retirement by the end of 2004, Robert was voted President of Carter-McLeod at the same Board vote on December 14, 2004. See Exhibit 7, ¶ 20; Exhibit 19.

32.     The original Stock Agreement has a mandatory arbitration clause and, pursuant to said clause, I have initiated an action against Robert and Alan Chadwick.  See Exhibit 19.  See also, Demand for Arbitration hereinafter referred to as Exhibit 8.

33.     One of the remedies demanded in my arbitration action is to be awarded the pro-rata shares of Carter-McLeod that would have been due to me upon Robert's retirement.

34.     I started MPS in or around December of 2004 because I was unemployed, without income and responsible for the support of my family.

35.     MPS does not compete in many of the markets in which Carter-McLeod competes. See Exhibits 6; 17.

36.     While MPS's business purpose is similar to Carter-McLeod in some respects, the similarities are simply not sufficient to create confusion as alleged in ¶ 29 of Robert's affidavit. See Exhibit 7. See also, January 14, 2005 Letter From President of Griffin Express hereinafter referred to as Exhibit 15.

37.     The Nationwide Correspondence referred to in ¶ 29(b)(3) of Robert's affidavit was nothing more than a computer generated solicitation I received at Carter-McLeod on a regular basis an example of which is Exhibit 14.

38.     The allegation in ¶ 29 (b) of Robert's affidavit that MPS is taking advantage of Carter-McLeod's good credit rating with Dun & Bradstreet is false.  In fact, Carter-McLeod's rating with Dun & Bradstreet, of which I was aware when I was employed with Carter-McLeod, shows that Carter- McLeod has negative payment rating, that 58% of the trade experiences

indicate slow payment and that payment experience exist which are greater than 60 days past due. I personally caused the Dun & Bradstreet database to be searched the results of which are hereinafter referred to as Exhibit 13.

39.     Any correspondence that was received from Dun & Bradstreet for MPS at the Carter-McLeod address was unsolicited by me or on by behalf by any agent of MPS.

40.     Carter-McLeod receives on average about 100 phone calls on a normal business day.

41.     Other than the isolated incidents outlined in ¶ 29 of Robert's affidavit, I have never been told by any former or new customer that he or she was confused as between MPS and Carter-McLeod.

42.     On information and belief, the attempt referred to in ¶ 29(d) of Robert's affidavit was not an attempt to "reactivate" an account but, rather to open a new account for MPS.

43.     I have no personal knowledge that any check was returned for insufficient funds from Country Bank For Savings as alleged in ¶ 29(e) of Robert's Affidavit.

44.     The e-mail to which Robert refers in ¶ 29(f) of his affidavit does have the automatic signature line from Carter-McLeod which, on information and belief, Morten Hazzard inadvertently forgot to change after he left Carter-McLeod's employ. However, the substance of the e-mail makes clear that Mr. Hazzard had left Carter-McLeod to join a new company, MPS and neither explicitly nor implicitly connects the two organizations. See Copy of Morten Hazzard's E-mail hereinafter referred to as Exhibit 16.

45.     I have never received any communication from anyone expressing confusion over Mr. Hazzard's e-mail which has long since been corrected.

46.     I never told Nancy McElvoy of AEP that Carter-McLeod was in "financial difficulty" as alleged in ¶ 30 of Robert's affidavit. Rather, I had conversations with Ms. McElvoy concerning Carter-McLeod's late payment to AEP which resulted in Carter-McLeod being put on a credit hold by AEP.  See June 6, 2005 Letter to Donald McLeod hereinafter referred to as Exhibit 11.

47.     I never told anyone at Malpack that Carter-McLeod was in financial difficulty resulting in Malpack's failure to ship product on credit to Carter-McLeod as alleged in ¶ 30 of Robert's affidavit. To the contrary, Carter-McLeod's bad payment history was the reason that Malpack refused to ship the last remaining order C.O.D.  See June 2, 2005 Letter From Troy Wolf to Don McLeod and Payment History hereinafter referred to as Exhibit 12.

48.     The Credit Note referred to in ¶ 30 of Robert's affidavit was frozen not because of anything I said to Phil Gonsalves at Country Bank For Savings, but rather, on information and belief, because by the terms of the Credit Note any substantial change in circumstances within Carter-McCleod, which would certainly include the termination of its President and 40% shareholder, was sufficient reason to freeze the credit line. See Revolving Line of Credit Contract hereinafter referred to as Exhibit 18.

49.     To the extent that MPS has any copies of documents taken from Carter-McLeod, such documents will be returned and/or destroyed.  Notwithstanding the aforementioned, on information and belief, no such documents have ever been used by MPS.

50.     Inasmuch as no one from McLeod Packaging Systems has ever made a false or disparaging statement or remark, we cannot cease and refrain from making such statements. However, for the purposes of this law suit, the defendants are willing to agree not to make false and disparaging statements without respect to the plaintiffs.

51.     At no time relevant to this action was I obligated under a Non-Compete Agreement not to engage in similar work or not to solicit customers with whom I had developed a relationship over the years I have been in the packaging business.

52.     The plaintiffs brought an action before the Secretary of State pursuant to M.G.L. c. 156D, § 4.01 which is the Massachusetts statute relative to the use of a trade name. See Copy of the Administrative Complaint hereinafter referred to as Exhibit 3.

53.     The hearing officer took evidence sufficient to review the allegations in the Administrative Complaint that MPS is a trade name for Carter-McLeod.

54.     Among the issues, the hearing officer had to analyze to rule on this complaint were whether or not MPS had developed a secondary meaning and/or that the consuming public associates the name exclusively with Carter-McLeod.

55.     The hearing officer ruled in favor of the defendant, MPS. and found that it was not in violation of M.G.L. c. 156D, § 4.01.  See Decision from the Administrative Hearing Officer, hereinafter referred to as Exhibit 4.

56.     The plaintiff, pursuant to M.G.L. c. 30A, § 14 has appealed this matter naming the Secretary of the Commonwealth as the defendant. See Copy of the Hampden Superior Court Docket Sheet hereinafter referred to as Exhibit 5.

57.     MPS has the right to intervene in the Administrative Appeal pursuant to M.G.L. c. 30A, but has not yet decided if it will do so.

58.     At the Administrative Hearing held on March 3, 2005, Robert was asked about the approximate number of calls Carter-McLeod receives a day and he testified that it

received about a hundred calls a day.  In a 20-day work month, therefore, Carter-McLeod

receives on average two thousand calls a month.

Signed under the pains and penalties of perjury this _23rd_ day of _June_ , 2005.

Donald McLeod

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:05-cv-30087-MAP

CARTER-McLEOD PAPER AND
PACKAGING COMPANY, INC. )
)
)
Plaintiff, )
)
)    MEMORANDUM IN SUPPORT OF
v. )    PLAINTIFF'S MOTION FOR
)    PRELIMINARY INJUNCTION
DONALD McLEOD; McLEOD )
PACKAGING SYSTEMS, INC. and )
MORTEN HAZZARD )
)
Defendants. )

## INTRODUCTION

This case follows the termination and removal by the plaintiff Carter-McLeod Paper and

Packaging Company, Inc. ("Plaintiff" or "Carter-McLeod Packaging") of Donald McLeod as an

officer, director and shareholder of the Plaintiff, following its discovery of Donald McLeod's

fraudulent and unlawful misappropriation and conversion of funds, and other egregious and

unlawful breaches of his fiduciary duty and duty of loyalty to the company. In response to the

Plaintiff's termination action, Donald McLeod and the other defendants (hereinafter collectively

("Defendants") have sought to capitalize on Carter-McLeod Packaging's established reputation

and goodwill by adopting and using a name virtually identical to Carter-McLeod Packaging's

former entity name, McLeod Packaging Systems, LLC, and current trademark, McLeod

Packaging Systems. Therefore, Carter-McLeod Packaging seeks to enjoin Donald McLeod and

his new company from identifying itself as McLeod Packaging Systems, Inc. ("McLeod

Packaging Systems").

Donald McLeod's wrongful behavior is not inadvertent or innocent. He adopted the

name "McLeod Packaging Systems" after he had conducted business on behalf of the Plaintiff

298510_1

and its predecessor entity, McLeod Packaging Systems, LLC, selling the same products in the same channels of trade to the same customers as his new business. The only conceivable reason for adopting the identical name is to confuse customers and to capitalize on the goodwill developed and paid for by the Plaintiff. Indeed, the name, as evidenced herein, has caused substantial confusion.

The Plaintiff also seeks an injunction precluding the Defendants from using confidential and proprietary information converted from the Plaintiff and to cease making defamatory and disparaging statements about the Plaintiff to vendors, customers and others. Specifically, contrary to the representation made by the Defendants through counsel that neither "one of them removed, transferred or converted confidential and proprietary information from Carter-McLeod," a forensic analysis of Morten Hazzard's hard drive, which the Plaintiff paid an expert in the field to conduct, reveals that Morten Hazzard emailed highly sensitive documents to his personal email account just prior to resigning and going to work for Donald McLeod's new company. Additionally, vendors and the Plaintiff's bank have taken adverse action against the Plaintiff based on false statements made by the Defendants regarding the Plaintiff's financial standing.

The Plaintiff does not seek to preclude or limit the Defendants from conducting their business, using the same channels of trade or even soliciting or profiting from the Plaintiff's customers. The Plaintiff's sole purpose in bringing this motion is to require the Defendants to conduct their business in a lawful manner without damaging the Plaintiff's business through unlawful means, confusing their overlapping customer base, or capitalizing on the Plaintiff's established goodwill.

2

## FACTS

The facts supporting this motion are set forth in the Affidavit of Robert H. McLeod, President of Carter-McLeod Packaging (**Exhibit A**, referenced as "R. McLeod Aff."), along with supporting exhibits attached thereto at **Tabs 1 through 8**.

## ARGUMENT

### I.  PRELIMINARY INJUNCTION STANDARD.

The moving party seeking a preliminary injunction must meet four criteria before the injunction can issue:  (1) that the party seeking the injunction has exhibited a likelihood of success on the merits; (2) that the party seeking the injunction will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which granting injunctive relief would inflict on the party against whom the injunction is sought; and (4) that the public interest will not be adversely affected by the granting of the injunction. *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987).  The evidence provided by the Plaintiff meets each of the four criteria and requires that the Defendants be enjoined as follows:  (1) to cease using the name and mark "McLeod Packaging Systems" or otherwise representing that they are associated or affiliated with the Plaintiff when they are not; (2) to account for all copies of the confidential documents converted by the Defendants from the Plaintiff and to return, destroy, and cease or refrain from using them; and (3) cease and refrain from making false and disparaging statements or remarks either orally or in writing about the Plaintiff.

### II.  THE COURT SHOULD ENJOIN THE DEFENDANTS FROM USING THE TRADEMARK "McLEOD PACKAGING SYSTEMS."

#### A.  Likelihood Of Success On Trademark And Unfair Competition Claims.

Section 43(a) of the Lanham Act provides that "any person who . . . uses in commerce any word, term, name, symbol or device, or any combination thereof . . . which is likely to cause

confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [defendant's] goods, services or commercial activities by [plaintiff] . . . shall be liable in a civil action . . . ." § 43(a) of the Trade Marks Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125(a) (2000). This legal wrong is generally referred to as "likelihood of confusion."

In a claim of this type, the trademark owner is required to prove the following three elements to succeed: (1) the ownership of a distinctive mark entitled to trademark protection; (2) its use by another in a manner likely to cause confusion as to the origin of the goods or services; and (3) the use of that mark in interstate commerce. *Calamari Fisheries, Inc. v. Village Catch, Inc.*, 698 F. Supp. 994, 1006 (D. Mass. 1988). Infringement of a trademark under Massachusetts state law is congruent to the federal cause of action. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir. 1981). The Plaintiff is likely to prove each of these elements based on the information it has at this early stage in the litigation.

(1) Distinctiveness of the Mark.

Trademarks are classified on what is commonly called the *Abercrombie* spectrum. The *Abercrombie* spectrum divides the world of trademarks into four or five categories in increasing degrees of distinctiveness, (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992); *see S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979) (dividing into four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary and fanciful). Generic "marks" are terms that have passed into common usage to identify a product, such as aspirin, and can never be protected. *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir. 1993). "Descriptive" terms, such as a geographical term, can be protected, but only if they have acquired "secondary meaning," indicating that consumers

4

associate the term with a particular producer or source.  *Id.*  A mark perceived as a surname also falls into this category.  *Donoghue v. IBC/USA (Publications), Inc.*, 886 F. Supp. 947, 952 (D. Mass. 1995).  Suggestive," "arbitrary" and "fanciful" terms that can be protected without proof of secondary meaning and are considered "inherently distinctive."  *Boston Beer*, 9 F.3d at 180 (internal citations omitted).

When placing a mark on the *Abercrombie* spectrum, the mark must be considered in its entirety, with a view toward what the purchasing public would think when confronted with the mark as a whole.  *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995).  Thus, a trademark consisting of descriptive terms may nevertheless create a non-descriptive whole.  *Id.* at 545 n.4 (stating that Defendant's claim that EQUINE TECHNOLOGIES was merely descriptive was "unsupported by case law, and lacking in basic common sense" and holding that the mark was inherently distinctive); *see In re Hutchinson Technology Inc.*, 852 F.2d 552 (Fed. Cir. 1988) (holding that, although "Hutchinson" was a surname and "Technology" commonly used in the industry, the mark as a whole was inherently distinctive); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 395 (S.D.N.Y. 1998) (holding that on surname challenge to LANE CAPITAL MANAGEMENT, the Court was required to "view the mark in its complete form rather than dissect it into its component parts."), *aff'd*, 192 F.3d 337 (2d Cir. 1999).

"Secondary meaning" refers to words' ability to tell the public that the words serve a special trademark function, namely, that they denote a product or service that comes from a particular source.  In contrast, words in ordinary, non-trademark, use normally refer to particular individual items that exhibit the characteristics that the word or phrase connotes, without specific reference to the item's source.  *Boston Beer*, 9 F.3d at 181.  For example, one court held that

"Boston" and "Boston Beer" for a brewery were descriptive without secondary meaning and therefore the terms did not function as trademarks. *Id.*

If proof of secondary meaning is required, "[t]here is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party. . . ." *President & Trustees of Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 807 (1st Cir. 1975). The relevant public for which a mark must have secondary meaning is not the public at large, but the purchasers and potential purchasers of the mark owner's goods and services. *Id.* at 808.

There are a number of ways to prove secondary meaning. Intentional copying is persuasive evidence of secondary meaning, "because there is no incentive for a competitor to copy a design that has no recognition among consumers." *McNeil-PPC, Inc. v. Merisant Co.*, Civ. No. 04-1090 (JAG), 2004 WL 3316380, at *13 (D.P.R. July 29, 2004), citing *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 32 (1st Cir. 1989). In addition, actual confusion is also strong evidence of secondary meaning. *Boustany v. Boston Dental Group, Inc.*, 42 F. Supp. 2d 100, 107 (D. Mass. 1999). Secondary meaning may also be proven through the length and manner of the use, the nature and extent of advertising and promotion of the mark, and efforts made to promote a conscious connection by the public between the trademark and the product's source. *Boston Beer*, 9 F.3d at 182.

The Plaintiff's marks, "McLeod Packaging Systems" and "Carter-McLeod Paper and Packaging," are both inherently distinctive. The purchasing public, when confronted with the mark "McLeod Packaging Systems" as a whole, recognizes that the unitary phrase is a trademark. Although the composite mark contains a surname as one component of it, the mark, taken as a whole with the addition of "Packaging Services," is inherently distinctive. *See Lane*

6

*Capital Mgmt.*, 15 F. Supp. 2d at 395 ("Under the present circumstances, where only one

element of the mark has both a strong surname and a non-surname significance, an average

member of the purchasing public would not view the mark as a whole as primarily merely a

surname or as a personal name"), *aff'd* 192 F.3d 337 (2d Cir. 1999); *Ex parte Norquist Prods.,*

*Inc.*, 109 U.S.P.Q. (BNA) 399, 400 (Comm'r Pat. 1956) (composite mark NORQUIST

CORONET inherently distinctive: "A word which is primarily merely a surname may lose that

significance when it appears in a distinctive composite"); *compare Flynn v. AK Peters, Ltd.*, 377

F.3d 13 (1st Cir. 2004) (holding that an author had to prove secondary meaning in her personal

name in a claim against a publisher that used her name without permission on a second edition of

a book).

      The same is also true of the mark "Carter-McLeod Paper and Packaging." The mark is

not a "surname" at all; it is a combination of two different surnames combined with additional

words. The combination of two surnames, when considered as a whole, is not perceived as a

surname. *See In re Standard Elektrik Lorenz Aktiengellschaft*, 371 F.2d 870, 873 (C.C.P.A.

1967) (holding that mark SCHAUB-LORENZ was not primarily merely a surname despite the

fact that both words were surnames). The addition of the "Paper and Packaging" component

further confirms that the mark is inherently distinctive.

      In addition to being inherently distinctive, both "McLeod Packaging Systems" and

"Carter-McLeod Paper and Packaging" also have secondary meaning as representing the

Plaintiff. Indeed, the Defendants themselves have established secondary meaning in "McLeod

Packaging Systems" by their intentional copying of that mark. *See Boston Athletic Ass'n*, 867

F.2d at 32. Donald McLeod's choice of the name "McLeod Packaging Systems" for his new

company is no coincidence. He has been an officer, director and shareholder of the Plaintiff

from its inception as McLeod Packaging Systems, LLC, in September of 1998, through the name

change, and was terminated only a few months ago, in mid-December 2004. R. McLeod Aff. at

¶¶ 2, 4, 8, 12, 20. During that period, Donald McLeod dealt with customers, vendors and others

under the marks at issue and participated in and was paid to develop the goodwill on behalf of

the Plaintiff in those marks. *Id.* Based on the infinite number of options available to Donald

McLeod, the only conceivable basis for adopting the exact mark of the Plaintiff was to capitalize

on the goodwill it developed and paid for over a six-year period.

Donald McLeod then set about deliberately creating actual confusion, additional evidence

of secondary meaning in "McLeod Packaging Systems." He misled at least one supplier by

representing to it that he was with "McLeod Packaging Systems" while trying to re-open an

account the Plaintiff previously held under its McLeod Packaging Systems, LLC name. *See* R.

McLeod Aff. at ¶ 29(d). Donald McLeod could not have done so if the supplier did not

recognize the name "McLeod Packaging Systems" and believe it was the same company as

Carter-McLeod Packaging. Donald McLeod did the same with a financing company, obtaining a

line of credit based on "the last 12 months" of credit history when McLeod Packaging Systems

had not been in business for twelve months. R. McLeod Aff. at ¶ 29(b) and Tab 7. Donald

McLoed's deliberate copying and successful exploitation of the mark "McLeod Packaging

Systems" to capitalize on the Plaintiff's goodwill is compelling evidence of secondeary meaning.

*See Boustany*, 42 F. Supp. 2d at 107.

Lastly, "McLeod Packaging Systems" has gained secondary meaning through the length

and manner of the use, the nature and extent of advertising and promotion of the mark, and

efforts made to promote a conscious connection by the public between the trademark and the

product's source. *See Boston Beer*, 9 F.3d at 182. Specifically, from its inception in September,

8

1998 until October, 2001, McLeod Packaging Systems, LLC grew to a $3 million company, with approximately 150 customer accounts. R. McLeod Aff. at ¶ 5. During that same period, McLeod Packaging Systems, LLC advertised in the Springfield, Holyoke, Hampshire County, Northampton, Amherst, and Easthampton Area Yellow Pages and had directory listings in these publications. R. McLeod Aff. at ¶ 6. In addition, McLeod Packaging Systems, LLC advertised through the publishing of brochures, business cards, literature labels, machine labels, letterhead stationary, envelopes, and lettering on two service vans, as well as sponsored various charitable organizations and participated in trade shows. R. McLeod Aff. at ¶¶ 6, 7. McLeod Packaging Systems, LLC also was recognized in at least one national trade publication, Packaging Digest, for its role in the sale of packaging machinery to the Wright Line company of Worcester. R. McLeod Aff. at ¶ 7.

That Plaintiff changed its corporate name from "McLeod Packaging Systems" to "Carter-McLeod Paper and Packaging" is of no moment. Carter-McLeod Packaging is still known by its vendors and customers as "McLeod Packaging Systems" and will be for some time. For example, companies still send goods to "McLeod Packaging Systems" at the Carter-McLeod Packaging address. *See* R. McLeod Aff. at ¶ 13 and Tab 3. This dual identity will continue for years; packaging equipment installed by Plaintiff's predecessor McLeod Packaging Systems, LLC bears plates identifying "McLeod Packaging Systems" as the source with a Carter-McLeod phone number. *See* R. McLeod Aff. ¶ 14 and Tab 4. The labels are on equipment that is in service today with an expected life span of up to 20 years. R. McLeod Aff. at ¶ 14. In addition, Carter-McLeod Packaging, on its acquisition of Carter Paper Company, deliberately merged the two names in order to capitalize on the goodwill that existed in each of the names and customers are fully aware that Carter-McLeod Packaging is a continuation of McLeod Packaging Systems,

9

LLC. R. McLeod Aff. at ¶ 9. As a result, they will continue to identify "McLeod Packaging Systems" with Carter-McLeod Packaging for many more years. R. McLeod Aff. at ¶ 10.

With respect to the mark "Carter-McLeod Paper and Packaging," not only is the mark inherently distinctive, but it also has strong secondary meaning, making it a mark with a high degree of distinctiveness. The company has now grown, after its acquisition of Carter Paper Company, to a $14 million company. R. McLeod Aff. at ¶ 15. It continues to advertise through Yellow Pages and event sponsorship, R. McLeod Aff. at ¶ 16, becoming one of New England's medium size independent packaging distributors. R. McLeod Aff. at ¶ 17.

Thus, the marks "McLeod Packaging Systems" and "Carter-McLeod Paper and Packaging" are distinctive marks entitled to trademark protection.

(2) Likelihood of Confusion.

In the First Circuit, courts consider the following factors when deciding whether there is likelihood of confusion: the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; defendants' intent in adopting its mark; and the strength of plaintiff's mark. *Pignons S.A.*, 657 F.2d at 487; *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 15 (1st Cir. 2004). Any other factors that have a tendency to influence the impression conveyed to prospective purchasers by the allegedly infringing conduct may also be considered. *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996). No one factor is determinative, but each must be considered. *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir.1989). In this case, all factors weigh in favor of Plaintiff, leaving no question whatsoever as to likelihood of confusion.

First, it is clear that Donald McLeod's intent in adopting the mark was to create as much confusion as possible. He did not independently devise the name of his new company; instead, he used the exact name by which the Plaintiff has been known for over six years, a name that Plaintiff used while Donald McLeod himself served as officer, director, shareholder and salesperson. R. McLeod Aff. at ¶¶ 2, 4, 12, 18. This intentional conduct creates a rebuttable presumption of likelihood of confusion. *See Boston Athletic Ass'n*, 867 F.2d at 34 (holding that "in cases of intentional copying, the second comer is generally presumed to have intended a confusing similarity of appearance and to have succeeded in doing so.").

The legitimacy of the presumption is validated by Donald McLeod's and Morten Hazzard's overt and intentional acts designed to take advantage of this deliberately created confusion. For example, Donald McLeod led a Carter-McLeod Packaging supplier to believe that he was still affiliated with Carter-McLeod Packaging, so that the supplier would reopen an account. R. McLeod Aff. at ¶ 29(d). By doing so, he avoided the difficulty and time involved with opening a legitimate account in his own name, on the merits of his own business trustworthiness. Donald McLeod also appears to have used the same tactic with a financial credit organization, Nationwide; Carter-McLeod Packaging received a letter that "McLeod Packaging System" was pre-qualified for a $100,000 equipment line of credit because "for the last 12 months, you have maintained an excellent score." R. McLeod Aff. at ¶ 29(b) and Tab 7. Carter-McLeod Packaging did not speak with Nationwide, did not request a line of credit from Nationwide, and McLeod Packaging Systems has also not been in business for twelve months, so it could not have its own "excellent score" based on the past 12 months. R. McLeod Aff. at ¶ 29(b). It appears that McLeod Packaging Systems is taking calculated advantage of the credit

worthiness of Carter-McLeod Packaging and the confusion over the similarity in the names to its own unfair advantage.

Defendants also tried to do the same with customers. An email sent out by Morten Hazzard soliciting business for McLeod Packaging Systems over a month after he left Carter-McLeod Packaging contains a signature block with the Plaintiff's name and address. R. McLeod Aff. at ¶ 29(f) and Tab 8. A customer could reasonably interpret that there is some association or affiliation between Carter-McLeod Packaging and McLeod Packaging Systems as a result of Morten Hazzard's deliberate disinformation. R. McLeod Aff. at ¶ 29(f).

Second, the Plaintiff's mark "McLeod Packaging Systems" and Defendants' mark "McLeod Packaging Systems" are identical. Defendants' use of "McLeod Packaging Systems" is also similar to the "Carter-McLeod Paper and Packaging" mark. As already noted, Carter-McLeod Packaging deliberately retained the words "McLeod" and "Packaging" in the mark in order to keep and build on the already-existing goodwill when combined with the well-recognized "Carter Paper" identity. R. McLeod Aff. at ¶ 9. Defendants' infringing mark is incorporated virtually in full within the longer "Carter-McLeod Paper and Packaging" mark, sharing both the distinctive word "McLeod" and the distinctive word "Packaging" with Plaintiff's mark. Thus, Defendants' mark "McLeod Packaging Systems" is identical to one of Plaintiff's marks, "McLeod Packaging Systems," and very similar to the other, "Carter-McLeod Paper and Packaging." This factor favors Plaintiff.

Third, the parties' goods are identical. Plaintiff Carter-McLeod Packaging sells packaging supplies, equipment and related services. R. McLeod Aff. at ¶ 24. Defendant McLeod Packaging Systems sells exactly what Carter-McLeod Packaging sells, packaging

supplies and equipment, along with related support services. *Id.* There is an identity of goods and services and this factor therefore favors Plaintiff.

Fourth, the two companies' channels of trade, advertising, classes of customers and actual customers are identical. These three categories are often considered together because they are closely related. *Boustany*, 42 F. Supp. 2d at 108, citing *Pignons S.A.*, 657 F.2d at 488; *R.J. Toomey Co. v. Toomey*, 683 F. Supp. 873, 877 (D. Mass. 1988). It is beyond dispute that two companies located the same geographic area selling the same products have overlapping channels of trade, advertising and prospective purchasers. In this case, not only are the prospective purchasers the same, but, indeed, Robert McLeod and Morten Hazzard have actively solicited Carter-McLeod Packaging customers, including Ken's Foods, Kraft Foods (Veryfine), H.P. Hood, and Milton Bradley. R. McLeod Aff. at ¶ 28. These factors also favor Plaintiff.

Fifth is actual confusion. When a preliminary injunction is sought shortly after the infringing mark first appears, proof of actual confusion is frequently not available. *McNeil-PPC*, 2004 WL 3316380, at *13, citing *DeCosta v. Columbia Broadcasting Sys., Inc.*, 520 F.2d 499, 512 (1st Cir. 1975). Here, however, there is a significant amount of actual confusion, which is highly probative. "Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion. Actual confusion is such persuasive evidence of the likelihood of confusion that even a minimal demonstration of actual confusion may be significant." *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 45 (D. Mass.1995) (internal citations omitted).

As already described, Donald McLeod and Morten Hazzard have diligently worked to create confusion in the marketplace. *See* p. 11-12, *supra*. There is further evidence of actual confusion:

13

- In January, 2005, Robert McLeod received a telephone call from Grif-Bak Warehouse in Holyoke, Massachusetts, Carter-McLeod Packaging's outside warehouse for more than six years, calling to ask what to do with a shipment it had received for "McLeod Packaging Systems." Apparently, McLeod Packaging Systems began warehousing product at the same warehouse and Grif-Bak thought that the product belonged to Carter-McLeod Packaging. R. McLeod Aff. at ¶ 29(a).

- Carter-McLeod Packaging has received misdirected mail intended for McLeod Packaging Systems, Inc., including an April 5, 2005 payment from Ben & Jerry's sending payment to Carter-McLeod Packaging's address made payable to McLeod Packaging Systems, LLC. Carter-McLeod Packaging returned the check to Ben & Jerry's, but nevertheless received another payment on April 14, 2005, sent to Carter-McLeod Packaging's address made payable to McLeod Packaging Systems, LLC. Therefore, despite having once corrected Ben & Jerry's, it sent another payment a second time with the same error. R. McLeod Aff. at ¶ 29(b).

- Carter-McLeod Packaging has received numerous telephone calls either intended for Donald McLeod or Morten Hazzard at McLeod Packaging Systems or otherwise seeking clarification regarding the relationship between the two companies. R. McLeod Aff. at ¶ 29(c).

- On May 10, 2005, Robert McLeod received a telephone call from a customer service representative at Country Bank for Savings and was informed it was returning a check for insufficient funds that had been drawn on an account of McLeod Packaging Systems, LLC that had a zero balance. The check was written by Jennifer Cushman, Donald McLeod's wife and a former employee of both McLeod Packaging Systems, LLC and Carter-McLeod Packaging, and who now works for McLeod Packaging Systems. Most charitably McLeod Packaging Systems itself was confused by the similarity of the names McLeod Packaging Systems, LLC and McLeod Packaging Systems, Inc., although quite possibly McLeod Packaging Systems, Inc. made a deliberate attempt to convert funds of Carter-McLeod Packaging. R. McLeod Aff. at ¶ 29(e).

Given the deliberate confusion intentionally generated by Defendants, along with this evidence of actual confusion, this factor, like all of the rest, favors Plaintiff and demonstrates the necessity of an immediate injunction.

Sixth, as noted *supra* at p. 4-10, Plaintiff's marks are strong because they are inherently distinctive with secondary meaning. This factor favors Plaintiff.

14

Lastly, there are also factors outside of the *Polaroid* framework that are relevant to a likelihood of confusion here. *See International Ass'n of Machinists*, 103 F.3d at 201 (noting that court may consider relevant factors other than the *Polaroid* factors). Here, in addition to the fact that Donald McLeod adopted the name "McLeod Packaging Systems" to deliberately trade on the goodwill of the Carter-McLeod Packaging name, as already discussed, he and Morten Hazzard are also in personal contact with customers. R. McLeod Aff. at ¶ 4, 12, 25. It is therefore a situation where, first, Donald McLeod and Morten Hazzard were salesmen working on behalf of McLeod Packaging Systems, then were working for Carter-McLeod Packaging, and are now working for McLeod Packaging Systems, an entirely different company. Customers are therefore being contacted by the same Donald McLeod and Morten Hazzard they dealt with before, and may reasonably assume that they are dealing with the same "McLeod Packaging Systems" as they had dealt with in the past when they are decidedly not.

The fact that the original McLeod Packaging Systems is the predecessor to what is now known as "Carter-McLeod Paper and Packaging" is also a factor that contributes to likelihood of confusion. Consumers are familiar with the name change of the company, R. McLeod Aff. at ¶ 10, and would therefore be less apt to distinguish that Donald McLeod's new company is different from Carter-McLeod Packaging. *See Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 413 (7th Cir. 1994) (in a suit brought nine years after the team moved, finding that BALTIMORE CFL COLTS was confusingly similar to INDIANAPOLIS COLTS in part because the predecessor team of the INDIANAPOLIS COLTS was the BALTIMORE COLTS).

In summary, every single factor overwhelming favors Carter-McLeod Packaging. Defendants' use of "McLeod Packaging Systems" cannot be allowed to continue.

15

(3) Use of the Marks in Interstate Commerce.

Because the Lanham Act is federal law arising under the Commerce Clause, a plaintiff

must demonstrate that its use is in interstate commerce for this Court to have subject matter

jurisdiction. Plaintiff sells goods in Massachusetts, as well as to New York, New Jersey, and

Virginia. R. McLeod Aff. at ¶ 3. It is therefore in interstate commerce. *See Boustany*, 42

F.Supp.2d at 107 (stating that "commerce" is defined as broadly as the definition of commerce

employed in any other federal statute).

**B. Irreparable Harm.**

In cases involving a trademark harm, the harm is necessarily irreparable: "[b]y its very

nature, trademark infringement results in irreparable harm because the attendant loss of profits,

goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner

cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark

infringement as a matter of law." *Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982

F.2d 633, 640 (1st Cir. 1992). Therefore, on a motion for preliminary injunction, if the plaintiff

successfully shows a likelihood of success on the merits, the irreparable harm prong of the

analysis is presumed. *Keds Corp.*, 888 F.2d at 220.

As described above in detail, Plaintiff is suffering harm to its goodwill every day that

suppliers and customers are confusing McLeod Packaging Systems with Plaintiff Carter-McLeod

Packaging. Defendants have obtained credit to which they are not entitled and confused

customers and vendors alike. Everyone is confused, and this confusion will redound on Plaintiff

to its great harm. The incident with Ben & Jerry's is one example; although Ben & Jerry's was

advised that the companies were different, it nevertheless made the same error again. R.

McLeod Aff. at ¶ 29(b). The situation will not improve; Defendants have only been in business

for a short period and the frequency of incidents can only increase. Defendants must be enjoined

16

so that Plaintiff can recover from the damage already caused and recoup its reputation before it is too late.

### C. <u>The Injury Outweighs The Harm Of Granting The Injunction.</u>

Defendants here will not be harmed. Donald McLeod deliberately adopted the name "McLeod Packaging Systems" in order to reap what he has not sown, that is, to take advantage of the confusion he causes by trading on the goodwill of the "McLeod Packaging Systems" name. Donald McLeod and Morten Hazzard may engage in fierce competition with Plaintiff for market share and for customers, but simply must do it fairly. All that Defendant company must do is change a name that it adopted only a few months ago. It does not have to cease doing business, but only compete on a level field instead of on one it has unfairly tipped to its advantage.

### D. <u>The Injunction Will Not Adversely Affect The Public Interest</u>

The only public interest involved here is the right of consumers to not be confused about the true source of goods and services that they receive. The public interest is served by enjoining Defendants. *See Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F. Supp. 120, 122 (D. Mass. 1996).

Thus, there is no reason whatsoever that Defendants should be allowed to continue to trade on Plaintiff's goodwill, confusing consumers and harming the good name that it worked so hard to develop.

### III. <u>THE COURT SHOULD ENJOIN THE DEFENDANTS FROM USING CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION.</u>

### A. <u>Likelihood Of Success On Plaintiff's Conversion Claim.</u>

In order to prove conversion, a plaintiff must show that defendant(s) have intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which

they had no right of possession at the time. *Grand Pacific Fin. Corp. v. Brauer*, 57 Mass. App.

Ct. 407, 412, 783 N.E.2d 849, 857 (2003) (conversion of funds in escrow account). Contrary to

the emphatic denial through counsel that the Defendants had not "removed, transferred or

converted confidential and proprietary information from Carter-McLeod," a forensic analysis of

Morten Hazzard's hard drive, which the Plaintiff paid an expert in the field to conduct, reveals

that Morten Hazzard emailed highly sensitive documents to his personal email account just prior

to resigning and going to work for Donald McLeod's McLeod Packaging Systems. R. McLeod

Aff. at 26 and Tab 6. The analysis by Carter-McLeod Packaging's forensic computer expert

establishes a clear likelihood of success on the merits of its conversion claims against

Defendants.

### B. Irreparable Harm.

This information includes highly sensitive and confidential customer data, data that

Donald McLeod has converted to his advantage as a formula presumably to steal Carter-McLeod

Packaging's clients. Specifically, the information removed consists of the deviated price lists for

Carter-McLeod Packaging's largest and most valued clients. R. McLeod Aff. at 27. The

deviated price lists, include, among other information, the varying prices of product provided by

vendors to Carter-McLeod Packaging based on the intended purchaser from Carter-McLeod

Packaging. *Id.* This information gives a Carter-McLeod Packaging competitor clear advantages

in negotiating with vendors for prices and pricing product for targeted customers. *Id.*

Additionally, such deviations, if shared with Carter-McLeod Packaging's customers could have a

substantially adverse impact on its relationships with customers who believe that they have been

unfairly charged as compared with other customers. *Id.*

To the extent that Defendants were to use the converted documents in an unfair and

unlawful manner, it would be virtually impossible for the Plaintiff to prove or place a value on

18

the resulting lost profits or other damages from such conduct. *Frank D. Wayne Assocs., Inc. v. Lussier*, 16 Mass. App. Ct. 986, 988-89, 454 N.E.2d 109, 111-12 (1983) (stating that lost profits are notoriously difficult to prove and that it was "wholly appropriate" for the trial judge to "seek to minimize the harm that final relief can not redress" by issuing a preliminary injunction).

### C. The Injury Outweighs The Harm Of Granting The Injunction And The Public Interest Will Be Served By Injunctive Relief.

The requested injunction seeks merely to preclude the Defendants from using documents unlawfully converted from Carter-McLeod Packaging. While the Plaintiff stands to lose potentially substantial but immeasurable profits if the injunction is not issued, the Defendants will merely be precluded from capitalizing on the use of misappropriated proprietary information. Precluding the use of unlawfully acquired information also serves the public interest.

## IV. THE COURT SHOULD ENJOIN THE DEFENDANTS FROM FURTHER DEFAMING OR DISPARAGING THE PLAINTIFF.

### A. Likelihood Of Success On Plaintiff's Defamation Claim.

To prevail on a claim of defamation, a plaintiff must establish that the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss. *White v. Blue Cross and Blue Shield of Mass., Inc.*, 442 Mass. 64, 66, 809 N.E.2d 1034, 1036 (2004), citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30, 782 N.E.2d 508, 511-12 (2003). Where, as here, the words prejudice a plaintiff in its profession or business, there is slander *per se* and economic loss need not be proven. *Ravnikar*, 438 Mass. at 630, 782 N.E.2d at 512; *Lyman v. New England Newspaper Publ'g Co.*, 286 Mass. 258, 261, 190 N.E. 542, 543 (1934).

19

At or around the time Donald McLeod formed McLeod Packaging Systems, he told at least two of Carter-McLeod Packaging's vendors that the Plaintiff was experiencing financial difficulty and could not meet various obligations to its customers, vendors and creditors. R. McLeod Aff. at 30. As a result, one of Carter-McLeod Packaging's vendors, Malpack, refused to ship product on credit to one of our customers, demanding payment up front. *Id.* At the time Malpack demanded the up front payment, Carter-McLeod Packaging had a zero balance and had given it no reason to question the company's credit worthiness. *Id.* In addition, immediately after Donald McLeod left the company, Phil Gonsalves, a Vice President with Country Bank for Savings, froze Carter-McLeod Packaging's operating line of credit. *Id.* Donald McLeod's conduct and the resulting adverse economic consequences is sufficient to establish a likelihood of success on Plaintiff's defamation claim.

## B. Irreparable Harm.

As a consequence of the Defendants action, the Plaintiff has been impaired in its business dealings, by the loss of credit and damage to its reputation as a trustworthy and sound business. R. McLeod Aff. at 30. The harm caused by the Defendants' defamation is unquantifiable and potentially fatal to the Plaintiff, if not enjoined.

## C. The Injury Outweighs The Harm Of Granting The Injunction And The Public Interest Will Be Served By Injunctive Relief.

The requested injunction seeks merely to preclude the Defendants from continuing in conduct that the law prohibits. The only impact on the Defendants of the requested injunction is the loss of any competitive advantages that they may gain by unlawfully damaging Carter-McLeod Packaging's competing business. This impact is far outweighed by the potential damage to Carter-McLeod Packaging's business that may result from ordering the Defendants to

20

refrain from making further unlawful defamatory statements about the Plaintiff. Precluding such unlawful conduct also serves the public interest.

## CONCLUSION

Defendants must be ordered to cease using the name and mark "McLeod Packaging Systems," cease using Plaintiff's proprietary business information, and cease slandering Plaintiff. Plaintiff therefore respectfully asks that this Court order Defendants to:

(1) cease using the name and mark "McLeod Packaging Systems" or otherwise representing that they are associated or affiliated with the Plaintiff when they are not;

(2) account for all copies of documents converted by the Defendants from the Plaintiff and to return, destroy, and cease or refrain from using them; and

(3) cease and refrain from making false and disparaging statements or remarks either orally or in writing about the Plaintiff.

Respectfully submitted,
Plaintiff
CARTER-MCLEOD PAPER &
PACKAGING COMPANY, INC.
By Its Attorneys:

Dated: May 24, 2005

/s/ Jeffrey E. Poindexter
Francis D. Dibble, Jr. – BBO No. 123220
Jeffrey E. Poindexter – BBO No. 631922
Pamela S. Chestek – BBO No. 647124
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115-5507
Tel: (413) 781-2820
Fax: (413) 272-6805
fdibble@bulkley.com
jpoindexter@bulkley.com
pchestek@bulkley.com

21

## COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE SECRETARY OF THE COMMONWEALTH
## CORPORATIONS DIVISION

| | |
|---|---|
| **CARTER-McLEOD PAPER & PACKAGING COMPANY, INC.,** | ) |
| **and McLEOD, McLEOD & CHADWICK, LLC f/k/a , McLEOD** | ) |
| **PACKAGING SYTEMS, LLC** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **McLEOD PACKAGING SYSTEMS, INC.** | ) |

### CORPORATE NAME CHALLENGE PURSUANT TO M.G.L. c. 156D §4.01(e)

**I.    INTRODUCTION**

Pursuant to M.G.L. c. 156D, §4.01(b)(1) and (e), Carter-McLeod Paper & Packaging, Inc. ("Carter-McLeod") and its predecessor, McLeod Packaging Systems, LLC protest the use of the name McLeod Packaging Systems, Inc. by a new Massachusetts corporation. On January 3, 2005, McLeod Packaging Systems, Inc. incorporated with the Secretary of State's Office. On January 24, 2005, Carter-McLeod, timely protested the use of the name McLeod Packaging Systems, Inc. by sending written notification to the Secretary of State's Office. A copy of the January 24, 2005 letter from Ronald P. Weiss, Esq. to the Secretary of State is attached hereto as Exhibit 1 and its contents are incorporated herein. Carter-McLeod protests the use of the name McLeod Packaging Systems, Inc. because: 1) the name, type of business and management affiliations of the newly proposed McLeod Packaging Systems, Inc. is so similar to that of Carter-McLeod and to Carter-McLeod's predecessor McLeod Packaging Systems, LLC that it is and will reasonably continue to cause confusion among costumers, suppliers and vendors in the packaging industry; and 2) McLeod Packaging Systems is the trade name of Carter-McLeod. Accordingly, Donald McLeod's use of the name McLeod Packaging Systems, Inc,'s would violate M.G.L. c. 156D, § 4.01(b)(1).

## II.    HISTORY OF THE MCLEOD PACKAGING NAME

**McLeod Packaging Systems, LLC**
incorporated September, 1998
located at 163 Doty Circle, West Springfield, MA
Company Officers:
      Robert H. McLeod, CEO and Chairman
      Donald D. McLeod, President
      Alan Chadwick, Vice President
      Robert Carver, Vice President
**McLeod Packaging Systems, LLC** changed its name to **McLeod, McLeod and Chadwick, LLC** on October 26, 2001 for the sole purpose of holding title to the real estate at 136 Wayside Avenue, West Springfield, MA.
**McLeod, McLeod and Chadwick, LLC** never conducted business under this name.

**Carter-McLeod Paper and Packaging, Inc.**
incorporated October 26, 2001
located at 136 Wayside Avenue, West Springfield, MA (2 blocks from original location)
Company Officers:
      Robert H. McLeod, Clerk, Treasurer
      Donald D. McLeod, President
      Alan Chadwick, Vice President
      Thomas Dingman
The name **Carter-McLeod Paper and Packaging, Inc** was derived by combining the names of **Carter Paper Company** with that of **McLeod Packaging Systems, LLC**.

**McLeod Packaging Systems, Inc. (newly proposed corporation)**
incorporated January 3, 2005
located at 16 East Hill Road, Brimfield, MA
Company Officers:
      Donald D. McLeod, President, Treasurer, Secretary & Director

## III.    ARGUMENT

### A.    McLEOD PACKAGING SERVICES, INC'S. PROPOSED USE OF THE MCLEOD PACKAGING SERVICES NAME VIOLATES M.G.L. c. 156D, § 4.01

M.G.L. c. 156D, §4.01(b)(1) states: "Except as authorized by subsections (c) and (d), a corporate name many not be the same as, or so similar that it is ***likely to be mistaken*** for: (1) the corporate name or trade name of a corporation organized, authorized to transact business or otherwise lawfully conducting business in the commonwealth." Id. (emphasis added).

2

Massachusetts courts have held that the test to determine if a proposed corporate name violates the rights of an existing corporation is whether the similarity of the name is such as to mislead a person of average intelligence. See <u>National Shoe Corp v. National Shoe Mfg. Co.</u>, 302 Mass. 449, 451 (1939); <u>John L. Whiting-J.J. Adams Co. v. Adams-White Brush Co.</u>, 260 Mass, 137, 141 (1927).

It is Carter-McLeod's contention that Donald McLeod should be prohibited from using the name McLeod Packaging Systems, Inc., because "McLeod Packaging Systems" is Carter-McLeod's trade name. The term "trade name" is not defined in Chapter 156D. Black's Law Dictionary defines trade name as: "[a]ny designation which (a) is adopted and used by a person to denominate goods which he markets or services which he renders, or business which he conducts, or *__has come__* *__to be so used by others__*..." Black's Law Dictionary, Fifth Addition. (emphasis added). It is Carter-McLeod's contention that its customers, suppliers and vendors still continue to refer to it as McLeod Packaging Systems, even after its legal change of name.

There is little doubt that Donald McLeod's use of the name McLeod Packaging Systems, Inc., is causing confusion and is likely to continue to cause confusion among Carter-McLeod's suppliers, vendors and customers. Robert McLeod's testimony makes this fact clear. The confusion between the newly proposed McLeod Packaging Systems, Inc. and Carter-McLeod is rooted in the history of Carter-McLeod. From 1998 to 2001 Robert McLeod, Donald McLeod and others ran a successful business in West Springfield by the name of McLeod Packaging Systems, LLC. In 2001, McLeod Packaging Systems, LLC purchased Carter Paper Company, Inc. and a new corporation known today as Carter-McLeod Paper and Packaging, Inc., was formed. The "McLeod Packaging" name was retained within the new name of Carter-McLeod because the principals of McLeod Packaging Systems, LLC wisely recognized that McLeod Packaging was a reputable company with a recognized name and a solid track record of providing quality goods and services to its customers. Common sense and good business judgment told them to include the McLeod

3

Packaging name in the new corporation. It was never the intent of the principals of McLeod Packaging Services to abandon the McLeod Packaging name. I was their intent to incorporate the Carter Paper name into the name of McLeod Packaging Systems.

The good name of McLeod Packaging is still today synonymous with that of Carter-McLeod. While an official name change occurs legally on a given date, the name under which a businesses' customers, suppliers and vendors refer to a business does not evolve as quickly. The names McLeod Packaging Systems and Carter McLeod are jointed at the hip and are interchangeable. As recently as two weeks ago, Carter-McLeod received invoices that were directed to McLeod Packaging Systems.

Carter-McLeod will demonstrate through the oral testimony of Robert McLeod that confusion exists and is reasonably likely to continue among Carter-McLeod's vendors, suppliers and customers as to the relationship between Carter-McLeod, its predecessor McLeod Packaging Systems, LLC and the newly proposed McLeod Packaging Systems, Inc. The facts presented at the hearing will include the following:

1.     Carter-McLeod was created by a merger between Carter Paper Company, Inc. and McLeod Packaging Systems, LLC.

2.     McLeod Packaging Systems is the trade name of Carter-McLeod.

3.     That substantial overlap in names, type of business and management affiliations is likely to cause confusion among vendors, suppliers and customers of the newly proposed McLeod Packaging Systems, Inc. and Carter-McLeod.

4.     Donald McLeod, a former officer of Carter-McLeod f/k/a as McLeod Packaging Systems, LLC has created a new corporation with the proposed name McLeod Packaging Systems, Inc. Donald McLeod is the former President of McLeod Packaging Systems, LLC which continues to do business today, after a merger, as Carter-McLeod.

5.      Donald McLeod intentionally chose the name McLeod Packaging Systems, Inc. because it is indeed, virtually identical to the name McLeod Packaging Systems, LLC under which he was formally part of a successfully run business.

6.      Carter-McLeod and the newly proposed McLeod Packaging Systems, Inc. are engaged in the same business of sale and distribution of packaging materials, supplies and equipment.

7.      The principals involved in Carter-McLeod and the newly proposed McLeod Packaging Systems, Inc. are the same, which leads to confusion over the affiliations and management of the respective corporate entities.

8.      Carter-McLeod still receives mail that is intended for Carter-McLeod but is addressed to its predecessor McLeod Packaging Systems. See Exhibits 2 and 3 attached hereto.

9.      The newly proposed McLeod Packaging Systems, Inc, started inventorying product at the same outside warehouse (Grif-Bak Warehouse, Holyoke) as Carter McLeod.  Inventory belonging to McLeod Packaging Systems, Inc., has been confused for Carter McLeod inventory.

10.     At least one vendor "reactivated" an old account of McLeod Packaging Systems, LLC believing McLeod Packaging Systems, Inc. and McLeod Packaging Systems, LLC to be one and the same company.

11.     Carter-McLeod frequently receives telephone calls from customers who are surprised to hear "Carter-McLeod" when the phone is answered.  Callers frequently suggest that they are trying to reach McLeod Packaging Systems and are unaware that the name has changed to Carter-McLeod.

12.     Carter-McLeod is still known as McLeod Packaging Systems.  The names Carter-McLeod and McLeod Packaging Systems are synonymous because McLeod Packaging Systems is the predecessor to Carter-McLeod.

12.    Carter-McLeod is still known as McLeod Packaging Systems. The names Carter-McLeod and McLeod Packaging Systems are synonymous because McLeod Packaging Systems is the predecessor to Carter-McLeod.

**V.    CONCLUSION**

The statue which governs challenges to corporate name selections prohibits a corporation from assuming a name that is so similar that is likely to be mistaken for the corporate name or trade name of another corporation. Based on Robert McLeod's testimony it is clear that Carter-McLeod is still known as McLeod Packaging and that confusion is likely to occur over the relationship between the newly proposed McLeod Packaging Systems, Inc. and Carter-McLeod . In addition, there are numerous similarities between the name, type of business and management affiliations of Carter-McLeod, its successor McLeod Packaging Systems, LLC and the newly proposed McLeod Packaging Systems, Inc., These similarities have and are likely to continue to cause confusion among Carter-McLeod's customers, vendors and suppliers.    Accordingly, McLeod Packaging Systems, Inc. should not be permitted to use the "McLeod Packaging Systems" name as its use violates M.G.L. c. 156D, §4.01(b)(1).

CARTER-McLEOD PAPER & PACKAGING
COMPANY, INC.
By its attorneys,

Mary Ellen Manganelli, BBO #641658
Bulkley, Richardson & Gelinas, LLP
One Post Office Square, Suite 3700
Boston, MA 02109
617-368-2503

COMMONWEALTH OF MASSACHUSETTS

SECRETARY OF THE COMMONWEALTH

Carter-McLeod Paper & Packaging Company, Inc., )
                                              )
and McLeod, McLeod & Chadwick, LLC,      )     NOTICE OF DECISION
                                              )
           Complainants,            )
                                              )
              v.                        )
                                              )
McLeod Packaging Systems, Inc.,           )
                                              )
           Respondent             )
                                              )

On March 3, 2005, a hearing was held at the Office of the Secretary of the Commonwealth, Corporations Division, One Ashburton Place, Boston, Massachusetts. The hearing was conducted in accordance with the Massachusetts Administrative Procedure Act, M.G.L.A. c. 30A, and the Commonwealth's Rules and Regulations for Adjudicatory Hearings, 950 CMR 101. At issue in the hearing was whether McLeod Packaging Systems, Inc.'s ("Respondent") corporate name is so similar to either or all of the names Carter-McLeod Paper & Packaging Company, Inc., or McLeod, McLeod & Chadwick, LLC, or their trade name, McLeod Packaging Systems ("Complainants"), as to be mistaken for any or all of these names. The standard of similarity is that which would mislead a person of average intelligence taking into account all of the facts and circumstances. Both parties appeared for the hearing and were ably represented by counsel.

Section 4.01 of Chapter 156D of the General Laws of the Commonwealth of Massachusetts is pertinent and provides:

(b)    Except as authorized by subsections (c) and (d), a corporate name may not be the same

as, or so similar that it is likely to be mistaken for:

(1) the corporate name or trade name of a corporation organized, authorized to transact

business or otherwise lawfully conducting business in the commonwealth;

(2) a corporate name reserved under section 4.02;

(3) the fictitious name adopted by a foreign corporation or entity authorized to transact

business or otherwise lawfully conducting business in the commonwealth because its

real or trade name is unavailable;

(4) the corporate name or trade name of a not-for-profit corporation organized,

authorized to conduct its activities or otherwise lawfully conducting it activities in the

commonwealth;

(5) the name or trade name of a partnership, business trust or other entity

organized, authorized to transact business or otherwise lawfully conducting  business

in the commonwealth; or

(6) a trademark or service mark registered with the secretary of state under

chapter 110B.

(c)    A person may apply to the secretary of state for authorization to use a corporate

name that does not comply with the requirements of subsection (b). The secretary of state

shall authorize use of the name applied for if:

(1) the other user consents to the use in writing and, if required by the secretary of

state, submits an undertaking in form satisfactory to the secretary of state to change

its name or mark to a name or mark that is not the same as or so similar that it is

likely to be mistaken for the name of the applicant; or

(2) the applicant delivers to the secretary of state a certified copy of the final

judgment of a court of competent jurisdiction establishing the applicant's right to use the name applied for in the commonwealth.

(d)  A corporation may use the name, including the fictitious name, or mark of another entity that is used in the commonwealth if the other entity is organized, authorized to transact business or otherwise lawfully conducting business in the commonwealth and the proposed user corporation:

(1) has merged with the other entity; or

(2) has been formed by reorganization of the other entity; or

(3) has acquired all or substantially all of the assets, including the name and marks, of the other entity.

(e)  Within 90 days after articles of organization or articles of amendment affecting a change in the name of a corporation are filed with the secretary of state, any person who is registered, qualified or carrying on business in the commonwealth at the time or who has reserved a name under section 4.02 may protest in writing to the secretary of state that the name assumed by the corporation is the same as or so similar that it is likely to be mistaken for the name of such person in violation of this section.  In such event, if the secretary of state decides to conduct a hearing regarding the dispute, he shall give notice thereof as soon as possible to the protesting party and the corporation which assumed the name.  If as a result of the hearing or otherwise, the secretary of state determines that the assumption of the corporate name violates this section, he shall file a statement withdrawing his approval of the articles of organization or articles of amendment insofar as they relate to the name assumed by the corporation and shall give written notice thereof to the protesting party and the corporation.  The withdrawal of approval shall take effect on the date specified by the secretary of state, which shall be not later than 180 days after the filing which was protested.  After the effective date of the withdrawal of

approval, the corporation shall have no right to use its assumed name and may be enjoined from doing business under such name by the superior court upon application of any interested person.

FINDINGS OF FACT:

All the findings of fact contained herein are based upon the evidence provided, the testimony of the witnesses, witness behavior and body language, the consistency of testimony, and whether it was supported by additional documents and testimony.

1.      On October 12, 2001, Complainant filed Articles of Organization for Carter-McLeod Paper and Packaging Company, Inc. ("Carter-McLeod") with the Secretary of the Commonwealth's Corporations Division for the purpose of which is to engage in the distribution and sale of industrial paper products and packaging films and supplies, the distribution, sale, servicing and supply of parts for packaging equipment, and to carry on any business incidental or related thereto. The Complainant listed Donald D. McLeod as President, Robert H. McLeod as Treasurer and Clerk, Thomas Dingman as Vice President of Service, and Alan Chadwick as Vice President of Sales. Robert H. McLeod was also listed as Chairman of the Board of Directors and Directors of the corporation included Donald D. McLeod, Thomas Dingman, and Alan Chadwick (Commonwealth Exhibit 1).

2.      On September 24, 1998, Complainant filed a Certificate of Organization for McLeod Packaging Systems, LLC with the Secretary of the Commonwealth's Corporations Division for the purpose of supplying packaging material supplies and equipment and any business related thereto. The Complainant LLC has no managers and listed Donald McLeod and Robert McLeod

as Secretary of the Commonwealth Signatories and also authorized both to convey interests in real property (Commonwealth Exhibit 2).

3.    On October 22, 2001, Complainant filed a Certificate of Amendment with the Secretary's Corporations Division for McLeod Packaging Systems, LLC changing the name of the limited liability company to McLeod, McLeod & Chadwick, LLC (Commonwealth Exhibit 3).

4.    On December 27, 2004, the Respondent filed Articles of Organization for McLeod Packaging Systems, Inc. for the purpose of dealing in all types and kinds of packaging materials, supplies, and equipment and any business related thereto.  The Respondent listed Donald McLeod as President, Treasurer, Secretary, Director and Registered Agent (Commonwealth Exhibit 4).

5.    On January 24, 2005, Complainant's Counsel sent a letter to the Director of the Corporations Division for the Secretary of the Commonwealth, protesting the use of a similar name by the Respondent, McLeod Packaging Systems, Inc., and claiming that it is likely that Respondent's name will be mistaken for either Carter-McLeod Paper and Packaging Company, Inc. or McLeod, McLeod & Chadwick, LLC (Commonwealth Exhibit 8).

6.    Robert McLeod, on behalf of the Complainant, started a distribution and packaging company, in business for himself, under the name McLeod Packaging Systems, LLC.  Later, Robert McLeod bought out another business named Carter Paper, a 170-year-old company, and changed the name of his business to Carter-McLeod Paper and Packaging Company, Inc. so that both names would be afforded recognition (Complainant Testimony).  Robert McLeod's credibility is manifested in his consistency, mannerisms and supporting evidence.

7.    Donald McLeod, representing the Respondent, is the nephew of Robert McLeod, and formerly associated with the Complainant Corporation, Carter-McLeod, as their president (Respondent Testimony, Commonwealth Exhibit 1).  Donald McLeod's testimony is credible because it is consistent and supported by other relevant evidence.

8.    Complainant argues that the current name of the Respondent Corporation, McLeod Packaging Systems, Inc., is identical to a trade name of Carter-McLeod Paper and Packaging Company, Inc. because it is the Complainant Corporation's former name.  Testimony proved that the vendors, suppliers and/or clients of Carter-McLeod were informed of the name change (Complainant Testimony).

9.    Evidence of Complainant's use of its former name as a trade name is illustrated by the metal name placards attached to machines manufactured, sold and continually serviced by the Complainant (Complainant Exhibit 13) and two invoices from vendors or suppliers, dated February 18, 2005, intended for Carter-McLeod but addressing the corporation as McLeod Packaging Systems (Complainant Exhibits 11 and 12).

10.    The Complainant and Respondent corporations all transact business in and around the city of Springfield, Massachusetts (Complainant Testimony, Respondent Testimony).  Carter-McLeod is in the business of packaging, paper products, janitorial services and food services and McLeod Packaging Systems, Inc. is only in the business of packaging (Respondent Testimony).

CONCLUSIONS AND REASONING:

Any corporate name approved or filed with the Secretary of the Commonwealth's Corporations Division may be withdrawn only if the moving party has demonstrated, by a preponderance of the evidence, that the name assumed by the corporation is the same as or so similar that it is likely to be mistaken for a corporate name or trade name of a corporation organized, authorized to transact business or otherwise lawfully conducting business in the commonwealth.

In the application of M.G.L. c. 156D, § 4.01, we look to the precedent set by the courts in interpreting its predecessor statutes, including but not limited to M.G.L. c. 156B, § 11, and the principles applied from common law relative to trade names. After hearing the testimony and reviewing the evidence presented at the hearing, I conclude that the name McLeod Packaging Systems, Inc. is not the same as Carter-McLeod Paper and Packaging Company, Inc.'s trade name of McLeod Packaging Systems so as to mislead a person of average intelligence. National Shoe Corp. v. National Shoe Mfg. Co., 302 Mass. 449, 451 (1939); First National Stores v. First National Liquor Company, 316 Mass. 538 (1944). The consuming public in Springfield, Massachusetts, was not misled by the use of the corporate name by the Respondent because the corporations provide different services sufficient to distinguish them; Carter McLeod provides packaging, paper products, janitorial services and food services, whereas McLeod Packaging Systems provides only packaging, notwithstanding the geographic location of the Respondent and Complainant. In addition, Complainant notified its vendors, suppliers, and/or clients of its name change from McLeod Packaging Systems to Carter-McLeod Paper and Packaging Company, Inc.

No evidence was offered to prove that the trade name McLeod Packaging Systems had acquired a secondary meaning such that the consuming public associates the name exclusively

with the Complainant as a single source.  <u>Professional Economics, Inc. v. Professional Economic</u>

<u>Services, Inc & Others</u>, 12 Mass. App. Ct. 70 (1981); <u>Union Oyster House, Inc. v. Hi Ho Oyster</u>

<u>House, Inc.</u>, 316 Mass. 543 (1944).  The Complainant did not introduce any evidence to indicate

that the public associated the name McLeod Packaging Systems exclusively with the

Complainant Corporations.  As such, Complainant failed to meet its burden of proof.


DECISION:

The Respondent's assumption of the name McLeod Packaging Systems, Inc. does not violate

M.G.L. c. 156D § 4.01, and the protest of the Complainant is dismissed.



___4/8/05___

Date

<u>Kelly L. Kopyt</u>

Kelly L. Kopyt, Esq.

Hearing Officer



PURSUANT TO M.G.L. CHAPTER 30 A § 14, APPEAL OF THIS DECISION MUST BE

MADE TO SUPERIOR COURT WITHIN THIRTY DAYS AFTER RECEIPT OF NOTICE OF

DECISION.

# Commonwealth of Massachusetts
## HAMPDEN SUPERIOR COURT
## Case Summary
## Civil Docket

## Carter-McLeod Paper and Packaging Company Inc et al v Secretary

Details for Docket: HDCV2005-00480

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | HDCV2005-00480 | **Caption:** | Carter-McLeod Paper and Packaging Company Inc et al v Secretary |
| **Filing Date:** | 05/09/2005 | **Case Status:** | Needs review for service |
| **Status Date:** | 05/09/2005 | **Session:** | Civil A - CtRm 6 |
| **Lead Case:** | NA | **Case Type:** | Standard |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | X | **Discovery:** | |
| **Service Date:** | 08/07/2005 | **Disposition:** | 12/05/2005 |
| **Rule 15:** | | **Rule 12/19/20:** | |
| **Final PTC:** | 11/05/2005 | **Rule 56:** | |
| **Answer Date:** | 10/06/2005 | **Jury Trial:** | NO |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | HDCV2005-00480 | **Caption:** | Carter-McLeod Paper and Packaging Company Inc et al v Secretary |
| **Filing Date:** | 05/09/2005 | **Case Status:** | Needs review for service |
| **Status Date:** | 05/09/2005 | **Session:** | Civil A - CtRm 6 |
| **Lead Case:** | NA | **Case Type:** | Admin agency appeal (30A) |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | X | **Discovery:** | |
| **Service Date:** | 08/07/2005 | **Disposition:** | 12/05/2005 |
| **Rule 15:** | | **Rule 12/19/20:** | |
| **Final PTC:** | 11/05/2005 | **Rule 56:** | |
| **Answer Date:** | 10/06/2005 | **Jury Trial:** | NO |

## Parties Involved

3 Parties Involved in Docket: HDCV2005-00480

| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Secretary of the Commonwealth | **First Name:** | The |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Carter-McLeod Paper and Packaging Company Inc | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | McLeod McLeod & Chadwick LLC | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

## Attorneys Involved

3 Attorneys Involved for Docket: HDCV2005-00480

| **Attorney Involved:** | | **Firm Name:** | BULK01 |
| **Last Name:** | Poindexter | **First Name:** | Jeffrey E |
| **Address:** | 1500 Main Street, Suite 2700 | **Address:** | PO Box 15507 |
| **City:** | Springfield | **State:** | MA |
| **Zip Code:** | 01115 | **Zip Ext:** | 5507 |
| **Telephone:** | 413-781-2820 | **Tel Ext:** | |
| **Fascimile:** | 413-272-6805 | **Representing:** | Carter-McLeod Paper and Packaging Company Inc, (Plaintiff) |

**Attorney**

| **Involved:** | | **Firm Name:** | MA02 |
|---|---|---|---|
| **Last Name:** | Whitcomb | **First Name:** | James S |
| **Address:** | 1350 Main Street | **Address:** | Western Mass Division |
| **City:** | Springfield | **State:** | MA |
| **Zip Code:** | 01103 | **Zip Ext:** | 1629 |
| **Telephone:** | 413-784-1240 | **Tel Ext:** | 113 |
| **Fascimile:** | 413-784-1244 | **Representing:** | Secretary of the Commonweal The (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | BULK01 |
|---|---|---|---|
| **Last Name:** | Chestek | **First Name:** | Pamela S. |
| **Address:** | 1500 Main Street | **Address:** | PO Box 15507 |
| **City:** | Springfield | **State:** | MA |
| **Zip Code:** | 01115 | **Zip Ext:** | |
| **Telephone:** | 413-781-2820 | **Tel Ext:** | |
| **Fascimile:** | 413-785-5060 | **Representing:** | Carter-McLeod Paper and Packaging Company Inc, (Plaintiff) |

## Calendar Events

No Calendar Events found for Docket: HDCV2005-00480.

There are currently no calendar events associated with this case.

## Full Docket Entries

5 Docket Entries for Docket: HDCV2005-00480

| Entry Date: | Paper No: | Docket Entry: |
|---|---|---|
| 05/09/2005 | 1 | Complaint & civil action cover sheet filed |
| 05/09/2005 | | Origin 1, Type E02, Track X. |
| 05/31/2005 | 2 | Atty James S Whitcomb's notice of appearance for The Secretary of the |
| 05/31/2005 | 2 | Commonwealth |
| 06/02/2005 | 3 | SERVICE RETURNED: The Secretary of the Commonwealth(Defendant) |



# CARTER ~ MCLEOD PAPER AND PACKAGING, INC.

Since 1894





## Shrink and Stretch

*tyco*

Cling Food Films, Stretch Food Films,
Polyolefin Shrink Film, Custom Printed Shrink Films,
"CRYOVAC" Shrink Film, "OPTI" Shrink Film,
Machine Stretch Wrap, Polyethylene Film,
Hand Stretch Wrap, Shrink Bags,
Custom Printed Shrink Bags, Skin Packaging,
Custom Printed Bundling Films

Sealed Air
CRYOVAC
Food Packaging Systems





**3M**

## Tapes

Adhesive Transfer, Hand Carton Sealing,
Machine Carton Sealing, Cellophane, Dispensers,
Double Coated, Filament, Paper Gummed,
Reinforced Gummed Paper, Strapping Tape,
Vinyl, Flat Back Paper, Heat Management,
Cloth, Label Protection, Masking,
Custom Printed Tapes

intertape polymer

**tesa**



## Equipment Sales and/or Service

### We service and/or sell the following equipment:

3M-Matic, Advance Strapping, Arpac, Bemis, Conflex,
Cousins Packaging, EAM Mosca, Eastey, Greatlakes,
Intertape, ITW Mima, ITW Muller, Little David, Loveshaw, New Castle Products,
Omni Metalcraft Conveyors, Orgapak, Orion, Pac Strapper, Packrite,
Samuels, Versa Conveyors, Weldotron,
**And many more**





## Packaging Supplies

Sealed Air
Our Products Protect Your Products'

Bubble Rolls, Bubble Sheets, Chipboard Sheets
Corner Board Protectors, Foam Rolls, Foam Sheets,
Aluminum Foil, Regular Peanuts,
Biodegradable Peanuts, Anti-Static Peanuts,
Plastic Strapping, Plastic Strap Seals and Tools,
Steel Strapping, Steel Strap Seals and Tools,
Wrapping Tissue, Wadding, Twine


SAMUEL
Samuel Strapping Systems


FP
INTERNATIONAL
Free Flow Packaging International Inc.

## JANITORIAL / WASHROOM

Kimberly-Clark
Professional

Toilet Tissue, Roll Towels, Multi Fold Towels,
Center Fold Towels, Bowl Cleaners, Floor Cleaners,
Liquid Hand Soap, Powdered Hand Soap,
Household Towels, Urinal Blocks, Bleach,
Towel Dispensers, Toilet Tissue Dispensers,
Wax & Floor Finish, Wipers, Sanitary Products



SIMONIZ


BAY WEST
Wausau-Mosinee






# CARTER — MCLEOD PAPER AND PACKAGING, INC.


136 Wayside Avenue ■ West Springfield, MA 01089



# Paper and Boxes

Corrugated Rolls, Corrugated Sheets,
Custom Boxes, Custom Trays, Bogus Paper Rolls,
Bogus Paper Sheets, Computer Paper, Kraft Paper Rolls,
Kraft Paper Sheets, VCI, Military Paper,
Newsprint Rolls, Newsprint Sheets, White Sign Paper,
Waxed Kraft Paper, Paper Tubes,
Deli and Bakery Paper, Coated Papers





# Safety Supplies

Alcohol Wipes, Coveralls,
Latex Gloves, Vinyl Gloves, Nitrile Gloves,
Leather Work Gloves, Hairnets,
Air Masks, Safety Walk, Ear Plugs, Ear Muffs,
Safety Glasses, Face Shields, Bump Caps, Hard Hats,
Chemical Sorbents, Maintenance Sorbents, Oil-Dri,
Petroleum Sorbents, Ice Melt





# FOOD SERVICE

Bowls, Paper Cups, Plastic Cups,
Cup Lids, Plates, Forks, Knives,
Spoons, To Go Containers, Scouring Pads,
Food Films, Aluminum Foil, Stirrers, Napkins,
Table covers, Paper & Poly Bags, Bakery Boxes,
Hairnets, Gloves, Straws, Stirrers, Table Covers





# ADHESIVES

3M ™ Spray Adhesives, 3M ™ Shipping-Mate,
3M ™ Fastbond, 3M ™ Scotch-Grip,
3M™ Adhesives, 3M ™ Jet-Melt, 3M ™ Jet-Weld,
3M ™ Pronto, 3M ™ Scotch-Seal,
3M ™ Scotch-Weld, Bumpons,
Poly Mask Rolls

Protec-Rite





# BAGS & LINERS

Plain Lay Flat Poly, Poly Static Control,
Poly Transparent Metallic Shielded,
Poly White Write–On
Gusseted Poly, Gaylord and Bin Liners,
Zippered Top, Poly Bags/Sheets on a Roll,
Specialty Bags, Trash Can Liners, Shopping,
Specialty, Poly Tubing







# Labels & Tags, and Office Supplies

Custom Envelopes, Fragile Labels,
Packing List Envelopes, Padded Envelopes,
Mailer Boxes, Computer Paper,
Green Bar Computer Paper, Merchandise Tags,
Custom Tags, Staples, Staplers, Tape Dispensers,
Stencils

Sealed Air



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:05-cv-30087-MAP

CARTER-McLEOD PAPER AND            )
PACKAGING COMPANY, INC.            )
                                   )
   Plaintiff                   )
                                   ) AFFIDAVIT OF ROBERT H. McLEOD
v.                                 )
                                   )
DONALD McLEOD; McLEOD              )
PACKAGING SYSTEMS and              )
MORTEN HAZZARD                     )
                                   )
   Defendants.                 )

I, Robert H. McLeod, being duly sworn, depose and say:

     I currently am the President of Carter-McLeod Paper and Packaging Company, Inc. ("Carter-McLeod Packaging"). I submit this affidavit in support of Carter-McLeod Packaging's Motion for Preliminary Injunction.

     1.    I am the current President and a founder of Carter-McLeod Packaging. Donald McLeod, one of the defendants, is my nephew.

     2.    McLeod Packaging Systems, LLC was formed in September 1998 and was located in West Springfield, Massachusetts. The company was a closely-held limited liability company with four shareholders and officers: myself (Chief Executive Officer), Donald McLeod (President), Alan Chadwick (Vice President), and Robert Carver (Vice President). The stated purpose of the company was to "supply packaging material supplies and equipment and any business related thereto or in useful connection therewith . . . ." A copy of the McLeod Packaging Systems, LLC Certificate of Organization is attached hereto at **Tab 1**.

3.     Beginning in September 1998, McLeod Packaging Systems, LLC used in interstate commerce the mark "McLeod Packaging Systems" in association with the distribution, sale, servicing and supplying of packaging materials, packaging equipment, and parts for packaging equipment in the Greater Springfield area and other parts of New England. McLeod Packaging Systems, LLC also sold goods to customers in New York, New Jersey, and Virginia and Carter-McLeod Packaging continues to sell to customers in these states and others today.

4.     Donald McLeod, as a salesperson and President of McLeod Packaging Systems, LLC, conducted business on behalf of that company. McLeod Packaging Systems, LLC compensated Donald McLeod and other employees to provide services and develop business and goodwill for the benefit of McLeod Packaging Systems, LLC.

5.     From September 1998 to October 2001, sales of McLeod Packaging Systems, LLC grew from $0 to over $3,000,000, and developed approximately 150 customer accounts based on the investment of time and money devoted by the company to develop the company and its goodwill.

6.     In addition to time and other investments in the goodwill of the company, McLeod Packaging Systems, LLC spent in excess of $15,000.00 on advertising between September, 1998 and October, 2001. From 1998 to October 2001, McLeod Packaging Systems, LLC advertised in the Springfield, Holyoke, Hampshire County, Northampton, Amherst, and Easthampton Area Yellow Pages, plus directory listings in these publications. In addition, McLeod Packaging Systems, LLC advertised through the publishing of brochures, business cards, literature labels, machine labels, letterhead stationary, envelopes and lettering on two service vans. McLeod Packaging Systems, LLC sponsored various charitable organizations such

as the "Hole in the Wall Gang" through our customer Ken's Foods, the John LeClair Foundation, Knights of Columbus golf tournament and the Vermont Pure Springs Bob Bierley Memorial Golf Tournament.

7.     McLeod Packaging Systems, LLC also was recognized in at least one national trade publication, Packaging Digest, for its role in the sale of packaging machinery to the Wright Line company of Worcester.  The company also participated in trade shows and the like, including participation and marketing efforts at the New England (Northeast) Packaging Show in Marlboro, Massachusetts in the Spring of 2000.

8.     In or around October 2001, McLeod Packaging Systems, LLC purchased an entity known as Carter Paper Company, a smaller company in sales that had been in business for approximately 107 years.  On or around October 12, 2001, the principals of McLeod Packaging Systems, LLC formed Plaintiff Carter-McLeod Packaging, a closely held corporation, to continue the businesses of both McLeod Packaging Systems, LLC and Carter Paper Company.  Carter-McLeod Packaging continued to maintain its principal place of business in West Springfield Massachusetts.  Specifically, Carter-McLeod Packaging's stated purpose in its Articles of Incorporation is "[t]o engage in the distribution and sale of industrial paper products and package films and supplies; the distribution, sale, servicing and supplying of parts for packaging equipment, and to carry on any business incidental or related thereto."  Carter-McLeod Packaging's primary shareholders and officers were myself (Chief Executive Officer); Donald McLeod (President), and Alan Chadwick (Vice President).  Each of these individuals were also officers and shareholders of McLeod Packaging Systems, LLC.  Copies of the Articles of Incorporation for Carter-McLeod Packaging are attached hereto as **Tab 2.**

9.     The principals of McLeod Packaging Systems, LLC merged the names of the two predecessors Carter Paper and McLeod Packaging Systems when creating the new company name "Carter-McLeod Paper and Packaging Company, Inc." in order to retain and continue to benefit from the goodwill developed and/or purchased in both companies.

10.     Although Carter-McLeod Packaging was a newly-formed corporation, its public identity was as the continuation of McLeod Packaging Systems, LLC. Most of the customers who knew us as McLeod Packaging Systems, LLC are still with us as Carter-McLeod Packaging. Carter-McLeod Packaging retained the main telephone and facsimile numbers that it had used as McLeod Packaging Systems, LLC.

11.     The name of the entity originally formed as McLeod Packaging Systems, LLC was changed to McLeod, McLeod and Chadwick, LLC. It still exists today as a real estate holding company.

12.     In or around October 2001, Donald McLeod became a 40% shareholder, director and President of Carter-McLeod Packaging. Following the organization of Carter-McLeod Packaging, McLeod Packaging Systems, LLC's officers, shareholders and salespeople, including Donald McLeod, continued to buy from, sell to and otherwise deal with its clients, customers, vendors and suppliers on behalf of Carter-McLeod Packaging.

13.     Carter-McLeod Packaging is still known today as McLeod Packaging Systems. We still receive invoices from companies sent to our current address and addressed to "McLeod Packaging Systems." Two examples are attached at **Tab 3**.

14.     By October 2001, McLeod Packaging Systems, LLC, in addition to other products, goods and equipment, had sold approximately 100 packaging machines with metal

placards attached containing the name "McLeod Packaging Systems," its logo (consisting of a rectangular box with the letters "MPS" in a diagonal orientation) and contact telephone number. The telephone number on the "McLeod Packaging Systems" placards is a current Carter-McLeod Packaging telephone number. The purpose of the placards is to identify the seller of the equipment, as a continuing advertisement for the maintenance and servicing of the machine and as a contact for future machine and equipment needs. The machines on which placards are attached range in life from five to twenty years. Carter-McLeod continues to maintain and service machines with the referenced placard. A true and accurate copy of a placard identical in all material respects to the placards placed on the referenced packaging machines is attached hereto as **Tab 4**.

15.    From October 2001 to present, Carter-McLeod Packaging has substantially grown its customer base and has grown from approximately $6,000,000.00 to approximately $14,000,000.00 in 2004 based, in part, on the time and money expended by the company on building its customer base and goodwill.

16.    From October 2001 to present, Carter-McLeod Packaging has spent approximately $16,000 in advertisements, sponsorships and contributions. Carter-McLeod Packaging has advertised in the Greater Springfield and Holyoke Area Yellow Pages, plus directory listings in these publications. In addition, Carter-McLeod Packaging advertises through the publishing of brochures, business cards, literature labels, machine labels, letterhead stationary, envelopes and lettering on three service vans and four delivery trucks. Carter-McLeod Packaging is a sponsor, through our customer Ken's Foods, of the Hole in the Wall Gang, The United Way and the New England Air Museum.

17.    From October 2001 to present, Carter-McLeod Packaging would be classified, based on dollars sales, as a medium size independent packaging distributor in New England.

18.    Donald McLeod remained an officer, director and shareholder of Carter-McLeod Packaging until December 15, 2004.

19.    In or around December of 2004, Carter-McLeod Packaging and its other officers, shareholders and directors learned that Donald McLeod had converted substantial funds from the company, paid himself inflated commissions, purchased substantial amounts of personal items with company funds and/or on company credit and had otherwise defrauded Carter-McLeod Packaging and breached his fiduciary duties as officer, director and shareholder.

20.    On December 15, 2004, Carter-McLeod Packaging's Board of Directors, in accordance with the bylaws of Carter-McLeod Packaging, voted to terminate the employment of Donald McLeod, effective immediately, to redeem his shares and to appoint me as President. Donald McLeod was required under the corporate bylaws to turn his stock certificates over to the Secretary of Carter-McLeod Packaging by January 14, 2005.

21.    On or around December 23, 2004, Shortly after Carter-McLeod Packaging terminated Donald McLeod's employment and called his shares, but while Donald McLeod was still a director of Carter-McLeod Packaging and a shareholder in redemption, Donald McLeod formed the Defendant company McLeod Packaging Systems, Inc. ("McLeod Packaging Systems"). A copy of the McLeod Packaging Systems' Certificate of Organization is attached hereto at **Tab 5.**

22.    According to its Articles of Organization, Donald McLeod was named President, Treasurer and Secretary of McLeod Packaging Systems and is its sole shareholder. See **Tab 5.**

23.    McLeod Packaging Systems' business purpose according to its Articles of Organization is "[t]o deal in all types and kinds of packaging materials, supplies, and equipment and any business related thereto or useful in connection therewith, and other lawful business." See **Tab 5.**

24.    McLeod Packaging Systems' business purpose is the same as or similar to Carter-McLeod Packaging's business purpose and, to the best of my knowledge, McLeod Packaging Systems currently sells the same items Carter-McLeod Packaging sells – packaging supplies and equipment, along with related support services.

25.    On January 3, 2005, Morten Hazzard, a Carter-McLeod Packaging purchasing manager who was hired and supervised by Donald McLeod, resigned from his position at Carter-McLeod Packaging and went to work for McLeod Packaging Systems. Morten Hazzard's resignation immediately followed a one-week vacation from Carter-McLeod Packaging.

26.    Records reflect that on December 20, 2004, just prior to his vacation and subsequent resignation, Morten Hazzard transferred proprietary and confidential business records, files and documents from Carter-McLeod Packaging's computer system to his own personal email account and/or computer. Specifically, Carter-McLeod Packaging retained a computer specialist to conduct a forensic computer analysis of the computer hard drive used by Morten Hazzard at Carter-McLeod Packaging, the results of which revealed the referenced transfer of confidential information. The information taken is confidential, highly sensitive, and potentially very damaging to Carter-McLeod Packaging in the hands of a competitor. A copy of the email, without the attached confidential documents, is attached hereto at **Tab 6.**

27.    Some of the information removed consists of the deviated price lists for Carter-McLeod Packaging's largest and most valued clients. The deviated price lists include, among other information, the varying prices of product provided by vendors to Carter-McLeod Packaging based on the intended purchaser from Carter-McLeod Packaging. If a Carter-McLeod Packaging competitor has this information, it can use the information to negotiate with vendors for more favorable prices and in pricing product for targeted customers. Additionally, such deviations, if shared with Carter-McLeod Packaging's customers, could have a substantially adverse impact on our relationships with our customers, who might believe that they have been unfairly charged as compared with our other customers.

28.    McLeod Packaging Systems conducts business in the same area and through the same channels of trade as Carter-McLeod Packaging. Carter-McLeod Packaging has learned from the following customers that they have been solicited by and or have conducted business with Donald McLeod and/or Morten Hazzard following their departure from Carter-McLeod Packaging and the formation of McLeod Packaging Systems: Kens Foods, CPF, Catania Spagna, Little Rill, Sullivan Paper, Tube Products, Jen-Coat, Kraft Foods (Veryfine), Southern States, Jaffco, H.P. Hood, Mayer Brothers, Olympic Manufacturing, John R. Lyman, Data Mail, OK Pet Supply, Heat Fab, Bozzuto's, Milton Bradley, American Disposables, Country Pure Foods, Vertis, Curtis Business Forms, Vermont Pure/Clear Source, Omya, Capital City Press, and Dartmouth Printing.

29.    The use by Donald McLeod and McLeod Packaging Systems of Carter-McLeod Packaging's name and mark has caused and continues to cause actual confusion as evidenced by

the following examples of specific instances of confusion and attempts by the defendants to capitalize on the established goodwill in that name:

    a.  In January 2005, I received a telephone call from Grif-Bak Warehouse in Holyoke, Massachusetts, Carter-McLeod Packaging's outside warehouse for more than six years, calling us to ask what to do with a shipment it had received for McLeod Packaging Systems. Apparently, McLeod Packaging Systems began warehousing product at the same warehouse and Grif-Bak thought that the product belonged to Carter-McLeod Packaging.

    b.  We have and continue to receive misdirected mail intended for McLeod Packaging Systems. Upon advice of counsel, we have copied some of the misdirected mail (attached at **Tab 7**). This mail includes (1) an April 5, 2005 payment from our customer, Ben & Jerry's (and apparently now McLeod Packaging Systems's customer) sending payment to Carter-McLeod Packaging's address, directed to the attention of Donald McLeod, and made payable to McLeod Packaging Systems, LLC. We returned this check to Ben & Jerry's. (2) Another payment on April 14, 2005 from Ben & Jerry's enclosing payment to Carter-McLeod Packaging's address, directed to the attention of Donald McLeod, and made payable to McLeod Packaging Systems, LLC. Therefore, despite having once corrected Ben & Jerry's, it sent us another payment a second time with the same error. (3) Correspondence dated May 18, 2005 from Nationwide Finance to the attention of Donald McLeod but directed to Carter-McLeod Packaging's address and fax machine, and naming "McLeod Packaging System."

The letter states that "McLeod Packaging System" was pre-qualified for a $100,000 equipment line of credit because "for the last 12 months, you have maintained an excellent score," meaning a Dunn & Bradstreet score. Carter-McLeod Packaging did not speak with Nationwide and did not request a line of credit from Nationwide. McLeod Packaging Systems has also not been in business for twelve months, so could not have its own "excellent score" based on the past 12 months. It appears that McLeod Packaging Systems is taking advantage of the credit worthiness of Carter-McLeod Packaging and the confusion over the similarity in names to build its own business.

c. Carter-McLeod Packaging has received numerous telephone calls either intended for Donald McLeod or Morten Hazzard at McLeod Packaging Systems or otherwise seeking clarification regarding the relationship between the two companies.

d. In January 2005, I was informed by a customer service representative, Will Moore, of Laddawn Manufacturing that Morten Hazzard reactivated an account that was originally in the name of McLeod Packaging Systems, LLC. I informed Mr. Moore that McLeod Packaging Systems, LLC and McLeod Packaging Systems, Inc. were two separate and unrelated companies and that our credit history with Laddawn Manufacturing was not be used and our old account was not to be reactivated.

e. On May 10, 2005, I received a telephone call from a customer service representative at Country Bank for Savings and was informed that it was returning

a check to us for insufficient funds drawn on an account of McLeod Packaging Systems, LLC that now has a zero balance. The check was written by Jennifer Cushman, Donald McLeod's wife and a former employee of both McLeod Packaging Systems, LLC and Carter-McLeod Packaging and who now works for McLeod Packaging Systems. The only reasonable explanations for such conduct I believe are that McLeod Packaging Systems made a deliberate attempt to convert funds of Carter-McLeod Packaging or that the company itself was confused by the similarity of the names McLeod Packaging Systems, LLC and McLeod Packaging Systems, Inc.

    f.    Attached at **Tab 8** is a copy of an April 7, 2005 email sent by Morton Hazzard to one of Carter-McLeod Packaging's largest customers, which was given to me by the customer. Although the email was sent more than a month after Morten Hazzard's departure from Carter-McLeod Packaging, the signature line reads "Morten Hazzard Carter-McLeod Paper and Packaging, Inc." Because of the misleading signature line, I believe that purchasers may believe that there is a connection between Carter-McLeod Packaging and McLeod Packaging Systems, for example, that "McLeod Packaging Systems" is the packaging subsidiary of Carter-McLeod Packaging.

    30.    Donald McLeod also told people, falsely, that Carter-McLeod Packaging was experiencing financial difficulty and could not meet various obligations to its customers, vendors and creditors. For example, Donald McLeod told Nancy McElvoy, a sales representative for AEP Films, that our company was in financial difficulty. He also told another vendor of ours,

Malpack, and as a result they refused to ship product on credit to one of our customers,

demanding payment up front.  At the time they demanded the up front payment we had a zero

balance and had given them no reason to question our credit worthiness.  In addition,

immediately after Donald McLeod left the company, Phil Gonsalves, a Vice President with

Country Bank for Savings, froze our operating line of credit.


Signed under the pains and penalties of perjury this 24 day of May, 2005.

Robert H. McLeod

TAB 1

## MCLEOD PACKAGING SYSTEMS, LLC

FILED

### CERTIFICATE OF ORGANIZATION

Pursuant to the Massachusetts Limited Liability Company Act (the "Act"), the undersigned hereby certifies that a limited liability company has been organized under the Act as follows:

1. **Name:**  The name of the limited liability company is:

   McLeod Packaging Systems, LLC

2. **Office:**  The street address of the office of the LLC in Commonwealth for purposes of the Act is:

   12 Crescent Street, Holyoke, MA 01040

3. **Business of the LLC:**  The general character of the business of the LLC is to supply packaging material supplies and equipment and any business related thereto or useful in connection therewith, and any other lawful business purpose or activity permitted by the Act.

4. **Date of Dissolution:**  The LLC has no specific date of dissolution.

5. **Resident Agent:**  The name and address of the resident agent of LLC for service of process is:

   Donald McLeod
   45 Meadowbrook Lane
   Palmer, MA 01069

6. **Managers:**  The LLC will be managed by its members and will have no Managers for purposes of the Act.

7. <u>Execution of</u>
   <u>Documents:</u>

   Donald McLeod
   45 Meadowbrook Lane
   Palmer, MA 01069

   Robert McLeod
   12 Heritage Circle
   Clinton, CT 06413

8. <u>Authority to</u>
   <u>Convey Title:</u>

   Any one of the following persons is authorized
   execute, acknowledge, deliver and record any
   recordable instrument purporting to effect an
   interest of real property of the LLC under
   Section 66 of the Act:

   Donald McLeod
   45 Meadowbrook Lane
   Palmer, MA 01069

   Robert McLeod
   12 Heritage Circle
   Clinton, CT 06413

   IN WITNESS WHEREOF, the undersigned has executed this
   Certificate of Organization as of ___September 18,___ 1998.



                                     DONALD MCLEOD

c-7

630862

*.115* .

## COMMONWEALTH OF MASSACHUSETTS

### LIMITED LIABILITY COMPANY
(General Laws, Chapter 156C)

Filed this _2.4_ day of _Sept_.

19 _98_.

*FEE PAID*
*$ 500.00*
*SEP 2 4 1998*

*CASHIERS*
*SECRETARY'S OFFICE*

*[signature]*

### WILLIAM FRANCIS GALVIN
### SECRETARY OF THE COMMONWEALTH

TAB 2

**D**



Examiner

Name
Approved

C
P
M
R.A.

**6**

P.C.

# The Commonwealth of Massachusetts

### William Francis Galvin
### Secretary of the Commonwealth
### One Ashburton Place, Boston, Massachusetts 02108-1512

## ARTICLES OF ORGANIZATION
### (General Laws, Chapter 156B)

01240216

### ARTICLE I
#### The exact name of the corporation is:

**CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC.**

### ARTICLE II
#### The purpose of the corporation is to engage in the following business activities:

To engage in the distribution and sale of industrial paper products and packaging films and supplies; the distribution, sale, servicing and supplying of parts for packaging equipment, and to carry on any business incidental or related thereto.

To have and exercise all powers conferred upon corporations by the laws of the Commonwealth of Massachusetts and to do everything suitable or necessary to accomplish the foregoing purposes, including all acts incidental to or connected therewith, so far as the same be not inconsistent with the laws of the Commonwealth of Massachusetts.

*Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on one side only of separate 8 1/2 x 11 sheets of paper with a left margin of at least 1 inch. Additions to more than one article may be made on a single sheet so long as each article requiring each addition is clearly indicated.*

108460-1

## ARTICLE III

State the total number of shares and par value, if any, of each class of stock which the corporation is authorized to issue.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| Common: | 200,000 | Common: | None | N/A |
| | | | | |
| Preferred: | None | Preferred: | None | N/A |
| | | | | |

## ARTICLE IV

If more than one class of stock is authorized, state a distinguishing designation for each class. Prior to the issuance of any shares of a class, if shares of another class are outstanding, the corporation must provide a description of the preferences, voting powers, qualifications, and special or relative rights or privileges of that class and of each other class of which shares are outstanding and of each series then established within any class.

**N/A**

## ARTICLE V

The restrictions, if any, imposed by the Articles of Organization upon the transfer of shares of stock of any class are:

**See ARTICLE V annexed hereto and made a part hereof.**

## ARTICLE VI

**Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or stockholders, or of any class of stockholders:

**See ARTICLE VI annexed hereto and made a part hereof.**

**If there are no provisions state "None".
*Note: The preceding six (6) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.*

108460-1

## ARTICLE V
### CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC.

Each share of common stock of the corporation is subject to the requirements and restrictions upon the transfer of such shares as hereinafter set forth, which shall be binding upon each stockholder and his or her heirs, assigns, executors, administrators or other legal representatives.

Any stockholder, before transferring any of his or her shares of common stock by sale or otherwise, shall first give written notice thereof to the corporation through the Board of Directors, stating the nature of the proposed transfer, the name of the proposed transferee and the consideration to be received, if any, and shall at the same time offer in writing to sell such shares to the corporation at the book value thereof as hereinafter defined or, in the case of a sale, at the price which he or she has been offered if lower than book value. Book value shall be the book value at the end of the corporate fiscal year next prior to the time of said offer and shall be determined by the accountant then servicing the corporation, using the customary accounting methods of the corporation.

The corporation shall have thirty days from the receipt of such offer to accept it or reject it and if such offer is not accepted within said thirty days it shall be deemed to be rejected. If such offer shall be accepted as above, then the shares so offered shall be sold and transferred to the corporation or its nominee and the transferring stockholder shall be paid the price determined in the manner set forth herein.

If at the end of said thirty days the directors shall not have exercised their right to purchase, then the shares shall be offered to existing stockholders on a pro rata basis and such stockholders shall have the same right as the corporation for an additional thirty days to purchase the stock of such transferring stockholder upon the same terms and conditions, including price, as contained in these restrictions in favor of the corporation.

If at the end of said sixty-day period neither the directors of the corporation nor the stockholders shall have exercised their right to purchase then the transferring stockholder may transfer the stock in the manner and to the person described in the written notice of the transferring stockholder to the Board of Directors.

No shares of stock in the corporation shall be sold or transferred until these provisions have been completely and accurately complied with, but the Board of Directors and stockholders may in any particular instance waive, by written instrument, the requirement for first offering such shares to the corporation and stockholders as set forth herein and the transferring stockholder may transfer the stock in the manner and to the person described in the written notice of the transferring stockholder to the Board of Directors.

J08412-1

## ARTICLE VI
### CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC.

Other lawful provisions for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining or regulating the powers of the corporation, or of its directors or stockholders, or any class of stockholders:

(a)    Meetings of the stockholders of the corporation may be held anywhere in the United States.

(b)    The rights of a stockholder shall not be considered adversely affected by any amendment of the Articles of Organization of the corporation which creates or alters any restriction on transfer of stock and any such amendment is hereby expressly permitted.

(c)    The directors may make, amend or repeal the by-laws in whole or in part, except with respect to any provision thereof which by law or the by-laws requires action by the stockholders.

(d)    The corporation may be a partner in any business enterprise it would have power to conduct by itself.

(e)    A director shall have no personal liability to the corporation or to its stockholders for monetary damages for breach of fiduciary duty as a director notwithstanding any provision of law imposing such liability; but this provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under General Laws Chapter 156B, Section 61 (relating to a distribution to a stockholder while the corporation is insolvent or thereby rendered insolvent) or Section 62 (relating to loans to an officer, director, or a stockholder with 1% of the voting power), or (iv) for any transaction from which the director derived an improper personal benefit.

108412-1

**ARTICLE VII**

The effective date of organization of the corporation shall be the date approved and filed by the Secretary of the Commonwealth. If a *later* effective date is desired, specify such date which shall not be more than *thirty days* after the date of filing.

**ARTICLE VIII**

The information contained in Article VIII is not a permanent part of the Articles of Organization.

a. The street address (*post office boxes are not acceptable*) of the principal office of the corporation *in Massachusetts* is:

163 Doty Circle, West Springfield, MA 01089

b. The name, residential address and post office address of each director and officer of the corporation is as follows:

| | NAME | RESIDENTIAL ADDRESS | POST OFFICE ADDRESS |
|---|---|---|---|
| President: | Donald D. McLeod | 45 Meadowbrook Lane<br>Palmer, MA 01069 | Same |
| Treasurer: | Robert H. McLeod | 12 Heritage Circle<br>Clinton, CT 06413 | Same |
| Clerk: | Robert H. McLeod | (See above for address) | Same |
| Directors: | Donald D. McLeod | (See above for address) | Same |
| | Robert H. McLeod* | (See above for address) | Same |
| | Thomas Dingman** | 71 Lancashire Road<br>Springfield, MA 01104 | Same |
| | Alan Chadwick*** | 1493 Tarte Road<br>Highgate, VT 05459 | Same |

| | |
|---|---|
| * | Chairman of the Board |
| ** | Vice President Service |
| *** | Vice President Sales |

c. The fiscal year (i.e., tax year) of the corporation shall end on the last day of the month of: December.

d. The name and business address of the resident agent, if any, of the corporation is:

David J. Martel      One Monarch Place – 19th Floor
                     Springfield, MA 01144–1900

**ARTICLE IX**

By-laws of the corporation have been duly adopted and the president, treasurer, clerk and directors whose names are set forth above, have been duly elected.

IN WITNESS WHEREOF AND UNDER THE PAINS AND PENALTIES OF PERJURY, I/we, whose signature(s) appear below as incorporator(s) and whose name(s) and business or residential address(es) *are clearly typed or printed* beneath each signature do hereby associate with the intention of forming this corporation under the provisions of General Laws, Chapter 156B and do hereby sign these Articles of Organization as incorporator(s) this _11_ day of _____October,____ 2001

David J. Martel, Esq.
DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.
One Monarch Place – 19th Floor
Springfield, MA 01144–1900

*Note: If an existing corporation is acting as incorporator, type in the exact name of the corporation, the state or other jurisdiction where it was incorporated, the name of the person signing on behalf of said corporation and the title he/she holds or other authority by which such action is taken.*

210441

THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF ORGANIZATION
### (General Laws, Chapter 156B)

I hereby certify that, upon examination of these Articles of Organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $ 200.00 having been paid, said articles are deemed to have been filed with me this 12 th day of OCTOBER 19 2001.

Effective date: _____

*William Francis Galvin*

**WILLIAM FRANCIS GALVIN**
*Secretary of the Commonwealth*

FILING FEE: One tenth of one percent of the total authorized capital stock, but not less than $200.00. For the purpose of filing, shares of stock with a par value less than $1.00, or no par stock, shall be deemed to have a par value of $1.00 per share.

### TO BE FILLED IN BY CORPORATION
### Photocopy of document to be sent to:

David J. Martel, Esq.
Doherty, Wallace, Pillsbury and Murphy, P.C.
One Monarch Place ~ 19th Floor
Springfield, MA 01144-1900

Telephone: _____ (413) 733-3111 _____

108460-1

# TAB 3

Olsen's Packaging & Parts Inc.
300 Bryant Lane
Woodbury TN  37190
Tel: (615)563-6318 Fax: (615)563-6321

I N V O I C E
No. 144042

Page:    1

Sold To: CARTER-MCLEOD PAPER & PKG, INC   Ship To: McLEOD PACKAGING SYSTEMS, LLC
         136 WAYSIDE AVE                            ATTN: TOM
         WEST SPRINGFIELD, MA 01089                 136 WAYSIDE AVE
                                                    WEST SPRINGFIELD, MA 01089

         (413)736-1000 Fax:(413)736-2500

| Invoice Date: 02/18/05 | Customer No.: 11746 |
| Ship Date   : 02/18/05 | Sales Person: KB |
| Shipped Via : UPS GROUND | Terms     : NET 30 |
| Order Number: 54102 | FOB       : WOODBURY, TN |

| ID NUMBER | QTY | DESCRIPTION | DSCNT | PRICE | TOTAL |
|---|---|---|---|---|---|
| 1350-052 | 2.00RL | 6" x 18 YDS x .003 | 20.00% | 49.860 | ▄▄▄ |
| 1350-035 | 4.00RL | 2" x 36 YDS x .003 | 20.00% | 35.000 | ▄▄▄ |
|  |  | UPS TRACKING #1Z3065770347330847 |  |  |  |

Placed On Account: ▄▄▄

NO RETURNS AFTER 30 DAYS. NO RETURNS WITHOUT RA #.
A service charge of 1.5% per month may be added to
past due accounts. Customer is responsible for any
legal fees. Shipping may include handling fee.

| Sub Total | : | ▄▄▄ |
| Tax- | : | 0.00 |
| Tax- | : | 0.00 |
| Shipping | : | ▄▄▄ |
| Total | : | ▄▄▄ |
| Amount Tend | : | 0.00 |
| Balance Due | : | ▄▄▄ |

03/01/2005  12:47    14137362500          CARTER MCLEOD                          PAGE  02/04

COMPLAINANT
Ex. 11

P.O. Box 689163
Des Moines IA 50368-9163

Return Service Requested

DELL™

BILLING
DOCUMENTS
ENCLOSED

LAHHSF1 01049

Make Address Changes Below

MC LEOD PACKAGING SYSTEM
ACCOUNTS PAYABLE
136 WAYSIDE AVE
W SPRINGFIELD MA 01089-1318

l0029008
D
X0CR

Presorted
First Class Mail
U.S. Postage Paid
C.C.  S.P.

03/01/2005  12:47   14137362500              CARTER MCLEOD              PAGE  03/04
                                              page 1 of 1

| | | Closing Date | 02/18/05 | |
|---|---|---|---|---|
| Previous Balance $ | ▇▇▇ | Next Closing Date | 03/22/05 | MC LEOD PACKAGING SYSTEM |
| Payments | -$ 0.00 | Payment Due Date | 03/15/05 | ACCOUNTS PAYABLE |
| Credits | -$ 0.00 | | | 136 WAYSIDE AVE |
| Purchases | +$ 0.00 | | | W SPRINGFIELD MA 01089-1318 |
| Debits | +$ 0.00 | | | |
| FINANCE CHARGES +$ | 0.00 | Current Payment Due $ | 0.00 | |
| Late Fees | +$ 0.00 | Past Due $ | 0.00 | Credit Limit $ ▇▇ |
| New Balance | =$ ▇▇▇ | Total Payment Due $ | 0.00 | Credit Available $ ▇▇ |

PAYMENTS, CREDITS, FEES, and ADJUSTMENTS

        Total Finance Charges billed in 2004 were    $41.58.

COPY

Make checks payable to: DELL COMMERCIAL CREDIT    Payment must be received by 2:00 p.m. local time on Payment Due Date.

| 03/15/05 | ▇▇▇ | 0.00 | |
|---|---|---|---|

For proper credit, please write  6011500039148302  on your check & enclose with your payment stub.

MAIL PAYMENTS TO:                     Make Address Changes Below

                                                      0002601
DEPT. 50 - 0039148302            MC LEOD PACKAGING SYSTEM         B
DELL COMMERCIAL CREDIT           ACCOUNTS PAYABLE                 XBCR
PO BOX 9020                      136 WAYSIDE AVE
DES MOINES IA 50368-9020         W SPRINGFIELD MA 01089-1318



6011500039148302200835040000000000000000

TAB 4



TAB 5

# D

# The Commonwealth of Massachusetts
### William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

FORM MUST BE TYPED     **Articles of Organization**     FORM MUST BE TYPED
(General Laws Chapter 156D; Section 2.02; 950 CMR 113.16)

## ARTICLE I
The exact name of the corporation is:

MGLEOR PACKAGING SYSTEMS, INC.

## ARTICLE II
Unless the articles of organization otherwise provide, all corporations formed pursuant to G.L. C156D have the purpose of engaging in any lawful business. If you wish to specify more limited purposes, state them below.

To deal in all types and kinds of packaging materials, supplies, and equipment and any business related thereto or useful in connection therewith, and other lawful business.

## ARTICLE III
State the total number of shares and par value, * if any, of each class of stock that the corporation is authorized to issue. All corporations must authorize stock. If only one class or series is authorized, it is not necessary to specify any particular designation.

| WITHOUT PAR VALUE | | WITH PAR VALUE | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| | 1,000 | | N/A | |
| | | | | |
| | | | | |

*General Laws Chapter 156D eliminates the concept of par value, however, a corporation may specify par value in Article III. See section 6.21 and the comments relative thereto.

P.C.

## ARTICLE IV

Prior to the issuance of shares of any class or series, the articles of organization must set forth the preferences, limitations and relative rights of that class or series. The articles may also limit the type or specify the minimum amount of consideration for which shares of any class or series may be issued. Please set forth the preferences, limitations and relative rights of each class or series and, if desired, the required type and minimum amount of consideration to be received.

N/A

## ARTICLE V

The restrictions, if any, imposed by the articles or organization upon the transfer of shares of any class or series of stock are:

See Attachment Sheet - Article V attached hereto and made a part hereof.

## ARTICLE VI

Other Lawful Provisions; if there are no such provisions, this article may be left blank or state "None."

See Attachment Sheet - Article VI attached hereto and made a part hereof.

*Note: The preceding six (6) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment*

## ARTICLE VII

Unless otherwise provided in the article of organization, the effective date of organization of the corporation is the date and time the articles were received for filing If the articles are not rejected within the time prescribed by law. If a later effective date is desired, specify such date, which may not be later than the 90th day after the articles are received for filing:

January 3, 2005

## ARTICLE VIII

The information contained in this article is not a permanent part of the articles of organization.

    a.   The street address of the initial registered office of the corporation in the commonwealth:
       16 East Hill Road, Brimfield, MA  01010

    b.   The name of its initial registered agent at its registered office:
       Donald D. McLeod

    c.   The names and addresses of the individuals who will serve as the initial directors, president, treasurer and secretary of the corporation:

| NAME | ADDRESS |
|------|---------|
| President:  Donald D. McLeod | 16 East Hill Road, Brimfield, MA  01010 |
| Treasurer:  Donald D. McLeod | 16 East Hill Road, Brimfield, MA  01010 |
| Secretary:  Donald D. McLeod | 16 East Hill Road, Brimfield, MA  01010 |
| Director(s):  Donald D. McLeod | 16 East Hill Road, Brimfield, MA  01010 |

    d.   The fiscal year end of the corporation: December 31

    e.   A brief description of the type of business in which the corporation intends to engage: Packaging services

    f.   The street address of the principal office of the corporation is:
       16 East Hill Road, Brimfield, MA  01010

    g.   The street address where the records of the corporation required to be kept in the commonwealth are located:

    16 East Hill Road, Brimfield, MA  01010 _____ , which is
                    *(number, street, city or town, state, zip code)*

    ☑  its principal office;

    ☐  or an office of its transfer agent;

    ☐  its secretary/assistant secretary;

    ☐  or its registered agent.

Signed this 22nd day of December , 2004 by the incorporators whose name and address are listed below:

Signature:  *Donald D. McLeod*

Name:  Donald D. McLeod

Address:  16 East Hill Road, Brimfield, MA  01010

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

**Attachment Sheet to Articles of Organization**
of
**MCLEOD PACKAGING SYSTEMS, INC.**

ARTICLE V. Restrictions:

(a)  Any stockholder, including the heirs, assigns, executors or administrators of a deceased stockholder, desiring to sell or transfer such stock owned by him or them, shall first offer it to the corporation through the Board of Directors in the following manner:

He shall notify the directors of his desire to sell or transfer by notice in writing, which notice shall contain the price at which he is willing to sell or transfer and the name of an independent and impartial arbitrator.  The directors shall, within thirty (30) days thereafter, either accept the offer or by notice to him in writing, name a second independent and impartial arbitrator, and these two shall name a third.  It shall then be the duty of the arbitrators to ascertain the value of the stock, and if any arbitrator shall neglect or refuse to appear at any meeting appointed by the arbitrators, a majority may act in the absence of such arbitrator.  After the acceptance of the offer, or the report of the arbitrators as to the value of the stock, the directors shall have thirty (30) days within which to purchase the same at such valuation, but if at the expiration of thirty (30) days, the corporation shall not have exercised the right to so purchase, the owner of the stock shall be at liberty to dispose of the same in any manner he may see fit.  No shares of stock shall be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may in any particular instance waive the requirement.  In addition, if an agreement executed by the stockholders contains restrictions on transfer, the terms of such agreement shall control.

(b)  Unless otherwise authorized by at least two-thirds of the stockholders of the corporation, no stockholder shall sell or otherwise transfer any shares of stock of the corporation if such sale or transfer shall cause the corporation to cease to be qualified under Subchapter S of the Internal Revenue Code, as amended.

(c)  Notwithstanding the foregoing, in the event the stockholders of the Corporation enter into an agreement among themselves or among themselves and the Corporation which imposes restrictions on the transfer of stock or provides for terms and conditions of the sale or transfer of stock of the Corporation, then the restrictions, terms and conditions of such agreement shall control so long as such agreement is in effect.

387108

MA SOC    Filing Number: 200495628400    Date: 12/27/2004 1:53 PM

THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

December 27, 2004 1:53 PM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

121179-1-0

# TAB 6

## Poindexter, Jeffrey

**From:**   Morten Hazzard [mhazzard@cartermcleod.com]
**Sent:**   Monday, December 20, 2004 4:48 PM
**To:**    mortenhaz@yahoo.com
**Subject:** FW: CARTERMCLEOD Summary Deviation Report


-----Original Message-----
**From:** Gangi, Steve [mailto:steve.gangi@AtlantisPlastics.com]
**Sent:** Monday, December 06, 2004 7:55 AM
**To:** mhazzard@cartermcleod.com
**Subject:** FW: CARTERMCLEOD Summary Deviation Report

Mort,
Here is you updated pricing; Any questions call me or Gwen1
Thank you,
SLG

STEPHEN GANGI
AREA SALES REP.
OFFICE 781-834-5252
FAX     781-834-7272
CELL    918-605-4657

**From:** Henry, Gwen
**Sent:** Tuesday, November 30, 2004 7:22 PM
**To:** Gangi, Steve
**Subject:** CARTERMCLEOD Summary Deviation Report

4/28/2005

# TAB 7

BEN AND JERRY'S HOMEMADE, INC.   30 COMMUNITY DRIVE, SO. BURLINGTON, VT 05403-6828

| DATE 05-APR-05 | CUST. ACCT. NO. | | VENDOR NAME MCLEOD PACKAGING SYS | VENDOR NO. 004008140 | |
|---|---|---|---|---|---|
| INVOICE NO. | INVOICE DATE | DESCRIPTION | | DISCOUNT AMOUNT | NET AMOUNT |
| 20106 | 28-FEB-05 | *WP121636 GEARBOX,MOTOR,BRAKE B | | 0.00 | 1,584.68 |

| CHECK NUMBER | 303432 | TOTALS | 0.00 | 1,584.68 |
|---|---|---|---|---|

PLEASE DETACH HERE                                  RETAIN THIS PORTION AS YOUR RECORD OF PAYMENT

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM.

**BEN & JERRY'S**
VERMONT'S FINEST • ICE CREAM & FROZEN YOGURT

| CHECK DATE | 64-9756 | 303432 |
|---|---|---|
| 05-APR-05 | 612 | CHECK NO. |

PAY ONLY ***1584.68*** CTS/CTS

AMOUNT
******$1,584.68

■ ONE THOUSAND FIVE HUNDRED EIGHTY-FOUR DOLLARS AND 68 CENTS **********

TO THE
ORDER OF        MCLEOD PACKAGING SYSTEMS LLC

Wachovia Bank
Augusta, GA

VOID OVER $1,584.68

Edward W Nelson

⑆000303432⑆ ⑈061209756⑈ 20799004 22898⑈





$00.3

US POSTA

**MCLEOD PACKAGING SYSTEMS LLC**
136 WAYSIDE AVENUE
WEST SPRINGFIELD, MA 01089-1318
USA





BEN AND JERRY'S HOMEMADE, INC.  30 COMMUNITY DRIVE, SO. BURLINGTON, VT  05403-6828

| DATE | 14-APR-05 | CUST. ACCT. NO. | VENDOR NAME | MCLEOD PACKAGING SYS | VENDOR NO. | 004008140 |
|---|---|---|---|---|---|---|

| INVOICE NO. | INVOICE DATE | DESCRIPTION | DISCOUNT AMOUNT | NET AMOUNT |
|---|---|---|---|---|
| 20130 | 16-MAR-05 | *WP121696 GEARBOX, MOTOR | 0.00 | 1,369.38 |

| CHECK NUMBER | 303667 | TOTALS | 0.00 | 1,369.38 |
|---|---|---|---|---|

PLEASE DETATCH HERE                                    RETAIN THIS PORTION AS YOUR RECORD OF PAYMENT

■ VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. ■ CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM. ■

**BEN & JERRY'S**

| | CHECK DATE | 54-975 | 303667 |
|---|---|---|---|
| | 14-APR-05 | 6123 | CHECK NO. |

AMOUNT
******$1,369.38

>>>>>>> PAY ONLY 138 58 ...CTSCTS

■ ONE THOUSAND THREE HUNDRED SIXTY-NINE DOLLARS AND 38 CENTS **********

TO THE
ORDER OF          MCLEOD PACKAGING SYSTEMS LLC

Wachovia Bank
Augusta, GA

VOID OVER $1,369.38          *Edward W Melormm*

⑈0000303667⑈  ⑆061209756⑆ 2079900422898⑈





$00.3
04/14/20
Mailed From
US POST

MCLEOD PACKAGING SYSTEMS LLC
136 WAYSIDE AVENUE
WEST SPRINGFIELD, MA 01089-1318
USA





 **Nationwide**              **Finance**

NEG-230169

Mc Leod Packaging System
Attn:Don Mcleod
163 Doty Cir
West Springfield, MA 01089

Hi Don,

I'm just touching base with you regarding the $100,000 equipment line of credit that we have Pre-Qualified for Mc Leod Packaging System

We contacted your company earlier this year and and were informed that you may be considering purchasing some equipment. As a reminder, the Pre-Qualified Equipment line of credit that we have available for you is based on your excellent Dunn & Bradstreet credit rating. The scoring system within Dunn & Bradstreet is called a "Paydex" score, and for the last 12 months, you have maintained an excellent score. If you are still considering purchasing any equipment, please call my direct line at 714-214-3101, and reference your NEG-230169

Rates are still holding at record lows so please let me know if there is anything I can do and I look forward to working with you.

As always, Nationwide is committed to helping your business grow!

Sincerely,
Jake Marshall
Senior Account Manager
Direct 714-214-3101

Nationwide Equipment Finance, Inc. is a nationwide lender financing all types of equipment. Our rates are extremely competetive so don't hesitate to call no matter what your equipment needs are.
Please fax this letter back to 1-208-378-8584 if you wish to be removed from our list.

TAB 8

| From: | Morten Hazzard [mortenhaz@yahoo.com] |
|---|---|
| Sent: | Monday, February 07, 2005 1:35 PM |
| To: | |
| Subject: | Left Carter-McLeod |



Morten
Introduction.doc

Wanted to let you know that I left Carter-McLeod.  I am now working for a new company called
McLeod Packaging Systems, Inc.  The attached is our introduction letter.  If I can ever be of any
assistance, please let me know.

Thanks
Morten

Morten Hazzard
Carter-McLeod Paper and Packaging, Inc.
136 Wayside Avenue
West Springfield, MA 01089
Phone: (413) 736-1000
Fax: (413) 736-2500

Do you Yahoo!?
Yahoo! Mail - Easier than ever with enhanced search. Learn more.
http://info.mail.yahoo.com/mail_250

# AMERICAN ARBITRATION ASSOCIATION
## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. If you would like the AAA to contact the other parties to determine whether they wish to mediate this matter, please check this box.* ☐ *There is no additional administrative fee for this service.*

| TO: Name | Name of Representative (if known) Ronald P. Weiss, Esq. | Name of Firm (if applicable) Bulkley Richardson |
|---|---|---|

| Address 136 Wayside Avenue | | Representative's Address 1500 Main St., Ste. 2700 | | |
|---|---|---|---|---|

| City West Springfield | State MA | Zip Code 01089 | City Springfield | State MA | Zip Code 01115 |
|---|---|---|---|---|---|

| Phone No. (413)736-1000 | Fax No. (413)736-2500 | Phone No. (413)781-2820 | Fax No. (413)785-5060 |
|---|---|---|---|

The named claimant, a party to an arbitration agreement contained in a written contract, dated May 29, 2003 providing for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

IS THIS A DISPUTE BETWEEN A BUSINESS AND A CONSUMER?    Yes ☐    No ☒

THE NATURE OF THE DISPUTE Stock Purchase Agreement, Article IV. The Corporation and Robert McLeod have breached the Agreement by the Corporation not enforcing the provision requiring Robert McLeod to retire from employment with the Corporation no later than 12/31 in the year in which he reached age 65. Robert McLeod turned 65 in 2004. David McLeod is a party to the Agreement.

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any)
Enforcement of provision of Agreement requiring redemption of Robert McLeod's shares in the Corporation and determination of formula for calculation of stock value for Donald McLeod.

DOES THIS DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP?    YES ☐    No ☒

IF THIS DISPUTE ARISES OUT OF AN EMPLOYMENT RELATIONSHIP, WHAT WAS/IS THE EMPLOYEE'S ANNUAL WAGE RANGE? Note: this question is required by California law.

☐ Less Than $100,000    ☐ $100,000 - $250,000    ☐ Over $250,000

TYPES OF BUSINESS
Claimant Sale of paper and packag- Respondent Sale of paper and packaging machinery ing machinery and equipment        and equipment

HEARING LOCALE REQUESTED    Springfield, MA

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association at its Northeast Ctr/R.I office, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative) Donald D. McLeod | Title Claimant | Date 1/24/05 |
|---|---|---|

| Name of Claimant Donald McLeod | Name of Representative James F. Martin, Esq. | Name of Firm (if Applicable) Robinson Donovan, PC |
|---|---|---|

| Address (to Be Used in Connection with This Case) PO Box 24 | Representative's Address                    01115 1500 Main St., Ste. 1400, Springfield, MA |
|---|---|

| City Brimfield | State MA | Zip Code 01010 | City Springfield | State MA | Zip Code 01115 |
|---|---|---|---|---|---|

| Phone No. (413)245-3452 | Fax No. | Phone No. (413)732-2301 | Fax No. (413)785-4658 |
|---|---|---|---|

TO BEGIN PROCEEDINGS, PLEASE SEND TWO COPIES OF THIS DEMAND AND THE ARBITRATION AGREEMENT, WITH THE FILING FEE AS PROVIDED FOR IN THE RULES, TO THE AAA. SEND THE ORIGINAL DEMAND TO THE RESPONDENT.

Packaging Digest

38

# The 'Wright' way to file away
# distribution savings

**Wright Line gets 100-day payback with stretch-wrap system to package office storage cabinets.**

Wright Line is taking a giant step toward reducing the amount of packaging materials used to ship its line of office cabinets around the world.

At the same time, the switch from corrugated containers to a stretch-wrap system results in less damage, increased output, more efficient use of manpower and nearly a 95 percent reduction in space needed to inventory packaging materials.

But most impressive is the 100-day payback the Worchester, Mass., metal furniture manufacturer has realized on its equipment investment from materials savings alone. On average, the new unit packaging cost is about $5 less than the $15 cost of the former package.

The original packaging for Wright's cabinets were full corrugated containers—in 15 sizes—with cushioning pads and metal strapping. "Not only was it too expensive," says Diane J. Gablaski, Wright's production engineer, "the former packaging didn't provide the protection we wanted." The search for alternatives began in January '88, about the same time the company launched its just-in-time manufacturing program.

"From the start," Gablaski emphasizes, "protection was a major priority, regardless of what new packaging materials we considered." Because Wright sells direct and ships via common carrier, often in less-than-truckload quantities, shipments are subject to varying levels of handling care.

Another consideration was to be able to continue using the Bastlold blade devices for lifting and handling the packaged cabinets in the plant and into trucks. Wright had used Bastlold handling lift trucks with its former packaging for years. The Bastlold blades are inserted under the top end cap (see photo, p. 42), which eliminates the need for fork lifting or clamp handling.

## Stretch wrapper at the core

The packaging solution that evolved combines specially-designed corrugated end caps with strategically placed cushioning and stretch wrap film that also acts as strapping. The core of the system is a stretch wrapper from Liberty Industries.

Working closely with Wright in the development of the stretch-wrap system was McLeod and Dewey Associates, distributors for Liberty and Linear Films. The stretch film, Linear's SX cast coextruded 1.15 mil linear low-density polyethylene, is supplied to Wright in 20-in.-wide rolls.

Top and bottom corrugated end caps for the cabinets are supplied by CPC Containers as die-cut blanks. Made from 275# test C-flute, the caps include 1-color letterpress printing of the Wright logo and cautionary handling copy.

Honeycomb pads are inserted before the end caps are put in place. There are also four honeycomb corner posts, vertically slit scored, plus two 8-in.-wide center posts. All International Honeycomb cushioning has ½-in cells and is polyethylene-coated on the inside surface to prevent abrasion.

In adopting the new packaging, Wright employs a strategy that should be contradictory: using more packaging components—11 compared to nine—but saving costs and storage space. "Previously we had to allocate 5,000 square feet to inventory packaging materials," says Gablaski. "Now we need only 350 square feet."

Robert L. Reynolds, Wright director of manufacturing engineering and materials control, tells PD the new packaging "creates instant recognition of Wright Line products as they're shipped throughout the United States, Canada, Europe and Australia. Our customers like it, too, because it helps solve the problem of materials disposal. And whether it's because our carriers can now see the cabinets they're handling, or because of the cushioning, damage is way down."

Diane Gablaski notes that Wright conducted its own drop and vibration testing before submitting to independent test laboratories and those of its common carriers. "It passed all the tests with ease," she says. All specifications are said to be in accordance with the National Safe Transit Assn.'s specification 141F.

Cabinets as tall as 84 in. with all "options" can weigh up to 300 lb. Continued on page 40



**Top**—As an 84-in.-H metal cabinet is stretch wrapped, the 20-in.-W film wrap is gathered into a "rope" to secure top and bottom end caps.

**Right**—Before stretch wrapping. The top pad and cap plus corner and center posts are positioned and stapled.

**Below**—The bottom honeycomb pad and corrugated cap are added before cabinets are upended.

40







*Wright's new stretch wrapper uses a patented roping device (right) to create a film "strap" for securing end caps to the cabinets. Power device pre-stretches the LLDPE film about 160 percent for the Wright Line furniture.*

*Top and bottom end caps are notched (above) to position the film "rope." It makes 2½ revolutions before spreading out (right) for full spiral wrapping of the cabinet.*

## Wright Line

*Continued from page 38*

So packaging protection is necessarily meticulous; even a 1-ft drop can have calamitous results.

Especially with Wright's top-selling Optimedia cabinets, manual involvement in production and packaging is a sine qua non. Starting with the basic metal frames, varying arrangements of shelves and accessories are offered to customers, including full tambour doors, multidoor shells and security bars.

### One machine, less manpower

While the overall assembly and packaging line appears much the same as it was with the previous package, a main difference is one new machine and less manpower.

Packaging begins as a cabinet is conveyed in a horizontal position to a mechanical upending device built by Wright. It receives the bottom honeycomb pad and end cap and is tilted to an upright position.

The cabinet then conveys to a platform, where the top pad, end-cap and vertical posts are fitted after shelves and accessories are inserted. It moves onto a powered conveyor to phase into the Liberty Series 1000 stretch wrapper.

The High-Yield™ machine is activated by a Photoswitch electric eye and an Allen-Bradley programmable controller which measures the length of the load and stops it at the center of a variable-speed turntable. An electric top platen lowers onto the top end-cap for positive control.

With 160-percent pre-stretching, the film is spiral-wrapped around the cabinet from bottom to top with a 50-percent overlap. As the film approaches the top, a patented device forms a rope of film which is drawn into special corner tabs on the end caps. The rope or strap makes 2½ rotations around the top cap before it spreads back into another top-to-bottom overlapped film wrap.

While pre-stretching 300 percent is possible, Wright determined that pre-stretching above 160 percent put too much tension on the metal cabinets. Another rope or strap secures the bottom end cap before the film makes two more complete full wraps. After cutting the film, it is brushed to bond to the wrapped package.

The completed package is released by the top platen and conveyed
*Continued on page 42*



17 Years   11 Years   Years   30 Years

Years   8 Years   26 Years   9 Years

# No Other World Leader Has Been In Control As Long As We Have.

The year Square D began making control products, Hoover was president. Pius XI was pope. And Mussolini was premier of Italy.

But while these leaders have come and gone, Square D has stayed in control. And today, we're a major worldwide supplier of electrical control components.

We manufacture push buttons in virtually every size, type and configuration. A complete line of NEMA-rated contactors and starters. A host of IEC components and accessories. Sensors. Limit switches. Logic devices. Transformers. And more.

All designed to provide control of just about any application, just about anywhere in the world.

### Original Solutions.

To get specific solutions for specific applications, you need the knowledge, understanding and insight of a very special kind of world leader. Square D. Call your local sales office or authorized distributor today.

*We Respond.™*

 **SQUARE D COMPANY**
*Dedicated to Growth • Committed to Quality*

Circle 55 on Reader Reply Form

42

  

After wrapping, (left) the load moves downstream where it is removed from the conveyor by a fork truck (right). It uses a Bastisld device to lift and transport the packages to storage and into trucks. Bastisld lifting blades insert (center) between the strapped end cap and a special flap that rests against the cabinet.



Our new photoelectric stands up to the pressure, so you don't have to.

## Wright Line

Continued from page 40

downstream. Here, it is removed from the conveyor by a fork lift truck with Bastfold blades that lift the cabinets without damaging the end caps.

End caps are designed with a special corrugated flap that folds down to protect the cabinet from the lifting blades. The flap is stapled to the corner posts and the film wrap is slit to permit the blades to be inserted under the strapped top end cap. A lift truck can then lift and transport the cabinets to storage or into trucks.

The packaging line cycles up to 18 cabinets/hr, fifty percent more than the previous output. However, Bob Reynolds observes that "as we become more comfortable with the new packaging, we expect to increase rates still more."

Previously, it took five minutes to finish one package," he says. "We've cut one-and-a-half minutes off that. We sometimes had to double manpower on the line from the usual five to meet our production goals for a shift. Now, that's history."

Diane Gablaski, who supervised development of the new packaging, notes that "we looked at and tried many alternatives before deciding to adopt the new system. In fact we're starting to use the same equipment for our PC workstations. This will expand the economies we've realized even more. How do we feel about the new system? It works and that's what counts."

More information is available from:
**Liberty Industries,** 555 Tibbetts-Wick Rd., Girard, Ohio 44420. *Circle No. 305.*
**McLeod & Dewey,** 37 North Ave., Norwalk, Conn. 06851. *Circle No. 306.*
**Linear Films,** 4920 S. 48th W. Ave., Box 9769, Tulsa, Okla. 74157. *Circle No. 309.*
**CPC Container,** 111 Milk St., Box 1063, Westborough, Mass. 01581. *Circle No. 307.*
**International Honeycomb Corp.,** 1149 Central Ave., University Park, Ill. 60466. *Circle No. 308.*
**Photoswitch Div.,** Allen-Bradley Co., 265 Winter St., Waltham, Mass. 02154. *Circle No. 310.*
**Allen-Bradley,** 1201 S. 2nd St., Milwaukee, Wis. 53204. *Circle No. 311.*
**Bastfold Products Corp.,** 312 North East St., Elnora. Ind. 47529. *Circle No. 312.*



Since 1894

CARTER – McLEOD
PAPER AND PACKAGING, INC.

SALES • SERVICE • SUPPLIES

413 - 736 - 1000

CERTIFICATE OF COMPLIANCE

| PICKED | | VALUE ADDED | | SPOOLED | | Q.C. |
|--------|--|-------------|--|---------|--|------|

| SHIPPED | DATE | NO. OF PACKAGES | TOTAL WEIGHT | FREIGHT CHARGE | WAYBILL NO. |
|---------|------|-----------------|--------------|----------------|-------------|

We certify that the material and/or parts furnished on your purchase order have been manufactured in accordance with applicable instructions, and/or commercial or military specifications. We further certify that these units satisfactorily meet all functional test regulations of (applicable specifications). Test reports covering all matter, and test pertaining to this order, are on file with the manufacturing company and will be made available upon request.

CERTIFICATE OF COMPLIANCE

AUTHORIZED SIGNATURE

TITLE: QUALITY ASSURANCE INSPECTOR

DATE

*June 6, 2005*

*To: Dorothy Varon*
*From: Nancy McEvoy*

*Don,*
*I do not remember having any conversation with anyone at Carter-Mcleod concerning their financial situation.  However, I did on numerous occasions discuss their failure to pay AEP within the 60 days that they were allowed, thus putting Carter on credit hold.*

*Hope this clears up any misunderstandings.*

*Best regards,*

*Nancy McEvoy*



**MALPACK U.S.A. INC.**

6/2/05

Attn: Don McLeod
McLeod Packaging Systems, Inc.
51 Denslow Road
East Longmeadow, MA 01028

Don,

I am writing this letter to confirm that on no occasion did you have a conversation with me regarding Carter-Mcleod's financial situation being good, bad or otherwise.

However, Malpack USA refused to ship the last remaining order C.O.D. as a result of poor payment history with our company. As you can see by the attached payment history our average days paid from Carter-McLeod was 82 days(see attached). Our payment terms are 2% 10, Net 30 Days and Carter-McLeod never paid up to our satisfaction of the terms set forth. Our credit department and myself made our decision to ship product to them C.O.D. based on their poor payment history with Malpack USA.

If there are any questions regarding this letter you can contact Donna Nixon or myself.

Sincerely,

*Troy Wolf*

Troy Wolf
Malpack USA
Direct @ 1-920-662-0087
or
1-888-678-0707



MALPACK U.S.A. INC.

**Payment History**

| Invoice # | Date | Amount | Date it was paid | # of days |
|---|---|---|---|---|
| 1172 | Aug 23/04 | 4,521.60 | Nov 18/04 | 87 |
| 1235 | Aug 31/04 | 15,072.00 | Nov 22/04 | 83 |
| 1285 | Sept 17/04 | 15,072.00 | Nov 24/04 | 69 |
| 1396 | Oct 13/04 | 6,650.88 | Jan 24/05 | 103 |
| 1397 | Oct 13/04 | 1,662.72 | Jan 10/05 | 89 |
| 1623 | Dec 7/04 | 23,632.80 | Feb 7/05 | 62 |



# Credit eValuator Report

## Carter-Mcleod Paper & Packaging Co Inc

136 Wayside Ave
West Springfield, MA 01089
Phone: 413 736-1000
D-U-N-S Number: 04-187-8906

**Report as of : June 06, 2005 \*\***

 

**Need more in-depth information and analysis?**
**Upgrade** to the Comprehensive Insight Plus Report and receive credit for the amount of your eValuator purchase.

>Learn more

### How much credit should you extend this business?
**Upgrade to the Credit eValuator Plus and receive a Credit Limit Recommendation and Payment Trend information on this company**

Learn More

>Upgrade Now

\*\*Included with this Credit eValuator Report are continuous tracking of key business changes and free Alert messages in the View My Reports/Alerts page. You can also choose to receive e-mail notifications of the important changes.
IMPORTANT NOTE: You will not receive e-mail alerts if you have opted out of receiving communications from D&B.

## Risk Summary



Lower Risk        Higher Risk
**Risk of Late Payment**



Unchanged
**Payment Performance Trend**

Risk of late payment is based on the following prioritized factors in addition to other information in D&B's files:

- 58% of trade experiences indicate slow payment
- Payment experiences exist for this firm which are greater than 60 days past due.
- Payment information indicates negative payment comments.

Indications of slowness can be the result of disputes over merchandise, skipped invoices, etc.

The payment performance trend for this company is Unchanged. The most recent payment information in D&B's files is:

- Payments currently: 26 days beyond terms.
- Payments 3 months ago: 26 days beyond terms.
- Industry average: 9 days beyond terms.

\*Note: Payments to suppliers are averaged weighted by dollar amounts.

Credit eValuator Report                                                    Page 2 of 2

---

### Company Profile

| | | |
|---|---|---|
| **Chief Executive:** | Bob Mcleod, Chb–Ceo | **Line of business:** |
| **Type of business:** | Corporation | Industrial Machinery And |
| **Years in business:** | 4 | Equipment |
| **Annual Sales:** | $13,000,000 | |
| **Employees total:** | 34 | |

---

### Legal Filings and Other Important Information

| | |
|---|---|
| **Bankruptcies:** | None |
| **Judgments:** | None |
| **Liens:** | None |
| **Suits:** | None |
| | |
| **Negative Payment Experiences:** | None |
| **Payments Placed for Collection:** | 1 |
| **Payments Placed for Collection Amount:** | $2,500 |

Accounts are sometimes placed for collection even though the existence or amount
of the debt is disputed.

Need more in-de
receive credit for

This report is prepared and provided under contract for the exclusive use of BeckyJean Gerni, Robinson Donovan PC.
This report may not be reproduced in whole or in part by any means of reproduction.

ApplyOnTheWeb.com| Home Loan Center ~ For All Your Home Loan Needs!    Page 1 of 3

Case 3:05-cv-30087-MAP    Document 15-16    Filed 06/24/2005    Page 1 of 5

**@pply ON THE Web.com**

Save W
**Nati**
**Fina**

About | Disclaimer | A

**LOAN CENTER**

■ **REFINANCE LOANS**

■ **HOME IMPROVEMENT LOANS**

■ **HOME EQUITY LOANS**

■ **DEBT CONSOLIDATION**

■ **HOME PURCHASE LOANS**

■ **SECOND MORTGAGE LOANS**

**EDUCATION CENTER**

■ **MORTGAGE WATCH NEWSLETTER**

■ **LOAN CALCULATORS**

■ **FAQs**

■ **LOAN TERM GLOSSARY**

■ **TOOLS AND RESOURCES**

**RATE QUOTES**

■ **GET A QUICK RATE QUOTE**

Home | Loan Center | Refinance | Debt Consolidation | Register For Free | Find A Mortgage Broker

## Get Nationwide Financial's information from our database.

## Simply type in your loan needs and we will provide you the Nationwide Financial's location and phone number for you to call and compare Nationwide Financial's offers with popular Mortgage Lender's and find the best offer!

### You will also be registered for a $500.00 Home Depot Gift Card.

**How Does This Work?**

- Fill out this 45 second, no-obligation form, press submit.
- The database will conveniently display Nationwide Financial's information.
- We'll help you to compare offers.
- You choose the loan specialist that's right for you.
- Start saving before your next bill arrives.

### Get The Lowest Rates Today!
### Complete Our No Obligation Information Application
### and get Nationwide Financial's information

Apply On The Web is here to help you obtain no obligation quotes from our elite lenders and will not access your credit report.

**No Obligation Registration Form**

First Name*            Last Name*

Street Address*

City*            State*    Zip*
          -
(Please enter location of actual property)

**Enter Mortgage Information**

Select Type of Loan Requested*

- ⦿ Refinance Mortgage
- ◯ New Home Purchase
- ☉ Debt Consolidation
- ☉ Home Equity  Loan
- ☉ Second Mortgage
- ☉ Home Improvement Loan

Work Phone*
(        )        -        ext.
Home Phone*
(        )        -
Email Address* (double check for accuracy)
                              ✉
(ex, john@yahoo.com)

Loan Amount Requested*
- Please Select One - ▦ ($100,000 Minimum Preferred)

Property Type*
- Please Select One - ▦ (NO Mobile Homes)

What's your Property Worth Today?*
- Please Select One - ▦ (Less than 50000 not accepted)

Est. 1st Mortgage Balance*

Ente
Gift (
to Ho
w:



Fin
Wit
Eng
Em

Zip

Loa

All
All
dir
yo

Page 1 of 3

☺ Construction Loan
All Loans available with Fixed or Adjustable rate terms!

- Please Select One - 📷 (Amount Owed)

**Current Interest Rate**
: Select: 📷

| Yes | 📷 | I need the loan in 30 days or less. |
| No | 📷 | Declared bankruptcy in the past 12 months? |
| No | 📷 | Property Currently under foreclosure |

**Best Time To Contact**
: Select: 📷

**Rate Your Credit**                    **Currently Employed?**
: - Please Select One - 📷              - Please Select One - 📷

---

**You're Finished - Just Submit and get Nationwide Financial's Information**

---

I, understand that by clicking the "Match Me with Qualified Lenders!" button and authorizing this submission. I am not obligated to open an account. (This prequalification request is not a loan application. Your loan officer will complete a loan application for you.)

---

### Things You Need To Know Before Refinancing Your Mortgage

**What are the reasons for refinancing?**
There are many benefits to refinancing; it just depends on what your objectives are. Some of the most popular reasons are:

**Refinancing may put money back in your pocket every month.**

If rates are lower now than when you originally financed your home, or if you choose an adjustable rate mortgage with a lower initial interest rate than your current rate, your monthly payment will go down (assuming you don't shorten the term or increase the loan balance significantly). That means you can save more every month or afford those dance lessons or dinners out or new suit you've had your eye on. Not only that, but you probably won't have to scrape together money to bring to the closing table either, because you can usually include all of the costs to close your loan in the new loan amount.   Find out the best rate for your refinance today.

**Refinancing may put a lot of money in your hands today.**

If you have significant equity in your house, you could get a cash-out refinance and walk away from the closing table not only with a new loan but with a large amount of money to invest or to use for a once in a lifetime opportunity - like an extensive vacation, college, home improvements or the purchase of a boat or anything else you've been dreaming of all your life.

**Refinancing may get you out of debt faster!**

Refinancing your current loan to a fifteen year or a bi-weekly loan may be possible without even raising the payment significantly, particularly if rates were high when you first bought. You could save thousands and thousands in interest and own your home many years before you would with a standard 30 year loan.

**How much can I borrow?**
You can borrow up to 100%. In some cases even more of your home's appraised value.

**When is a good time to refinance ?**
The best time(s) to refinance your home is when the mortgage rates are you are in need of fast cash for any reason.

**How does a refinance closing work?**

ApplyOnTheWeb.com| Home Loan Center ~ For All Your Home Loan Needs!    Page 3 of 3

Case 3:05-cv-30087-MAP    Document 15-16    Filed 06/24/2005    Page 3 of 5

The refinance closing will be conducted the same way that your loan was closed when you first purchased the property. Soon after your loan is approved your loan consultant will send a list of documents you'll need to bring to the closing. You'll also be sent an Estimated Settlement Statement that tells you the amount, if any, you'll need to bring to closing in the form of a cashier's check, as well as an outline of how the funds from your new loan will be disbursed. If this is a refinance of a primary residence, the loan won't actually fund until three business days after signing the loan documents, due to the borrower's right of rescission.

---

**Hot Articles On Refinancing Your Mortgage**

4 Things You Need To Know Before You Refinance
Its important to have a clear objective and plan in your mind when discussing your refinancing options. Here are the four most important things you need to know. Find out which is the best way for you: Read full article

The Market And Your Interest Rates
Discover how the national market effects interest rates and find out when the best time is to refinance: Read full article

Refinance Your Way Out Of Debt
This article will show you how to refinance your home and get money back to pay off that outstanding debt: Read full article

If you have questions or would like help with your loan, you can email us today at **info@applyontheweb.com**

We can help you find the mortgage broker that can get you the best deal for your financial situation including setting you up most competitive lenders based on your loan type and zip code. ApplyOnTheWeb.com is a third party provider of free loans and refinancing information. Our sponsors pay us to provide you with details of their offer, however we do not limit your search to just sponsor's listings.

Home | Loan Center | Refinance | Debt Consolidation | Register For Free | Find A Loans Broker
Mortgage Leads

Privacy Policy | Disclosures

All brand names and product names used on these web pages are trademarks, or trade names of their respective holders.
May or may not be affiliated with Nationwide Financial
May or may not be affiliated with Nationwide Financial



B808:0001

MCLEOD PACKAGING SYSTEMS L L C
12 Crescent St.
Holyoke, MA  01040-6008
IIllllnnllIIlnnllllIIllnnIIlnIIlllnnIlllnllnllnlllnlllnnllllnllllllll

**Watch how quickly the savings can add up when you use the American Express®
Business Gold Card—fee-FREE for the first year.**

**FEE-FREE FOR THE
FIRST YEAR**

---

**NO PRE-SET
SPENDING LIMIT**

---

**SAVE AN
ADDITIONAL**
**2-25%**
**ON BUSINESS
PURCHASES**

---

**PERSONALIZED
SMALL BUSINESS
DASHBOARD**

Dear Business Owner:

With the American Express® Business Gold Card from OPEN: The Small Business Network℠, you can
receive substantial savings on the things you already buy for your business—just by using the Card.
**Best of all, it's fee-FREE for the first year**¹, a $75 value.

### The Benefits of OPEN SAVINGS℠

Use the Card and you can save: 5% on **AT&T** small business plans, 5% at **Hertz,®** 2% at **Staples,®**
25% on **ExpensAble**, 10% on **USA TODAY**, 5% at **FedEx,®** and 15% at **1-800-FLOWERS.COM.®**
These savings can be combined with other discounts your business may already receive. Savings will
appear automatically as a credit on your monthly statement.*

### No Pre-Set Spending Limit

And the Business Gold Card has no pre-set spending limit.** So you have the freedom to buy what your
business needs, when you need it. That's invaluable when you have to jump on opportunities quickly.

You'll also get a long list of other OPEN Network benefits, including a Personalized Small Business
Dashboard. With this time-saving online management tool, you can see your balance, view Card
activity, even access loans and lines of credit you've been pre-approved for—day or night.

Just complete, sign and return the attached form by June 29, 2005. Or, **for Express Approval**℠
**service, call 1-888-352-OPEN** and mention RSVP# C0409975244343 to apply by phone and you can
receive a decision in under 60 seconds. Either way, the Card will arrive in 2-3 weeks once you're approved.

Sincerely,

*Susan Sobbott*

Susan Sobbott
President
OPEN: The Small Business Network℠
from American Express





**APPLY BY PHONE:**
**1-888-352-OPEN**
**RSVP# C0409975244343**
See reverse side of letter for fee and other important information.



**OR**
**BY MAIL**

NQS-L0505

61102 V302 3130808



**GREATER SPENDING POWER AND CONTROL CAN NOW BE YOURS IN UNDER 60 SECONDS.**

**OPEN** SMALL BUSINESS NETWORK™

HERE'S ALL THAT'S REQUIRED TO REQUEST YOUR BUSINESS GOLD CARD.    NOS-F0505

MCLEOD PACKAGING SYSTEMS L L C
12 Crescent St.
Holyoke, MA  01040-6008

By signing below I agree to the terms on the reverse side.

### Tell us about your business

Company Name
( )
Company Phone    E-mail Address (optional) * * *

Tax I.D. Number (If left blank, we will assume you are a Sole Proprietor)
☐ Farm  ☐ Non-profit  ☐ All other
Years in Business    Number of Employees    Type of Business

Company Street Address    City    State    Zip
(If different from home address; not a P.O. Box)

### Tell us about yourself

Name    Social Security Number
– –

Home Street Address    City    State    Zip
( )    / /
Home Phone    Date of Birth (MM/DD/YY)

### Authorization Information

The application must be signed by a partner, proprietor, or other officer of the firm who has been authorized to open the Account on behalf of the Company.
X    / /
Signature on behalf of you and the Company    Date (MM/DD/YY)

NPA

S54    A00-00-0201-C    9975244343    Q03133097A    5532    SNABS*

---

## IT'S EASY TO GIVE YOUR EMPLOYEES THE ADVANTAGE OF THE BUSINESS GOLD CARD. SIMPLY COMPLETE THIS FORM.

THE FIRST ANNUAL $35 MEMBERSHIP FEE FOR EACH ADDITIONAL CARD WILL BE WAIVED.
PLEASE READ AGREEMENT ON REVERSE SIDE.
(PLEASE PRINT)

| 1 NAME OF EMPLOYEE | 3 NAME OF EMPLOYEE |
|---|---|
| 2 NAME OF EMPLOYEE | 4 NAME OF EMPLOYEE |





**GRIFFIN EXPRESS**

*Shipping On Time, Every Time - Since 1926*

June 14, 2005

Dear Sir:

There was an isolated incident whereby Grif-Bak warehouse personnel had to call Carter McLeod Packaging to help identify an inbound shipment. The shipper/manufacturer had not clearly labeled its product.

We have never had any problems identifying material in our warehousing facility scheduled for Carter McLeod Packaging, McLeod & Dewey, Carter Paper, or McLeod Packaging.

If I can be of further assistance contact me directly.

Sincerely,

Stephen F. Bakos
President
Griffin Express Inc.
Grif-Bak Warehouse

02/24/2005  17:56   14137362500        CARTER MCLEOD                PAGE  02/03

From: Morten Hazzard [mortenhaz@yahoo.com]
Sent: Monday, February 07, 2005 1:35 PM
To:
Subject: Left Carter-McLeod



Morten
Introduction.doc

Wanted to let you know that I left Carter-McLeod.  I am now working for a new company called
McLeod Packaging Systems, Inc.  The attached is our introduction letter.  If I can ever be of any
assistance, please let me know.

Thanks
Morten

Morten Hazzard
Carter-McLeod Paper and Packaging, Inc.
136 Wayside Avenue
West Springfield, MA 01089
Phone: (413) 736-1000
Fax: (413) 736-2500

Do you Yahoo!?
Yahoo! Mail - Easier than ever with enhanced search. Learn more.
http://info.mail.yahoo.com/mail_250

Yahoo! Mail - mortenhaz@yahoo.com

Yahoo! - My Yahoo! - Mail

**YAHOO!** MAIL

Welcome, **mortenhaz**
[Sign Out, My Account]

Search
the Web                    [Search]

Mail Home - Mail Tutorials - Help

---

| Mail ▼ | Addresses ▼ | Calendar ▼ | Notepad ▼ | | **What's New** - **Mail Upgrades** - **Mail Options** |

[Check Mail]   [Compose]                                   [Search Mail ▼]   [Search the Web]


A card for
credit comebacks

**Folders**   [Add - Edit]

**Inbox (3)**
Draft
**Sent**
**Bulk (1)**   [Empty]
Trash   [Empty]

**My Folders**   [Hide]
Corey
JenCoat
Personal
Stanpak

What's your Credit
Score? See it FREE!

Get unlimited calls
to U.S./Canada

FREE mtg quotes
Low 2.9% Rates!

Online Degree
Programs

Previous | Next | Back to Messages                    Printable View - Full Headers

[Delete]  [Reply ▼]  [Forward ▼]  [Move... ▼]

This message is not flagged. [ Flag Message - Mark as Unread ]

**Date:**     Mon, 7 Feb 2005 10:34:53 -0800 (PST)

**From:**     "Morten Hazzard" <mortenhaz@yahoo.com>    Add to Address Book

**Subject:**  🖉 Left Carter-McLeod

**To:**       "Robin Feyre" <rfeyre@jencoat.com>

Hi Robin,

Wanted to let you know that I left Carter-McLeod.   I
am now working for a new company called McLeod
Packaging Systems, Inc.  The attached is our
introduction letter.  If I can ever be of any
assistance, please let me know.

Thanks
Morten

=====
Morten Hazzard
Carter-McLeod Paper and Packaging, Inc.
136 Wayside Avenue
West Springfield, MA 01089
Phone: (413) 736-1000
Fax: (413) 736-2500

---

Do you Yahoo!?
Yahoo! Mail ~ Easier than ever with enhanced search. Learn more.
http://info.mail.yahoo.com/mail_250

---

**Attachments**                    Attachment scanning provided by: **AntiVirus** 2002

**Files:**

# MPS

## MCLEOD PACKAGING SYSTEMS, INC.

PHONE: (413) 525-0706
FAX: (413) 525-0713

| Packaging Supplies | New & Used Packaging Equipment | Packaging Equipment Service and Repairs |
| --- | --- | --- |

## To Contact Us

**Phone**

**(413) 525-0706**

Fax

**(413) 525-0713**

E-mail address

mcleodpack@mcleodpack.com

Web address

www.mcleodpack.com

Mcleod Packaging Systems, Inc.
P.O. Box 1047
51 Denslow Road
East Longmeadow, MA 01028-1047





### New & Used Equipment Sales & Service



McLeod Packaging Systems, Inc. also has the capability to service and supply parts for all major brands of Stretch, Shrink, and Tape Equipment.

Just a few examples of the brands of equipment that we service and / or sell are:

ITW MULLER, ITW MIMA, LANTECH, COUSINS, INFRAPAK, ARPAC, GREAT LAKES, SHANKLIN and many others

Please call and let us supply you a quote for either a new or used purchase or your repair needs.





# Stretch Film ( Hand Wrap and Machine )

## Blown / Cast Films

### Blown Wrap

Excellent puncture resistance, Excellent cling

### Cast Wrap

Quite release, Clear, Good, puncture resistance, Good cling



### Hand Wrap

Wrap Widths: 12", 15", & 18"

Gauges : 60, 70, 75, 80, 90,& 120

Extended 1" Core Handwrap - 1" core, 20" width, cast film.

## Machine Wrap



Available Widths:

20", 30", 40" 50", 60" & 70"

Available Gauges:

50, 60, 65, 70, 80, 90, 100, 115, 120, 150, 175, 200, 225, 250, 275, & 300

# Shrink, Bundling Films, and Cornerboard

## Shrink Films

McLeod Packaging Systems, Inc. provides a wide range of shrink films

- multipurpose shrink films
- specialty shrink films
- cross-linked shrink films



Gauges Available:

45, 50, 60, 75, & 100

## Bundling Films



Bundling Film Grades Available:

Standard, High Strength, Freezer Grade, High Clarity, and Custom

## Cornerboard (Custom Lengths)



Thickness :

.090", .120", .160", .225", .250", .300", & .400"

Leg Width:

2"x2", 2 1/2" x 2 1/2", 3"x3", 2"x3", & 2"x 4"

# Tapes

## Carton Sealing Tape & Dispensers



Widths:

48mm (2") & 72mm (3")

Lengths:

50 M (55 Yards)
100 M (110 Yards)
220 M (220 Yards)
914 M (1000 Yards)
1371M (1500 Yards)
1829M (2000 Yards)

## Water Activated Tapes
### Gummed & Reinforced

Water Activated Tapes:

Gummed, Light Duty, Medium Duty, Regular Duty, Heavy Duty, Extra Heavy Duty

## Specialty Tapes & Printed Tapes

McLeod Packaging Systems, Inc. is also proud to carry the following tape availabilities:

Label Protection
Stationary
Strapping
Flatback Paper / Hand Tearable
Masking
Filament
Custom Printed Tapes

# COPY

January 14, 2004

Donald McLeod, Jr.
Robert McLeod
c/o Carter McLeod Paper & Packaging Company, Inc.
136 Wayside Avenue
West Springfield, MA  01089-1318

Messrs. McLeod:

I am pleased to inform you that Country Bank for Savings has approved your financing request
in the amount of $400,000 subject to the following terms and conditions:

1. <u>Borrower</u>:   Carter McLeod Paper & Packaging, Inc.

2. <u>Guarantor</u>:   Robert McLeod, Donald McLeod, Jr., Alan Chadwick, James Polard and
   McLeod, McLeod & Chadwick, LLC

3. <u>Loan Amount</u>:  $400,000

4. <u>Interest Rate</u>:    Floating at Prime plus 1.00%

5. <u>Monthly Payments</u>:    Interest only in arrears

6. <u>Revolving Line of Credit</u>:  $400,000 demand revolving line of credit with interest upon
   outstanding principal floating at 1.00% per annum over the rate of interest announced from
   time to time as the Bank's Prime Rate and with interest charged on a 365 day year over the
   actual date elapsed.  Interest rate changes shall be effective as of each change in the Prime
   Rate.  All advances on the line shall be made at the Bank's sole and exclusive discretion.
   All principal, interest and other amounts due upon the line of credit shall be payable in full
   upon demand at all times.  Until such demand, interest shall be payable monthly in arrears.
   During each 12 month period, Borrower shall be required to reduce the line of credit
   balance to zero for a period of 30 days.  After demand, interest shall be charged at the rate
   of 5.00% per annum above the rate otherwise in effect upon the line.  The proceeds of this
   line of credit are to be used for additional working capital.

7. <u>Primary Security</u>:  In addition to other security interests and liens covered by the loan
   documents, the loan will be secured primarily by the following:

   A.   A Blanket mortgage on property owned by Borrower and located at 136 Wayside
        Avenue, West Springfield and UCCs on all assets owned by Borrower and Guarantors.

8. <u>Maturity</u>:  On demand

**COPY**

9. <u>Late Charge</u>: Five (5%) percent of any payment not received within fifteen (15) days of its due date.

10. <u>Assignment of Leases</u>: Borrower shall assign to Bank under a general assignment of leases and rents in form and content acceptable to Bank all leases and rents now existing or arising in the future. The form and content of all leases shall be acceptable to Bank and said leases shall be subordinated to the Loan.

11. <u>Covenants</u>: The Country Bank for Savings existing Line of Credit, #01-44-05097127, must be paid off and closed with the loan proceeds.
    Receipt and review of 2001 and 2002 Federal Income Tax Returns on James Polard.

    Borrower shall furnish, or cause to be furnished, the following documents and materials for the property in such form and content satisfactory to Bank's counsel prior to the establishment of a closing date:

12. <u>Loan Documents and Additional Security</u>: The following documents and all other required material under this commitment shall constitute the Loan Documents: Promissory Note, Mortgage Deed and Security Agreement, UCC-1 Financing Statements, Collateral Assignment of Leases and Rentals, the Guaranty(s), and a Closing Affidavit from Borrower and Guarantor. Unless otherwise stipulated by the Bank, or in this commitment, all loan documents and security for the Note shall be executed, delivered and recorded or filed in order to constitute valid binding and enforceable agreements and to constitute first priority liens or security interests in favor of the Bank.

13. <u>Title Insurance</u>: An A.L.T.A. Standard Loan Policy Additional Coverage (1970) edition issued by a title insurance company satisfactory to the Bank in the full amount of the Note. The policy shall (a) insure the lien of the mortgage to be a valid lien against the property securing the Loan in the full amount of the Note; (b) contain a pending disbursements clause which requires no further action on behalf of the Bank to have the total disbursements of the loan fully insured; and (c) be subject only to those exceptions to title and exclusions from coverage which have been approved in writing by the Bank.

14. <u>Survey</u>: In connection with the title insurance policy, the Bank shall receive an updated property survey dated within six (6) months of the date of closing showing the location of the improvements, building ordinances, and other restrictions of record.

15. <u>Uniform Commercial Code Search</u>: A standard UCC-1 form for all owners of the property during the past five years, including the Borrower, and showing no filed financing statements covering personal property servicing as security for the Note.

16. <u>Building Permits and Zoning</u>: All appropriate permits from governmental authorities having jurisdiction including, without limitation, building department, water, sewer, and environmental, which may be necessary for the full construction of the improvements and

COPY

in order to use them in the manner contemplated. Evidence from the appropriate zoning body that the improvements comply with the zoning classification affecting the property.

17. <u>Insurance</u>: Borrower shall provide insurance coverage in form, in such amounts, and issue by companies approved by the Bank, to cover such casualties, risks, perils, liabilities, and other hazards as the Bank may require. The Bank shall not require the amount of property insurance to exceed one hundred (100%) percent of the replacement cost of the improvements.

18. <u>Authorization</u>: If Borrower or any Guarantor is a corporation, a copy of the certificate of incorporation, by-laws, a Certificate of Good Standing, and a Corporate Borrowing Resolution will be required. If Borrower or any Guarantor is a joint venture, partnership, trust or other unincorporated entity, a copy of the documents creating same and the written consent from the appropriate sources authorizing this transaction will be required.

19. <u>Legal Opinion</u>: A favorable written opinion from Borrower's counsel stating (a) Borrower and Guarantor, if any, as the case may be, are in good standing under the laws of the Commonwealth of Massachusetts, have taken all actions to authorize and have full power and authority to carry out the terms of this commitment and all loan documents executed in connection with the loan; (b) when executed, delivered, and recorded in accordance with this commitment, all loan documents will constitute valid, binding and enforceable documents in according with their terms; (c) the improvements are in compliance with all applicable federal, state and local laws and regulations, including all zoning and environmental laws, affecting the property and the use thereof and that all necessary permits and approvals for the full use thereof are available; (d) the execution, delivery and performance under the loan documents will not violate any provision of law, regulation, order, decree, writ, or injunction of any court, public board or body, or any agreement, indenture, note or other instrument which is binding upon Borrower or any Guarantor, or any of their properties, and will not require the consent of any person or entity whatsoever; (e) there is no pending litigation against Borrower or Guarantor, if any, which can materially change the financial condition of Borrower or any Guarantor; (f) all permits and approvals necessary for the utilization of the property for its intended purposes have been validly issued are in full force and effect, there is no pending (or threatened, to counsel's knowledge) litigation or proceeding challenging any such permits or approvals, and with respect to any zoning, subdivision or environmental permits or approvals, no appeal from the issuance thereof has been taken or is available; and (g) such other matters as Lender may reasonably require.

20. <u>Loan Documents</u>: The loan documents will be prepared by the Bank's counsel and shall contain the terms set forth in this commitment together with such other terms as are customarily found in commercial mortgages written by the Bank. Its counsel in this loan shall be Attorney Jonathan C. Sapirstein from Sapirstein & Sapirstein, P.C. The fee for this transaction is estimated at $2,100 and is due and payable to Attorney Sapirstein at the closing.

COPY

21. Expenses: Borrower agrees to pay all expenses in connection with this loan, whether or not the loan is closed, including, without limitation, taxes and assessments and all recording fees, registration taxes, title insurance premiums and other charges of the title company, attorney's fees, for Bank's counsel, appraisal fees, the cost of Bank's inspector, if any, and architectural/engineering expenses.

22. Non-Assignability of Commitment: This commitment is not assignable by the Borrower.

23. Restriction on Transfers and Additional Encumbrances: The unpaid balance of the Note may be declared to be immediately due and payable at the option of the Bank, (a) if the property or any part thereof or any interest therein is sold, transferred, encumbered, or conveyed without the prior consent of the Bank, in any manner whatsoever, whether voluntary or involuntary; or (b) if any ownership interest in Borrower or any Guarantor is assigned, conveyed, hypothecated, or transferred in any manner whatsoever. Unless approved in writing by the Bank, no additional financing will be permitted to be incurred by the Borrower or any Guarantor in connection with financing the contemplated improvements.

24. Survival of Terms: The parties hereto agree that this commitment shall survive the loan closing, that each and every one of the obligations and undertakings of Borrower and any Guarantor named herein shall be continuing obligations and shall not cease and terminate until the entire loan has been repaid in full.

25. Lender Not a Joint Venturer: Notwithstanding anything to the contrary, lender, by making this commitment or by any action pursuant hereto, will not be deemed a partner or a joint venturer with Borrower and Borrower agrees to hold lender harmless from any damages and expenses resulting from such construction of the relationship of the parties or any exertion thereof.

26. Entire Agreement: This commitment letter constitutes the entire agreement of the parties hereto and supersedes and replaces any and all prior agreements or correspondence.

27. Amendment: No amendment or modification of this commitment shall be enforceable unless signed by the party against whom the enforcement is sought.

28. Termination: This commitment may be terminated by the Bank in its sole and exclusive option, without liability on our part, or further notice to you if the Bank, in its sole and exclusive discretion, determines that any adverse happenings to the financial or business status of the corporation, or principals, has occured. Similarly, the Bank reserves the right to amend, delete, or add to the requirements set forth in this letter and to also require such additional or substituted documentation, both involving procedural and substantive matters in connection with these credit facilities, as it or its counsel may deem appropriate at any time prior to closing. You should not expend funds, or incur liabilities relying upon this letter without full recognition of these unreserved reservations that run in favor of the Bank. Your acknowledgement and approval of this letter will act as your agreement to this condition, as well as all other requirements contained in this letter.

COPY

29. <u>Expiration</u>: This commitment shall expire on January 31, 2004, unless a signed copy is returned to the Bank prior to such date. Even if this commitment is accepted in timely fashion, it may thereafter still be terminated if, in the continuing sole and exclusive discretion of the Bank, the closing of the credit facilities are not fully completed to the satisfaction of the Bank and its counsel, on or before forty-five (45) days from date, unless delayed by the Bank, time being of the essence in all particulars.

30. <u>Financial Information and Other Information</u>: Annually, during the term of the Loan, Borrower shall promptly deliver to the Bank the following: (a) updated Personal Financial Statement (on Bank form), completed, signed and dated; (b) complete copy (including all schedules and W-2's, if any) of Borrower's annual federal income tax return, signed and dated; (c) updated Property Summary Sheet (on Bank form) on any real estate in which Borrower has an interest, completed, signed and dated; (d) complete copy of the federal income tax return on any corporation, realty trust, and/or partnership in which Borrower has a material interest, signed and dated; (e) any additional information from time to time reasonably requested by the Bank.

31. <u>Flood Insurance</u>: If we determine that the property owned by the Borrower which will secure financing is located in an area identified as a flood area, then the Borrower will be required to purchase flood hazard insurance up to the loan amount or a maximum of $250,000 on residential buildings or $500,000 on commercial buildings, which ever is less. This requirement is in accordance with the National Flood Insurance Reform Act of 1994.

COPY

If the above terms and conditions are acceptable to you please sign the acceptance below and return the original in the enclosed envelope. The other copy is for your records. If you have any questions, please feel free to contact me.

Very truly yours,

Phil B. Goncalves
Vice President
Country Bank for Savings

PBG/krd

Enclosures

The above terms are acceptable.

---

Carter McLeod Paper & Packaging, Inc.,
  Its President

Date

---

Robert McLeod, Guarantor

Date

---

Donald McLeod, Jr., Guarantor

Date

---

Alan Chadwick, Guarantor

Date

---

James Polard, Guarantor

Date

---

McLeod, McLeod & Chadwick, LLC,
  Its Member

Date

Attorney Representing The Borrower:

Name: _____

_____

_____

445221

# REVOLVING LINE OF CREDIT

## MAXIMUM PRINCIPAL AMOUNT:

### $400,000.00

## DEMAND REVOLVING LINE OF CREDIT NOTE

FOR VALUE RECEIVED, the Undersigned, CARTER-McLEOD PAPER AND PACKAGING COMPANY, INC., a Massachusetts corporation with its principal place of business located at 136 Wayside Avenue, West Springfield, Massachusetts (the "Undersigned"), promises to pay to COUNTRY BANK FOR SAVINGS ("Lender"), at the Lender's main office presently located at 75 Main Street, Ware, Massachusetts, or such other place as Lender may designate in writing, ON DEMAND, the principal sum of FOUR HUNDRED THOUSAND AND 00/100 DOLLARS ($400,000.00), or, if greater or lesser, the (then) total unpaid principal balance due Lender (as reflected by the Lender's books and records) as a result of loans hereafter made by Lender to the Undersigned under this Note from time to time, plus all interest and other charges due Lender hereunder.

Interest upon all loans advanced under this Note shall, from the date of the advance and until repaid, accrue at an adjustable rate of interest floating at one and 00/100 percent (1.00%) per annum over Lender's Prime Rate (as hereinafter defined) and shall be payable monthly in arrears, without demand. Each change in such interest rate shall take effect simultaneously with the corresponding change in such Prime Rate. "Prime Rate" as used herein shall mean the "Prime Rate" as identified and published by the *Wall Street Journal* under its listing of Money Rate (and where more than one "Prime Rate" is so published, the highest rate shall be used herein). If the above Prime Rate index should no longer become available, Lender shall select a new index which is based upon comparable information and shall notify the Undersigned of the change.

In accordance with the terms hereof, Lender shall consider the Undersigned's requests from time-to-time for loans hereunder, and Lender may from time-to-time make such loans to the Undersigned, at Lender's sole and exclusive discretion. The aggregate amount of all loans or advances (plus any amounts added to principal pursuant to the terms of this Note) made by Lender to Undersigned hereunder, less all payments and credits which Lender has applied against principal under the terms of this Note, shall constitute the unpaid principal balance due Lender hereunder, while the total amount of the Undersigned's indebtedness to Lender by reason of loans, advances, and other appropriate charges, including interest, under this Note, less all payments and credits which Lender has applied against the indebtedness under the terms of this Note, shall constitute the total unpaid balance due Lender hereunder. The Lender's books and records shall at all times constitute prima facie evidence of all amounts due Lender. At least once each month, Lender shall render a statement of account for the amounts due Lender hereunder, which statement shall be considered correct, accepted by, and conclusively binding upon the Undersigned, unless the Undersigned submits a written objection within fifteen (15) days from the date the statement is mailed to the Undersigned

It will be within the continuing, sole and exclusive discretion of Lender whether to make or continue to make loans of any amount under this Note. At no time shall the Undersigned be entitled to any loans or advances which cause the unpaid principal balance hereunder to exceed the stated maximum principal amount hereof, and if at any time such excess does arise, the Undersigned shall pledge, assign, and transfer to Lender additional collateral or shall pay cash to Lender to be credited to the total unpaid balance hereof in such an amount as may be necessary to eliminate this excess. However, nothing herein shall be construed to restrict Lender, in its sole and exclusive discretion, from making advances in excess of the stated maximum principal amount or from waiving any requirements upon collateral herein, without modification hereof or the execution of any additional note(s), and by so doing at any time, Lender does not waive its right to insist upon strict compliance with the terms hereof at any other time and to further rely upon all collateral secured to it for satisfaction of all obligations of the Undersigned to Lender, without exception.

The Undersigned, and each guarantor and endorser hereof, agree that Lender, in its sole and exclusive discretion, may make loans hereunder to the Undersigned upon verbal or written authority from any person representing to have authority to act on behalf of the Undersigned and may deliver loans hereunder to the Undersigned by direct deposit to any demand deposit account of the Undersigned with Lender, or as otherwise instructed.

If any scheduled payment required hereunder is more than fifteen (15) days overdue, (in addition to the interest accruing hereunder) a late charge of five percent (5.00%) of such overdue payment shall be charged to the Undersigned and be immediately due and payable to Lender. Any payment having a due date falling upon a legal holiday or a day during which Lender is not open for business shall be due and payable on the next business day for which Lender is open for business, and interest shall continue to accrue during the extended period.

The Undersigned hereby authorizes Lender to debit from any account(s) of the Undersigned with Lender, at any time, any interest or other charges due Lender hereunder, without prior notice to the Undersigned.

Any interest or other charges hereunder, if not paid when due, may, at Lender's option and without prior notice to the Undersigned, or any guarantor or endorser hereof, be added to the principal balance due hereunder, with interest likewise accruing thereon at the rates set forth herein.

Any payments received by Lender with respect to this Note shall be applied first to any charges, or expenses (including attorneys' fees) due Lender from the Undersigned, second to any unpaid accrued interest hereunder, and third to the unpaid principal hereunder.

If any payment received by Lender with respect to this Note shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under federal or state law, or otherwise due any party other than Lender, then, the obligation for

which the payment was made shall not be discharged by the payment and shall survive as an obligation due hereunder, notwithstanding the Lender's return to the Undersigned or any other party of the original of this Note or other instrument evidencing the obligation for which payment was made.

During each calendar year, the Undersigned agrees to reduce the unpaid balance due hereunder to zero and maintain such balance for a period of thirty (30) successive days.

Interest hereunder shall be computed on the basis of a three hundred sixty-five (365) day year and shall accrue and be paid for the actual number of days any principal hereunder remains unpaid. Upon the occurrence of a default hereunder, interest upon the total unpaid principal hereunder shall thereafter, at Lender's option, without notice to Undersigned, or to any guarantor or endorser hereof, and until payment in full of all obligations hereunder, accrue at a rate ("Default Rate") equal to the lesser of (a) the highest interest rate permitted by applicable law or (b) five percent (5.00%) per annum above the interest rate then in effect hereunder at the time of the default.

It is not intended under this Note to charge interest at a rate exceeding the maximum rate of Interest permitted to be charged under applicable law, but if interest exceeding said maximum rate should be paid hereunder, the excess shall, at Lender's option, be (a) deemed a voluntary prepayment of principal not subject to the prepayment premium (if any) set forth herein or (b) refunded to the Undersigned.

The following described property, in addition to all other collateral now or hereafter provided by the Undersigned to Lender, shall secure this Note and all other present or future obligations of the Undersigned to Lender: Mortgage upon the premises located at 136 Wayside Avenue, West Springfield, Massachusetts, owned by McLeod, McLeod and Chadwick, LLC, and a security interest in all assets of the Undersigned.

As additional collateral for the payment and performance of this Note and all other obligations, whether now existing or hereafter arising, of the Undersigned to Lender, Lender shall at all times have and is hereby granted a security interest in and right of offset against all cash, deposit balances and/or accounts, instruments, securities, or other property of the Undersigned, and of any endorser or guarantor hereof, now or hereafter in the possession of Lender, whether for safekeeping or otherwise. This right of offset shall permit Lender at any time and without notice to the Undersigned or any endorser or guarantor hereof, to transfer such funds or property as may be deemed by Lender to be appropriate so as to reduce or satisfy any obligation of the Undersigned to the Bank, whether or not such obligation is then due.

All unpaid principal, interest, and other amounts due under this Note shall at all times be immediately due and payable UPON DEMAND (whether or not scheduled payments required hereunder have been timely made) and this Note shall be IN DEFAULT upon the

failure of the Undersigned to pay immediately any amount due hereunder, once demand is made.

The Undersigned, and each endorser and guarantor hereof, respectively (a) waive presentment, demand, notice, protest, and delay in connection with the delivery, acceptance, performance, collection, and enforcement of this Note, and (b) assent to any extension, renewal, modification, or other indulgence permitted by Lender with respect to this Note, including, without limitation, any release, substitution, or addition of co-makers, endorsers, or guarantors of this Note and any release, substitution, or addition of collateral securing this Note or any other obligations of the Undersigned, or any such endorsers or guarantors, to Lender, and (c) authorize Lender, in its sole and exclusive discretion and without notice to the Undersigned, or any endorser or guarantor hereof, to complete this Note if delivered incomplete in any respect.

No indulgence, delay, or omission by Lender in exercising or enforcing any of its rights or remedies hereunder shall operate as a waiver of any such rights or remedies or of the right to exercise them at any later time. No waiver of any default hereunder shall operate as a waiver of any other default hereunder or as a continuing waiver. The Lender's acceptance of any payment hereunder, following any default, shall not constitute a waiver of such default or of any of the Lender's rights or remedies hereunder (including charging interest at the Default Rate), unless waived in writing by Lender.

All of the Lender's rights and remedies hereunder and under any other related loan documents shall be cumulative and may be exercised singularly or concurrently, at the Lender's sole and exclusive discretion.

The Undersigned, and each endorser and guarantor hereof, jointly and severally agree to pay on demand all costs and expenses, including, but not limited to, reasonable attorney's fees, incurred by Lender in connection with the protection and/or enforcement of any of Lender's rights or remedies hereunder, whether or not any suit has been instituted by Lender.

The word "Lender" where used herein shall mean the named payee, its successors, assigns, affiliates, and endorsees (and/or the holder of this Note if, at any time, it is made payable to bearer), all of whom this Note shall inure to their benefit as holders in due course.

The word "Undersigned" where used herein includes the Borrower and any and all makers and co-makers hereof, and their respective heirs, successors, assigns and representatives, all of whom, along with each endorser and guarantor of this Note, and their respective heirs, successors, assigns, and representatives, shall be jointly and severally liable hereunder. Any reference herein to the Undersigned, or to any endorser or guarantor hereof, is a reference to such party or parties individually as well as collectively.

The use of masculine or neuter genders hereunder shall be deemed to include the

feminine, and the use of the singular or the plural herein shall be deemed to include the other, as the context may require.

The Undersigned represents that the proceeds of this Note will not be used for personal, family, or household purposes and that this loan is strictly a commercial transaction.

The Undersigned, at its own expense, shall provide Lender with such financial statements and other information as Lender may reasonably require from time-to-time.

This Note shall be governed by the laws of the Commonwealth of Massachusetts, and the Undersigned, and each endorser and guarantor hereof, submit to the jurisdiction of its courts with respect to all claims concerning this Note or any collateral securing it.

ALL PARTIES TO THIS NOTE, INCLUDING LENDER, HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY, AS TO ALL ISSUES, INCLUDING ANY COUNTERCLAIMS, WITHOUT EXCEPTION, IN ANY ACTION OR PROCEEDING RELATING, DIRECTLY OR INDIRECTLY, TO THIS NOTE AND/OR OTHER INSTRUMENTS OR LOAN DOCUMENTS (IF ANY) EXECUTED IN CONNECTION HEREWITH.

This Note constitutes a final written expression of all of its terms and is a complete and exclusive statement of those terms. Any modification or waiver of any of these terms must be in writing signed by the party against whom the modification or waiver is to be enforced.

THE UNDERSIGNED ACKNOWLEDGES THAT THIS NOTE IS A DEMAND NOTE AND THE RIGHT OF THE LENDER TO DEMAND PAYMENT OF THIS NOTE IN WHOLE OR IN PART AT ANY TIME SHALL BE ABSOLUTE, UNCONDITIONAL AND IN THE SOLE DISCRETION OF THE LENDER.

The Undersigned, and each endorser and guarantor hereof, agree to be bound by the terms of this Note and acknowledge receipt of a signed copy hereof.

Signed as a sealed instrument this 17th day of February, 2004.

Witness:

Carter-McLeod Paper and Packaging Company, Inc.

By: _____
     Donald D. McLeod, President

By: _____
     Robert H. McLeod, Treasurer

X:\WP61\COUNTRY\Mcleod.2004\note.wpd

# STOCK PURCHASE AGREEMENT

AGREEMENT made as of May 29, 2003  by and among  DONALD D. MCLEOD,
ROBERT H. MCLEOD, ALAN CHADWICK  and THOMAS DINGMAN  (the "Stockholders")
and CARTER-MCLEOD PAPER AND PACKAGING COMPANY, INC., a Massachusetts
corporation with a usual place of business in West Springfield, Massachusetts, (the
"Corporation").

WHEREAS, the Stockholders are the owners of  all the issued and outstanding shares of
common stock of the Corporation, each owning the following shares as of the date of this
Agreement:

| | |
|---|---|
| Donald D. McLeod | 40 |
| Robert H. McLeod | 40 |
| Alan Chadwick | 15 |
| Thomas Dingman | 5 |

WHEREAS, the Stockholders wish to agree that in the event of the death, disability,
retirement or involuntary termination of employment of the Stockholder, his shares of stock, as
listed above, and any such shares acquired hereafter (hereinafter collectively "Shares") will be
sold to the Corporation, and further that if a Stockholder elects to sell his Shares during his
lifetime, the Corporation shall have the right to purchase the shares, all upon the terms and
conditions hereof.

NOW THEREFORE, the parties hereto mutually agree as follows:

136565-1

## I. SHARES OF STOCK

1.     No Stockholder shall, while this Agreement is in force, assign, encumber, pledge, transfer or otherwise dispose of any of the Shares of the stock of the Corporation now owned or hereafter acquired by him except pursuant to the terms of this Agreement or with the written consent of the Corporation. Upon the execution of this Agreement, the following shall be endorsed on all certificates of stock of the Corporation now owned or hereafter owned by any of the Stockholders:

"This certificate and the shares of stock represented hereby are subject to the terms of a Stock Purchase Agreement among Donald D. McLeod, Robert H. McLeod, Alan Chadwick, Thomas Dingman and Carter-McLeod Paper and Packaging Company, Inc."

## II. LIFETIME TRANSFERS OF STOCK

1.     In the event any Stockholder should desire to dispose of any of his Shares during his lifetime to a third party, he must first offer in writing to sell his Shares to the Corporation at the lesser of:

(a)  The value determined as provided for in Section VII; or

(b)  The price at which he proposes to sell his Shares to any prospective buyer thereof who has made a bona fide offer to purchase such Shares.

2.     If the Corporation shall not accept such offer in writing within thirty (30) days of receipt of such offer, the offering Stockholder shall have the right to sell such Shares offered to the prospective buyer.

136565-1                                    2

### III. PURCHASE OF STOCK ON DEATH

1.    Upon the death of a Stockholder, the Corporation shall purchase and the estate of the deceased Stockholder shall sell all of the Shares of stock of the Corporation owned by the deceased Stockholder at the time of his death. The purchase price shall be determined in accordance with the valuation in effect at the date of death provided in Section VII and shall be paid as provided in Section VIII of this Agreement.

2.    Upon the death of a Stockholder, the purchase price (in cash or in cash and a note, as provided for in Section VIII (1)) shall be paid promptly to such person as may be designated in writing by the deceased Stockholder during his lifetime or, if none is designated, to the legal representative of the estate of the deceased Stockholder, and all the stock of the Corporation owned by the deceased Stockholder shall be transferred to the Corporation upon such payment.

### IV. DISABILITY OR RETIREMENT

1.    In the event that a Stockholder shall become disabled so as to qualify for at least fifty percent (50%) of the maximum disability benefits under the Social Security Act or shall retire from employment with the Corporation at any time after becoming sixty (60) years of age, the disabled or retiring Stockholder shall sell, and the Corporation shall purchase, the Shares of the Corporation owned by (i) the disabled Stockholder thirty (30) days after the date of the disability qualification referred to above or (ii) the retiring Stockholder upon retirement, as the case may be. The purchase price shall be determined in accordance with the valuation in effect at the date of purchase as provided in Section VII and shall be paid as provided for in Section VIII of this Agreement. By executing this Agreement the Stockholders agree to retire from employment with the Corporation no later than December 31 in the year in which the Stockholder reaches age 65.

136565-1

3

## V.  INVOLUNTARY TERMINATION OF EMPLOYMENT

In the event that a Stockholder shall be involuntarily terminated as an employee of the Corporation before reaching sixty (60) years of age except for death, disability or a termination for cause, the terminated Stockholder shall sell, and the Corporation shall purchase, the Shares of Stock of the Corporation owned by the terminated Stockholder upon the date of such termination. The purchase price shall be determined in accordance with the valuation in effect at the date of termination as provided in Section VII and shall be paid on the terms provided in Section VIII of this Agreement thirty (30) days after termination of employment. For purposes of this Agreement, the term "cause" shall mean gross misconduct, or unsatisfactory performance of his duties which continues for more than three (3) months after delivery of a written warning from the Board of Directors of the Corporation.

## VI.  VOLUNTARY TERMINATION OF EMPLOYMENT

1.    In the event that a Stockholder shall voluntarily terminate his employment with the Corporation before reaching sixty (60) years of age or in the event that a Stockholder shall be terminated for cause, the Corporation shall have the option to purchase the Shares of the Corporation owned by such Stockholder at any time within five (5) years after the date of such termination of employment. The purchase price shall be determined in accordance with the valuation in effect at the date of termination as provided in Section VII and shall be paid as provided in Section VIII of this Agreement.

## VII.  PURCHASE PRICE

For purposes of setting the purchase price hereunder, the parties agree that the fair market value of each share of stock of the Corporation owned by each Stockholder as of the date of this Agreement is Five Thousand Dollars ($5,000) per share.  It is the intention of the parties to agree

136565-1                    4

upon the fair market value of each share of stock of the Corporation held hereunder within ninety (90) days after the end of each fiscal year and at such other times during the year as the parties hereto shall agree. Such value shall be endorsed on Schedule A attached hereto and made a part hereof. If the parties fail to redetermine a value for one or more years, the price shall be determined by calculating the average annual earnings for the Corporation for the three fiscal years prior to the event triggering the sale of the shares of stock, multiplying that amount by four (4) and dividing the resulting total amount by the number of shares outstanding on the date of sale. In the event that an event triggering the sale of shares of stock takes place prior to the time that the Corporation has concluded three (3) fiscal years of existence, the foregoing calculations shall be based on earnings for the first fiscal year or the average earnings for the first and second fiscal years, as the case may be. For purposes of the foregoing calculation, earnings shall be determined after payment of annual salaries, including officers' salaries, but before payment of year-end bonuses. The foregoing calculations shall be made by the outside accountant then servicing the Corporation in accordance with Generally Accepted Accounting Principles except that depreciation shall be in accordance with the Internal Revenue Code.

## VIII. PAYMENT OF PURCHASE PRICE

1.      Upon the death of a Stockholder, the Corporation shall pay the purchase price in cash to the extent of any life insurance proceeds on the life of the deceased Stockholder payable to the Corporation and to execute and deliver to said designated person or his legal representative, as the case may be, its promissory note for any unpaid balance of said purchase price on the terms set forth in Subsection (3) below.

2.      In the event the Corporation purchases the stock of a Stockholder during his lifetime, whether as a result of his disability, retirement, termination of employment or

136565-1                                                5

otherwise, the Corporation shall pay twenty percent (20%) of the purchase price in cash and the balance in a note from the Corporation with the terms set forth in Subsection 3 below.

3.    Any note given by the corporation as part of the purchase price pursuant to Subsection 1 or 2 above shall (i) bear interest, which shall be fixed as of the date of the note, at the prime rate of interest then being charged by the bank then servicing the Corporation, plus one percent (1%), but in no event more than eight percent (8%), for the entire term of the note; (ii) have a term determined by the Board of Directors but not more than five (5) years; (iii) provide for at least equal semi-annual installments or principal and interest; and (iv) reserve to the Corporation the right to anticipate payment of principal either in whole or in part at any time.

IX.    PROVISIONS APPLICABLE ONLY TO ROBERT H. MCLEOD

1.    Notwithstanding the provisions of Section VII of this Agreement, the minimum price to be paid for shares of stock owned by Robert H. McLeod shall be Five Thousand Dollars ($5,000.00) per share.

2.    Notwithstanding the provisions of Section VIII (2) of this Agreement, Robert H. McLeod agrees that the entire purchase price for a lifetime purchase of his shares of stock shall be paid by a note from the Corporation with the terms set forth in Subsection VIII (3) of this Agreement.

3.    The parties agree that during such time that Robert H. McLeod is a stockholder in the Corporation, no additional shares of stock in the Corporation shall be issued to any party except for 11.2 shares of stock to be issued pursuant to an agreement with James Pollard.

4.    The Corporation and Robert H. McLeod agree that after the sale and purchase of the shares of stock owned by Robert H. McLeod pursuant to this Agreement, Robert H. McLeod shall be employed by the Corporation as a salesperson for a period of four (4) years from the date

136565-1                                             6

of sale and purchase of stock. Compensation for such employment shall be on a commission-only basis plus such fringe benefits then being paid to other employee-salespersons of the Corporation. The commissions payable to Robert H. McLeod shall be based on the same schedule being used for other employee-salespersons as it changes from time to time.

## X. LIFE INSURANCE

1.      The Corporation has taken out insurance on the life of each of the Stockholders in the amount specified in Schedule B attached to and made a part of this Agreement. Such proceeds shall be used to purchase the Shares of the deceased Stockholder. The Corporation shall have the right to take out additional insurance on the life of any Stockholder whenever additional insurance may be reasonably required to carry out its obligations under this Agreement. Any additional policies shall be listed in Schedule B and shall otherwise be subject to the terms of this Agreement.

2.      The Corporation shall be the owner of the policies of insurance described in Schedule B. The Corporation shall have the exclusive right to any or all privileges arising out of the ownership of said policies. The Corporation may not remove, amend, or cancel any of said policies without the consent of all of the Stockholders. All cash value, dividends and the like paid under said policies shall be the property of the Corporation and may be applied in the discretion of the Corporation toward the payment of premiums.

## XI. TERMINATION

1.      This Agreement shall terminate:

(a)      Upon the receivership, bankruptcy or dissolution of the Corporation;

(b)      If all Stockholders die within a thirty (30) day period;

136565-1                              7

(c)    Upon the Agreement in writing of all parties who are, at the time of such termination, bound by the terms hereof.

## XII.  ARBITRATION

1.    Any controversy or claim arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of Springfield, in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.  Such an award shall be final and binding on all parties hereto.  Each party to the arbitration will be responsible for his own costs and expenses related to the arbitration and the cost of the arbitration itself shall be borne equally by the two parties.

## XIII.  GENERAL PROVISIONS

1.    This Agreement shall be binding upon the parties hereto, their heirs, legal representatives, trustees, successors and assigns.  The parties agree to execute any instrument in writing which may be necessary or desirable to carry out the purposes and intent of this Agreement.

2.    This Agreement and the construction and interpretation of all provisions hereof shall be governed by the laws of the Commonwealth of Massachusetts.

136565-1                                    8

IN WITNESS WHEREOF, the parties have executed and sealed this Agreement as of the

day and year first written above.

_____
Witness

_____
Witness

_____
Witness

_____
Witness

_____
Witness

_____
Donald D. McLeod

_____
Robert H. McLeod

_____
Alan Chadwick

_____
Thomas Dingman

CARTER-MCLEOD PAPER
AND PACKAGING COMPANY, INC.

By _____
Its

136565-1                                    9

## SCHEDULE A

Pursuant to Section VII of this Stock Purchase Agreement, the Shareholders agree that the per share purchase price of the Common Stock in the Corporation for the year _____ is _____ Dollars ($000.00) per share.

_____

_____

_____

_____

181613-1

## SCHEDULE B

## LIFE INSURANCE

[company, policy number,
and amount for each stockholder]

Robert H. McLeod

General American Life Insurance
Policy # 3403482
$100,000.00

Donald D. McLeod

General American Life Insurance
Policy # 3395359
$250,000.00

Alan Chadwick

None

Thomas Dingman

None

181613-1                                                                    2