UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:05-cv-30087-MAP

CARTER-McLEOD PAPER AND )
PACKAGING COMPANY, INC. )
    Plaintiff )  PLAINTIFF'S REPLY TO
     )  DEFENDANTS' OPPOSITION TO
v. )  PLAINTIFF'S MOTION FOR
     )  PRELIMINARY INJUNCTION
DONALD McLEOD; et al. )
    Defendants. )

## I.   DEFENDANTS DO NOT CONTEST THAT MORTEN HAZZARD MISAPPROPRIATED PROPRIETARY INFORMATION

Defendants do not contest Plaintiff's allegations and evidence showing that Morten Hazzard and McLeod Packaging Systems, Inc. misappropriated Plaintiff's proprietary information as described in Plaintiff's Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("Memo") at 17-19.  The Court should therefore enter an injunction requiring that Defendants account for all copies of documents converted by the Defendants from the Plaintiff and to return, destroy, and cease or refrain from using such information.

## II.   DEFENDANTS AGREE TO NO LONGER DEFAME PLAINTIFF

Defendants have agreed to refrain from making defamatory or disparaging comments about Plaintiff.  See Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp.") at 16.  Accordingly, the Plaintiff asks that such agreement be memorialized in an Order enjoining the Defendants from making false and disparaging statements or remarks either orally or in writing about the Plaintiff.

## III.   THERE IS A LIKELIHOOD OF CONFUSION

A.   The Likelihood of Confusion Factors

The Defendants have not only failed to rebut the Plaintiff's evidence of the likelihood of confusion, they have introduced evidence confirming such confusion and otherwise supporting the injunction.

Donald McLeod Admits Adopting Plaintiff's Mark To Capitalize On the Goodwill Developed And Paid For By Plaintiff:  Donald McLeod does not deny the Plaintiff's assertion that he adopted the Plaintiff's mark with the intent of capitalizing on the Plaintiff's goodwill.  On the contrary, Donald McLeod admits in his brief that he adopted the name "McLeod Packaging Systems" because it was already known to potential customers, i.e., he had to "use[] his name and description of the business in which he had been operating and *well known for many years*" to succeed in his business.  Opp. at 14 (emphasis added).    Defendants further underscore the importance and strength of the "McLeod Packaging Systems" name by claiming that an injunction precluding its use will have a "serious economic impact" on their business, although Defendants have only used it for a short period of time.  Opp. at 15.  Had the mark not already had a substantial amount of goodwill before Defendants started using it, there would be little to lose by changing names after such a short time.  Donald McLeod's intentional adoption and use of the Plaintiff's mark, particularly given his intimate involvement with McLeod Packaging Systems, LLC and its successor, Carter-McLeod Packaging, itself strongly supports the issuance of a preliminary injunction.

Evidence of Actual Confusion:  Plaintiff, in its opening brief, provided substantial evidence of actual ongoing confusion occurring because of the co-existence of the two confusing names.  Defendants do not dispute that these events occurred, but only either speculate as to how they occurred, claim that the Court should just ignore the evidence, or make non-responsive

statements designed to mislead the Court.  Opp. at 12-14.  For example, contrary to the
suggestion in the Defendants' brief that "there was no confusion" by Grif-Bak warehouse, the
letter upon which this statement relies actually acknowledges the instance of confusion presented
by the Plaintiff with respect to McLeod Packaging System, Inc.'s product.  Opp. at Exh. 15.[1]
Defendants also have no counter or explanation for Ben & Jerry's two separate payments
directed to Carter-McLeod Packaging but intended for McLeod Packaging Systems, Inc., other
than pure unsupported speculation.  Opp. at 13.

Defendants' Opposition represents as a purported fact that "no one at [McLeod
Packaging Systems, Inc.] ever tried to reactivate an account with a former supplier" to McLeod
Packaging Systems, LLC.  However, Donald McLeod's affidavit bases this representation only
"upon information and belief" not facts.  Affidavit of Donald McLeod (hereinafter "D. McLeod
Aff.") at ¶ 42.  Additionally, the conversation was between Will Moore of Laddawn and
Defendant Morten Hazzard, not Donald McLeod.  Affidavit of Robert H. McLoed (hereinafter,
"First R. McLeod Aff.") at ¶ 29(d).  Note that although Morton Hazzard is an employee of the
McLeod Packaging Systems and represented by the same counsel, he presumably was unwilling
to go on record under oath.   This was for good reason, for Morten Hazzard spoke with Mr.
Moore a second time, after Plaintiff's opening brief was filed, claiming that he had not tried to
reactivate an account but instead open a new one.  Second Affidavit of Robert H. McLeod
(hereinafter, "Second R. McLeod Aff.") at ¶ 6.[2]  Mr. Moore made clear to Morten Hazzard,
however, that, if called as a witness, he would testify truthfully regarding Morten Hazzard's
reactivation of the account.  *Id.*

---

[1]    The letter carefully suggests that this confusion was the result of unclear labeling of McLeod Packaging
System, Inc.'s product without specifying how the product was unclearly labeled.
[2]    Tabs 1 through 8 are appended to the First Affidavit of Robert H. McLeod.  Tabs 9 through 11 are appended to
the Second Affidavit of Robert H. McLeod.

As another example, Robert McLeod related a telephone call he had with a customer service representative for Country Bank for Savings, where he was informed that Jennifer Cushman, Donald McLeod's wife, had written a check against an account in the name of McLeod Packaging Systems LLC.  First R. McLoed Aff. at ¶ 29(e).  Defendants do not deny having written the check or that there may otherwise have been confusion between the McLeod Packaging Systems, Inc. and McLeod Packaging Systems, LLC accounts, but carefully state only that Donald McLeod has "no personal knowledge that *any check was returned for insufficient funds* from Country Bank for Savings as alleged in ¶ 29(e) of Robert's Affidavit."  D. McLeod Aff. at ¶ 43 (emphasis added).[3]

Similarity of the Marks:  The Defendants rely primarily on the Secretary of the Commonwealth's administrative decision in support of its claim that "McLeod Packaging Systems" is not similar to "McLeod Packaging Systems."  As summarized below in Section III.B, this reliance is both inappropriate and misplaced.  In any event, any suggestion by the Defendants' that the marks "McLeod Packaging Systems" and "McLeod Packaging Systems" are not identical and that "McLeod Packaging Systems" and "Carter-McLeod Paper and Packaging" are not similar would be disingenuous, at best.

Similarity of Goods:  The Defendants argues in essence that the Plaintiff sells products A, B, C and D, the Defendants sell only A, B and C, and, therefore, they sell different products.  This argument simply is nonsensical.  Both companies admittedly sell A, B and C, which are not just similar goods, but identical.  As clearly stated in Donald McLeod's Demand For Arbitration

---

[3]    Donald also makes misleading statements about Plaintiff's evidence of secondary meaning.  For example, the non-evidentiary Opposition states that Carter-McLeod Packaging "printed new placards to be put on all existing and new machinery bearing the name Carter-McLeod."  Opp. at 9.  Donald's affidavit states, however, "when Carter-McLeod formed, it replaced the placard . . . with a new placard . . . ," D. McLeod Aff. at ¶ 19, and makes no suggestion whatsoever that the new placards were put on existing equipment.  Plaintiff's evidence that the old placards are still on existing equipment, First R. McLeod Aff. at ¶ 14, is unrebutted.

(Opp. Exh. 8), both parties are engaged in the "sale of paper and packaging machinery and equipment." The parties' goods are identical.

Channels of Trade, Advertising and Customers: Defendants claim that in the absence of a non-compete agreement they are free to sell their products in any channels of trade they wish. Plaintiff has not brought a non-compete claim and does not quibble with this point. But, Donald McLeod may not do so under the name "McLeod Packaging Systems." The Defendants do not deny that they target, solicit and sell to the same customers in the same geographical region as the Plaintiff. Such evidence unequivocally tilts the scale strongly in favor of the Plaintiff on these factors.

All eight factors favor Plaintiff and the Court must therefore enjoin Defendants from using the name "McLeod Packaging Systems."

B. The Secretary Of Commonwealth Decision

The Defendants mistakenly place great weight on the April 8, 2004 Notice of Decision by Kelly L. Kopyt, Esq., a hearing officer with the Office of the Secretary of the Commonwealth, concluding that the use of the corporate name McLeod Packaging Systems, Inc. does not violate the Massachusetts corporate name statute, Mass. Gen. Laws ch. 156D, § 4.01. Opp. Exh. 4. The Defendants' reliance on the Notice of Decision is misplaced for at least two reasons.

First, a corporate name challenge under Mass. Gen. Laws ch. 156D, § 4.01 has a different purpose, and does not supplant, a federal or state trademark infringement or unfair competition claim. As explained by the Supreme Judicial Court:

The Secretary, under c. 155, § 9,[4] considers only the abstract likelihood or possibility of one name being mistaken for another because of literal similarity . . . . Under G.L. c. 110, § 7A,[5] however, whether or not the names in the abstract appear so similar or likely to be mistaken one for the other as to warrant

---

4    The predecessor to the current name challenge statute, Mass. Gen. Laws 156D, § 4.01.
5    The predecessor to the current Massachusetts trademark statute, Mass. Gen. Laws c. 110B, § 12.

an injunction under G.L. c. 155, § 9, the court may still proceed to determine whether the location or the manner of the use of the name may result in 'injury to business reputation or . . . dilution of the distinctive quality of a trade name' and grant an injunction. The proceedings under G.L. c. 110, § 7A, are more broadly based than those under G.L. c. 155, § 9.

*Massachusetts Mut. Life Ins. Co. v. Massachusetts Life Ins. Co.*, 351 Mass. 283, 290-91, 218 N.E.2d 564, 569-70 (1966) (first ellipses added, second ellipses in original). It is therefore beyond peradventure that the name challenge decision has no relevance in the instant proceeding.

Second, the hearing officer's decision is very poorly reasoned and lacks any degree of persuasiveness meriting any weight by this Court. Specifically, the hearing officer made an explicit finding that "the name McLeod Packaging Systems, Inc. is not the same as [the Plaintiff's] trade name of McLeod Packaging Systems so as to mislead a person of average intelligence." Opp. Exh. 4, p. 7. This conclusion is simply bizarre. The hearing officer reached this conclusion, "notwithstanding the geographic location of the [Defendant] and [Plaintiff]," and only by finding that the products sold by McLeod Packaging Systems, Inc. are not the same as the Plaintiff's products because the Plaintiff sells some additional products, *id.*, as previously noted, an illogical argument. Not surprisingly, Plaintiff has appealed this decision in the Hampden County Superior Court. *See* Opp. Exh. 5.

This Court is quite capable of plenary review of the evidence before it and is not required to rely on the questionable reasoning of an administrative hearing officer with a different charge.

C. Distinctiveness And Abandonment

As noted *supra*, Donald admits adopting the name "McLeod Packaging Systems" exactly because it was already well-known, i.e., it had secondary meaning as the Plaintiff's mark. *See* Opp. at 14. The referenced goodwill connected with that surname in association with the packaging business is, however, not Donald's, but was developed and paid for by the Plaintiff. Other than confirming their intent in adopting Plaintiff's mark, the Defendants offer no credible

factual or legal support undermining Plaintiff's claim of distinctiveness. The Plaintiff's brief cites to several cases in which surnames coupled with descriptive words are recognized as distinctive.

Defendants also suggest, without legal support or analysis and without pleading abandonment as an affirmative defense, that the mark "McLeod Packaging Systems" was abandoned by Plaintiff. Opp. at 3. The Defendants fleeting reference to abandonment deserves little response, other than to note courts have invariably concluded that the abandonment defense is inapplicable in circumstances very similar to the present case, *see, e.g.:*

> *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 413 (7th Cir. 1994): Court upheld preliminary injunction against a Canadian football league's use of "Baltimore CFL Colts" because it infringed the "Indianapolis Colts" former identity nine years earlier as the "Baltimore Colts." The Court noted that subsequent use by the Baltimore CFL Colts could cause confusion with the Indianapolis Colts by virtue of its prior use of the mark "Baltimore Colts" despite the change in market and league. The present case is even stronger because, unlike in the *Indianapolis Colts* case, McLeod Packaging Systems, Inc. is owned by a former principal in both Carter-McLeod Packaging and its predecessor McLeod Packaging Systems, LLC, and sells the same product to the same customers in the same geographical area.

> *Peter Luger Inc. v . Silver Star Meats Inc.*, 63 U.S.P.Q. (BNA) 1555, 2002 WL 1870066 (W.D. Pa. 2002): Court issued preliminary injunction precluding defendant's use of the mark "R. Luger Classics" as infringing upon "Hatfield Delichoice" products formerly sold under the "Peter J. Luger" name pursuant to established goodwill in processed meat products. The Court concluded that "injunctive relief is warranted, even if defendants succeed on their abandonment defense, in order to prevent confusion caused by the residual association of the Luger-PA name and trade dress with its former user." The Court held "that a company which purchases goodwill, trade name and trade dress of a product does not forfeit its right to any residual goodwill associated with those attributes merely because it transitions to a new brand name."

> *Stilson & Associates, Inc. v. Stilson Consulting Group, LLC*, Nos. 03-4458, 03-4542, 2005 WL 1059277 (6th Cir. May 06, 2005) (unpublished, appended hereto). Affirming district court's entry of a permanent injunction enjoining the defendant, grandson of the plaintiff's founder, from using "Stilson Consulting Group" as infringing the plaintiff's former name "Stilson and Associates," a name that was subsequently changed to "Dodson-Stilson" by merger and then "DLZ Ohio." The court held that use of the Stilson & Associates name

after the merger was a bona fide use in commerce of the name and therefore the name was not abandoned.  It then enjoined defendant from using his last name in his business.[6]

## IV.  IRREPARABLE HARM

Despite the short use of the name McLeod Packaging Systems, Inc., the Defendants' baldly assert that an injunction would "disrupt" and have a "serious economic impact" on its business.  The Defendants' assertion flies in the face of their earlier argument the mark has no distinctive importance and was adopted because it simply was "the most descriptive name [Donald] could use for his new company."  Opp. at 7.  Given the short use of the name, a name change at this stage likely would have little impact on Defendants' business.

## V.  DEFENDANTS DEFENSES OF "UNCLEAN HANDS" AND "MOOTNESS" ARE FACIALLY AND LEGALLY MERITLESS

Defendants' suggestions that Plaintiff's purported unclean hands bar a preliminary injunction, or that the arbitration may render the issue moot, are premised on misleading statements about the scope of the referenced arbitration and are bereft of any factual or legal support.  Indeed, the Defendants' position is unsupported by applicable authority.

"The unclean hands doctrine should not be used to justify the continued confusion of the public with respect to the origin of goods and services."  *Donoghue v. IBC USA (Publications), Inc.*, 886 F. Supp. 947, 954 (D. Mass. 1995) (citing *Bell v. StreetWise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir.1985) (Breyer and Coffin, JJ., concurring)), *aff'd*, 70 F.3d 206, 218 (1st Cir. 1995).  In circumstances in which the "unclean hands" defense applies, it has merit "only where some *unconscionable act* of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."  *Norton Co. v. Carborundum Co.*, 530 F.2d

---

[6]    *Cf. Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 103-04 (5th Cir. 1983), in which the court held that purely defensive token use merely to prevent use by others without any good faith intent of utilizing the goodwill of its prior mark resulted in abandonment of the mark.  The circumstances of that case do not exist in the present case.

435, 444 (1st Cir. 1976) (emphasis added), *citing Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S. Ct. 146, 147, 78 L. Ed. 293 (1933).

No such situation exists here. As background, Carter-McLeod Packaging, by vote of its Board of Directors, terminated Donald McLeod's at-will employment on December 15, 2004, after discovering various illegal actions as alleged in more detail in Plaintiff's Complaint in this action. Second R. McLeod Aff. at ¶ 1. Upon his termination, Carter-McLeod Packaging was required to redeem Donald McLeod's shares and pay Donald McLeod for the value of such shares per the terms and express calculation method set forth in Sections V and VII of the Stock Purchase Agreement, which it did.[7] *Id.* at ¶ 2. Subsequently the corporation, through its Board of Directors, waived the Stock Purchase Agreement's retirement provision to retain Robert McLeod as an officer and shareholder of the company. *Id.* at 3. This conduct is far from "unclean," but was a series of legitimate steps taken to remove an officer and employee who converted funds from the company and otherwise breached his fiduciary duty.

With respect to mootness, contrary to the Defendants' suggestion, Opp. at p. 7, n. 3, Donald McLeod has no claim pending in the arbitration, or in any forum, that the termination of his at-will employment was wrongful, nor is such a claim arbitrable. Indeed, Donald McLeod's Demand for Arbitration expressly indicates that the dispute does not arise out of an employment relationship. Opp. Exh. 8 (checking "no" to question about whether dispute arises from an employment relationship). Instead, the claim for arbitration alleges only breach of the Stock Purchase Agreement because Robert McLeod did no retire at 65 and seeks a remedy only of the redemption of Robert McLeod's shares and the determination of the proper method of valuing

---

[7]    Contrary to the representation in the Opposition, Opp. at 17, the Stock Purchase Agreement does not provide for redistribution of the redeemed shares either pro rata or by any other method. Second R. McLeod Aff. Tab 9.

9

Donald McLeod's stock, not a reversal of his compulsory redemption. See Opp. Exh. 8. There is no outcome in the arbitration that would render the present action moot.

For the foregoing reasons and for the reasons stated in the Plaintiff's original motion and Memo, the Plaintiff's request that it Motion for Preliminary Injunction be allowed.

> Respectfully submitted,
> The Plaintiff
> CARTER-MCLEOD PAPER & PACKAGING
> COMPANY, INC.
> By Its Attorneys:

Dated: July 6, 2005

> /s/ Jeffrey E. Poindexter
> Francis D. Dibble, Jr. – BBO No. 123220
> Jeffrey E. Poindexter – BBO No. 631922
> Pamela S. Chestek – BBO No. 647124
> Bulkley, Richardson and Gelinas, LLP
> 1500 Main Street, Suite 2700
> Springfield, Massachusetts 01115-5507
> Tel:  (413) 781-2820
> Fax:  (413) 272-6805
> fdibble@bulkley.com
> jpoindexter@bulkley.com
> pchestek@bulkley.com



**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT RECOMMENDED FOR FULL--TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule 28.)

United States Court of Appeals,
Sixth Circuit.
**STILSON &** ASSOCIATES, INC.;  DLZ Ohio, Inc.,
Plaintiffs-Appellees,
Cross-Appellants,
v.
**STILSON** CONSULTING GROUP, LLC;  William
E. **Stilson;** Jerry R. Dailey,
Defendants-Appellants, Cross-Appellees.
**Nos. 03-4458, 03-4542.**
May 6, 2005.

**Background:**   Civil engineering firm sued competitor for, inter alia, infringement of its "Stilson" trade name and tortious interference with business relations. Following a bench trial, the United States District Court for the Southern District of Ohio, held for firm on infringement claim, but for competitor on tortious interference claim. Parties cross-appealed.

  **Holdings:**   The Court of Appeals, Cook, Circuit Judge, held that:
  (1) firm had not abandoned name;
  (2) evidence supported finding of infringement; and
  (3) evidence supported finding of no tortious interference.
  Affirmed.

West Headnotes

**[1] Trademarks** 1171
382Tk1171 Most Cited Cases

Evidence supported finding that civil engineering firm had not abandoned trade name when it merged with another firm, for purpose of determining whether name was being infringed by third party's post-merger use;  combined firm continued to use trade name for work with pre-merger clients. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[1] Trademarks** 1800
382Tk1800 Most Cited Cases
Stilson & Associates.

**[2] Trademarks** 1629(3)
382Tk1629(3) Most Cited Cases
Evidence supported finding that civil engineering firm's use of "Stilson Consulting Group" mark created likelihood of confusion, and thus infringed, competitor's "Stilson & Associates" trade name; although buyer sophistication would likely have prevented confusion at point of sale, initial-interest confusion was likely.  Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[3] Trademarks** 1717(2)
382Tk1717(2) Most Cited Cases
Requirement that civil engineering firm change its name, upon finding that its current name infringed competitor's trade name, was not abuse of discretion. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[4] Torts** 242
379k242 Most Cited Cases
Finding that civil engineering firm did not tortiously interfere with competitor's business relationship was supported by evidence that client switched firms due to dissatisfaction with competitor, and that firm did not solicit client's breach of agreement with competitor;  under Ohio law, firm's mere willingness to contract with client was not enough to render it liable.
 **\*993** On Appeal from the United States District Court for the Southern District of Ohio.

 Diane W. French, DLZ Corporation, Barry L. Lubow, Stilson & Associates, Columbus, **\*994** OH, for Plaintiffs-Appellees Cross-Appellants.

 Timothy J. Ryan, Gallagher, Gams, Pryor, Tallan & Littrell, Columbus, OH, for Defendants-Appellants Cross-Appellees.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)), 2005 Fed.App. 0363N
**(Cite as: 129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)))**

Before BOGGS, Chief Judge; COOK and BRIGHT, Circuit Judges. [FN*]

> FN* The Honorable Myron H. Bright, Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

COOK, Circuit Judge.

**1 Defendants, Stilson Consulting Group, William Stilson, and Jerry Dailey, appeal the district court's judgment in favor of Plaintiffs, DLZ and Stilson & Associates, on various federal and state-law claims arising from Defendants' use of the "Stilson" name. Plaintiffs cross-appeal the district court's judgment in favor of Defendants on Plaintiffs' tortious-interference with-a-business-relationship claim. We affirm.

I

Alden Stilson founded Alden E. Stilson & Associates, a civil engineering firm, in the mid-1940s. In the late 1980s, the DLZ Corporation purchased the firm, by then known as Stilson & Associates, and made Dodson-Lindblom Associates its parent company. In 1995, DLZ merged Stilson & Associates into Dodson-Lindblom and changed the name to Dodson-Stilson. Then, in 2000, Dodson-Stilson and other DLZ Corporation firms in Ohio merged to form DLZ Ohio.

That same year, William E. Stilson, Alden Stilson's grandson, created and began operating Stilson Consulting Group in direct competition with DLZ Ohio. Plaintiffs sued, arguing that Defendants' use of the name Stilson, in combination with its use of an "S" insignia and corporate colors and inclusion of Stilson & Associate firm history in its brochure, violated the Lanham Act and constituted unfair competition, trade name infringement, a deceptive trade practice, and misappropriation or conversion of assets. According to Plaintiffs, customers would likely perceive Stilson Consulting Group as related to Stilson & Associates. Plaintiffs also claimed dilution of the Stilson name and tortious interference with a business relationship.

The standard applicable to Lanham Act claims governs Plaintiffs' unfair competition, common law trade name infringement, and claims under the Ohio Deceptive Trade Practices Act--thus, success depends on whether Plaintiffs demonstrate a likelihood of confusion. 15 U.S.C. § 1125; Ohio Rev.Code §

4165.02; Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280, 288 (6th Cir.1997); NBBJ E. Ltd. P'ship v. The NBBJ Training Acad., Inc., 201 F.Supp.2d 800, 804 (S.D.Ohio 2001). Following a bench trial, the district court concluded that Plaintiffs had not abandoned the Stilson & Associates name, as Defendants claimed, and that Defendants' conduct created a likelihood of confusion. Accordingly, the district court granted judgment in favor of Plaintiffs on their claims of trade name infringement, unfair competition, deceptive trade practices under the Lanham Act and Ohio Deceptive Trade Practices Act, and misappropriation or conversion of assets (which the district court construed as an unfair competition claim). The district court granted judgment in favor of Defendants on Plaintiffs' claims of dilution and tortious interference with a business relationship. In a separate **995 order, the district court issued a permanent injunction.

Defendants now challenge the district court's abandonment and likelihood-of-confusion findings. Defendants further contest the scope of the court's injunction, which requires Defendants to alter Stilson Consulting Group's name. Plaintiffs cross-appeal the district court's tortious-interference judgment.

II

A. Abandonment

**2 [1] "[A] defendant who successfully shows that a trademark plaintiff has abandoned a mark [FN1] is free to use the mark without liability to the plaintiff." Cumulus Media, Inc. v. Clear Channel Communications, Inc., 304 F.3d 1167, 1173 (11th Cir.2002). Under § 1127 of the Lanham Act, "[a] mark shall be deemed to be 'abandoned' ... [w]hen its use has been discontinued with intent not to resume such use." "Use of a mark means the bona fide use of such mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Kellogg Co. v. Exxon Corp., 209 F.3d 562, 575 (6th Cir.2000)(quoting 15 U.S.C. § 1127)(internal quotation marks omitted). Thus, "[i]n order for a party to succeed on a claim of abandonment, it must prove the elements of both non-use and intent, i.e., that the other party actually abandoned its mark through non-use and that it intended to do so." Id. at 575-76 (citing United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 138 (3d Cir.1981)). And "[b]ecause a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.' " Cumulus Media, Inc., 304

F.3d at 1175 (footnote omitted).

FN1. Under the Lanham Act, the term "mark" includes services marks, which are names (such as Stilson here) "used to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services...." 15 U.S.C. § 1127.

Defendants contend that Plaintiffs abandoned the Stilson name following the 1995 merger. First, relying on a D.C. Circuit case, *Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp.,* 109 F.2d 35 (D.C.Cir.1939), Defendants allege that the name's goodwill did not survive the merger and that we must, therefore, deem the name abandoned. Second, though Defendants recognize that Plaintiffs continued to use the Stilson name after the merger, they analogize such use to exhausting inventory of a discontinued line of goods and object to its characterization as "bona fide." *See Del Rain Corp. v. Pelonis USA, Ltd.,* 29 Fed. Appx. 35, 38 (2d Cir.2002)("An effort to dispose of the remaining stock of an abandoned line of merchandise does not constitute a bona fide use ... in the ordinary course of trade that suffices to defeat a finding of abandonment.")(internal quotation marks and citations omitted); *Uncas Mfg. Co. v. Clark & Coombs Co.,* 309 F.2d 818, 820 (1st Cir.1962) (upholding the district court's finding that the plaintiffs abandoned a jewelry label, despite continued attempts to sell rings with the label, where such sale attempts "may well have been directed to disposal of the remaining stock of an abandoned line of merchandise instead of an intention to continue the line"); *Anvil v. Consol. Foods Corp.,* 464 F.Supp. 474 (S.D.N.Y.1978)(concluding the sale of remaining inventory--approximately 100,000 shirts--bearing a discontinued label did not constitute "bona fide" use where the plaintiff "was merely depleting an inventory of labels it had on hand on **\*996** items where the use of an obsolete label made no difference").

Plaintiffs dispute that the merger extinguished the goodwill of the Stilson & Associates name (and also question the continued viability of *Lawyers Title Ins. Co.*--a pre-Lanham Act case), and point the court to cases holding that a plaintiff's decreased use of a mark, even with the intent to ultimately phase out its use, does not constitute abandonment. *See Emachines, Inc. v. Ready Access Memory, Inc.,* No. 00-00374-VAP, 2001 WL 456404 at \*8, 2001 U.S. Dist. Lexis 13904 at \*26 (C.D.Cal. March 5, 2001)

(emphasizing "[t]he Lanham Act does not require a regular pattern of sales to prove use" and concluding that using, servicing existing customers, and making new sales of a discontinued product constituted bona fide use under the Lanham Act); *KeyCorp v. Key Bank & Trust,* 99 F.Supp.2d 814, 827 (N.D.Ohio 2000)("Without being able to establish non-use of [the mark by the plaintiff], [the defendant] certainly cannot establish that [the plaintiff] does not intend to resume use of the mark. This is true even if the company did at one time have the goal of discontinuing [the mark].").

**\*\*3** Regarding Plaintiffs' use of the Stilson name after the merger, the district court found: clients who approached Dodson-Stilson or, later, DLZ, believing them to be Stilson & Associates were not turned away or denied services; part of Plaintiffs' strategy was to use or invoke the Stilson name if it facilitated interchange with the client; Stilson & Associates continued to perform work on contracts existing before the 1995 merger, including making ninety-two proposals; Plaintiffs continued to send Stilson & Associates documents to clients and to receive documents and payments directed to Stilson & Associates; and as of February 2002, Stilson & Associates had thirteen contracts for six clients. [FN2] Though finding the evidence in Plaintiffs' favor "not overwhelming," the district court concluded that Defendants failed to satisfy their burden of proving abandonment.

FN2. Defendants attack the district court's factual findings to the extent that they rely on testimony from Plaintiffs' witnesses, given the "record of false testimony provided by Plaintiffs' employees." But nothing prohibits the district court from finding some aspects of Plaintiffs' evidence credible while rejecting others as incredible, and such assessments are virtually unchallengeable. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 574-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Defendants fail to justify upsetting the district court's findings here.

Because abandonment is a question of fact, we review the district court's finding for clear error. *See Cumulus Media, Inc.,* 304 F.3d at 1174; *McCarthy on Trademarks* § 17.1. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse it even if convinced that we would have weighed the evidence differently sitting as the trier of fact. *Anderson, 470*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Fed.Appx. 993                                                                                                              Page 4
129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)), 2005 Fed.App. 0363N
**(Cite as: 129 Fed.Appx. 993,  2005 WL 1059277 (6th Cir.(Ohio)))**

U.S. at 574, 105 S.Ct. 1504. In the face of conflicting evidence and authority supporting both Plaintiffs' and Defendants' views, we cannot deem implausible the district court's conclusion that Plaintiffs used the Stilson & Associates name to identify the source of services--a bona fide use. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* Accordingly, we uphold the district court's rejection of Defendants' abandonment defense for the reasons provided in its thorough and well-reasoned opinion.

### B. Likelihood of Confusion

[2] "The touchstone of liability under [the Lanham Act] is whether the defendant's **\*997** use of the disputed mark is likely to cause confusion among consumers regarding the origin of goods offered by the parties." *Daddy's Junky Music Stores,* 109 F.3d at 280. When determining the likelihood of confusion, the Sixth Circuit applies the eight factors articulated in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.:* (1) the strength of the plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) the evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; (8) the likelihood of expansion of the product lines. 670 F.2d 642, 648 (6th Cir.1982). In *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* this court further clarified:

These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

**\*\*4** 931 F.2d 1100, 1107 (6th Cir.1991).

The district court, after considering each of the *Frisch's* factors, concluded: "[P]laintiffs have carried their burden of proving that [D]efendants' use of the Stilson Consulting Group name and the 'S' insignia creates a likelihood of confusion." The court acknowledged that some factors weighed in favor of Defendants--the degree of purchaser care and the decline in the strength of the Stilson & Associates name since 1995. But, according to the court, the relatedness of the services offered by Plaintiffs and Defendants, as well as the similarity of the marks,

tipped the scale in Plaintiffs' favor. Though the district court agreed with Defendants that buyer sophistication would likely prevent confusion at the point of sale, it found initial-interest confusion likely: "[A] consumer is likely to be confused when first becoming aware of Stilson Consulting Group ... given the similarly in names and the fact that [Plaintiffs] and [Defendants] are direct competitors in the same market."

We review the district court's underlying factual findings for clear error and its ultimate finding of confusion de novo. *Homeowners,* 931 F.2d at 1107. Defendants first argue the district court's initial-interest-confusion finding suffers from the court's purported failure to consider the unique aspects of the engineering market and to give sufficient weight to the degree of consumer care. In the alternative, Defendants maintain that, even assuming the likelihood of initial-interest confusion, the district court erroneously concluded that such confusion violates the Lanham Act. We find these arguments unpersuasive.

Defendants insist that, in finding initial-interest confusion likely, the district court failed to account for "aspects of the engineering services market that would make the possibility of confusion very remote," such as the degree of consumer care and sophistication and the emphasis consumers place on individual engineers and engineering teams. This failure, according to Defendants, caused the court to place undue weight on the similarity-of-marks factor and to define the product too broadly--as engineering services, instead of as "the skill, expertise, and experience of the engineering teams that firms can provide." But the record reflects the district court recognized and carefully considered the **\*998** unique characteristics of the engineering market, and we find no clear error in the court's factual findings regarding the *Frisch's* factors.

Defendants also cite *Rust Env't & Infrastructure, Inc., v. Teunissen,* 131 F.3d 1210 (7th Cir.1997), as purported authority for the proposition that confusion is unlikely in the engineering market. In *Rust,* the Seventh Circuit found confusion unlikely, in part because of the sophistication of consumers of wastewater engineering consultants and the high cost of wastewater projects. Nothing in the *Rust* opinion convinces us to alter our view that a likelihood of confusion exists in this case. First, we have no basis for comparing the wastewater engineering market to the engineering market at issue here--and no reason to assume the two identical. Moreover, as indicated,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Fed.Appx. 993                                                                                           Page 5
129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)), 2005 Fed.App. 0363N
**(Cite as: 129 Fed.Appx. 993,  2005 WL 1059277 (6th Cir.(Ohio)))**

confusion determinations must be made on a case-by-case basis, *Homeowners,* 931 F.2d at 1107, not on the basis of broad market generalizations. Finally, the presence of actual survey evidence suggesting the unlikelihood of confusion in *Rust* further distinguishes that case. Here, the district court acknowledged consumer sophistication, but found this factor could not negate the likelihood of confusion created by the similarity of the marks and the direct nature of the competition between the parties. We find no error in this analysis.

 **\*\*5** Likewise, Defendants' insistence that initial-interest confusion cannot sustain a likelihood-of-confusion finding lacks merit. Our precedent expressly repudiates the notion that the Lanham Act prohibits only point-of-sale confusion. In *Ferrari S.P.A. Esercizio Fabriche Automobili E. Corse v. Roberts,* 944 F.2d 1235 (6th Cir.1991), the defendant claimed his use of Ferrari's automobile design could not create a likelihood of confusion because he informed his purchasers that his cars were not Ferraris, eliminating any confusion at the point of sale. Concluding that the defendant's pre-sale disclosure did not insulate him from liability, the court reasoned: "The Lanham Act ... was intended to do more than protect consumers at the point of sale." *Id.* at 1244;  *see also Rust,* 131 F.3d at 1217 ("[I]nitial interest confusion is also forbidden by the Lanham Act. The Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods or services as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated.") (citations and internal marks omitted).

 Defendants cite *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270 (3d Cir.2001), for the proposition that initial-interest confusion only suffices under the Lanham Act if the court concludes that the initial confusion will have a meaningful effect in the marketplace. In *Checkpoint,* the Third Circuit, evaluating the import of evidence of actual initial-interest confusion, opined: "Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis." *Id.* at 297. But *Checkpoint* does little to strengthen Defendants' arguments here. The *Checkpoint* court expressly declined to "issue a blanket rule limiting the probative value of initial interest," concluding instead that "[i]ts significance will vary and must be determined on a case-by-case basis" after evaluating all of the relevant factors. *Id.* Central to the court's conclusion that evidence of initial-interest confusion

lacked probative value in that case was the absence of party competition and interrelatedness. Here, by contrast, the district court expressly found both. Thus, contrary to supporting the irrelevance of initial-interest confusion in this case, *Checkpoint* underscores its importance. Consequently, we find no error in **\*999** the district court's conclusion that the likelihood of initial-interest confusion rendered Defendants liable under the Lanham Act.

 In sum, we find no clear error in the district court's underlying factual findings, and we agree that those findings support a conclusion that Defendants' use of the Stilson name created a likelihood of confusion.

### C. Scope of Injunction

 [3] Finally, Defendants contend that the district court "erred as a matter of law when it restrained its own authority to fashion an injunctive remedy on the premise that the Lanham Act compels a name change." As support, Defendants point to the district court's statement that "[w]hile [D]efendants argue that any confusion can be dispelled by a remedy short of name change, the Lanham Act does not permit anything less."

 **\*\*6** We view the district court's statement not as an indication that the judge lacked knowledge of his discretion to fashion a remedy short of a name change, but as an expression that he deemed this an inappropriate case in which to exercise that discretion. The district court correctly posited: "If the name of a firm is likely to cause confusion in the marketplace, then the court has the obligation to eliminate such likelihood." The district court's analysis shows no misapprehension of the applicable law and convinces us that it considered the facts of this case and fashioned a remedy no broader than necessary to eliminate the likelihood of confusion. In short, we find no abuse of discretion in the injunctive relief granted.

### D. Cross Appeal--Tortious Interference with a Business Relationship

 [4] Plaintiffs also claim that Defendants tortiously interfered with their business relationship with the City of Pickerington when the City ended its relationship with Plaintiffs and followed Jerry Dailey to Defendants' firm. Under Ohio law, "[t]he elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof;  (3) an intentional interference causing a breach or termination of the relationship;  and (4) damages resulting therefrom." *Wolf v. McCullough-Hyde*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Fed.Appx. 993                                                                                    Page 6
129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)), 2005 Fed.App. 0363N
**(Cite as: 129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)))**

*Mem. Hosp., Inc.,* 67 Ohio App.3d 349, 586 N.E.2d 1204, 1208 (1990) (citations omitted). In rejecting Plaintiffs' claim, the district court considered evidence that the City, dissatisfied with Plaintiffs' work, would have gone elsewhere for its future projects, regardless of Defendants. This evidence, combined with the lack of evidence that Defendants solicited the City's breach of its agreements with Plaintiffs or otherwise acted improperly, convinced the court that Plaintiffs could not sustain its tortious-interference claim. We agree with the district court that Defendants cannot be said to have *caused* the termination of the relationship. Plaintiffs argue that Defendants' willingness to contract with the City-- which allegedly enabled the City to end its relationship with Plaintiffs--suffices to render them liable. Plaintiffs, however, provide no authority for this contention, and we find it unpersuasive. The district court, therefore, correctly entered judgment in favor of Defendants on this claim.

III

Accordingly, we affirm the decision of the district court in all respects for the reasons stated in this opinion and in the well-reasoned opinion of the district court.

129 Fed.Appx. 993, 2005 WL 1059277 (6th Cir.(Ohio)), 2005 Fed.App. 0363N

**Briefs and Other Related Documents (Back to top)**

• ___03-4542_____(Docket) (Dec. 02, 2003)

• ___03-4458_____(Docket) (Nov. 06, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 3:05-cv-30087-MAP

| | | |
|---|---|---|
| CARTER-McLEOD PAPER AND | ) | |
| PACKAGING COMPANY, INC. | ) | |
| | ) | |
|    Plaintiff | ) | SECOND AFFIDAVIT |
| | ) | OF ROBERT H. McLEOD |
| v. | ) | |
| | ) | |
| DONALD McLEOD; McLEOD | ) | |
| PACKAGING SYSTEMS and | ) | |
| MORTEN HAZZARD | ) | |
| | ) | |
|    Defendants. | ) | |

I, Robert H. McLeod, being duly sworn, depose and say:

1.     The Board of Directors of Carter-McLeod Packaging made the decision to terminate Donald McLeod "without cause," although the Board believed that it had more than sufficient cause to terminate his employment pursuant to the facts alleged in the Complaint.

2.     After the Board terminated Donald as an officer, we called for the redemption of his shares, as required by Article V of the Stock Purchase Agreement (Tab 9) and also appointed an accountant to value the shares in accordance with Article VII of the Stock Purchase Agreement.  See Tab 10 (Minutes of Directors' Meeting for December 15, 2004).  Donald McLeod was then no longer a shareholder of Carter-McLeod Packaging and the company subsequently acquired Donald McLeod's shares consistent with the terms set forth in Section VII of the Stock Purchase Agreement.

3.     Attached as Tab 11 is a true and correct copy of the Minutes for Directors' Meeting of Carter-McLeod Paper and Packaging Company, Inc. for December 28, 2004.

4.      Any adverse credit rating experienced by Carter-McLeod Packaging is a direct result of Donald's mishandling of its finances.  One of Donald's primary responsibilities as President of Carter-McLeod Packaging was to oversee payments to vendors.  Donald instructed the bookkeeper as to which accounts were to be paid and when.  Donald specifically requested this responsibility, since, as he informed us, he was "good at handling the vendors."  Donald of course, as his brief states, would have been "well aware" of Carter-McLeod Packaging's "lack of credit worthiness" since he was directly responsible for any negative credit.

5.      It is correct that the loan agreement called for a review if major changes occured and certainly the firing of the President would qualify as a major change.  We were well aware of this clause and it is for this reason that I placed a call to Mr. Phil Gonsalves, Vice President for Country Bank for Savings, approximately two weeks before the Board took any action against Donald.  Mr. Gonsalves did not return my call for over a week, even though I stated in my voice mail that it was important (prior to that call he was always very prompt in returning calls).  I received his return call approximately one week before Donald's dismissal.  Mr. Gonsalves' tone from the very beginning of the conversation was very terse, bordering on belligerent.  It was very clear to me that he was already aware of what was taking place.  Although I had not yet informed him that Carter-McLeod Packaging might be terminating Donald's employment, he made the statement, "if Donald was not with the Company then he was not our banker."  There is no reason for him to have made this statement unless he had prior knowledge, which could have come from only one source – Donald.  Mr. Gonzalves then simply froze our line of credit without notification, even thought I had a conversation with him literally minutes before he did

so, and without determining whether Donald's dismissal would adversely affect the credit worthiness of Carter-McLeod Packaging. I found his conduct to be very unprofessional.

6.    On or about June 3, 2005 I received another telephone call from Will Moore of Laddawn Manufacturing. He informed that that he had just spoken with Morten Hazzard, who tried to claim that Mr. Moore was the person who suggested reactivating the account. Mr. Moore informed me that he told Morten Hazzard if anyone asked him what happened he would tell the truth, that he specifically recalls that Morten asked about reactivating an old account, not opening a new one.


Signed under the pains and penalties of perjury this 5th day of July, 2005.


Robert H. McLeod

TAB 9

## STOCK PURCHASE AGREEMENT

AGREEMENT made as of May 29, 2003 by and among DONALD D. MCLEOD, ROBERT H. MCLEOD, ALAN CHADWICK and THOMAS DINGMAN (the "Stockholders") and CARTER-MCLEOD PAPER AND PACKAGING COMPANY, INC., a Massachusetts corporation with a usual place of business in West Springfield, Massachusetts, (the "Corporation").

WHEREAS, the Stockholders are the owners of all the issued and outstanding shares of common stock of the Corporation, each owning the following shares as of the date of this Agreement:

| | |
|---|---|
| Donald D. McLeod | 40 |
| Robert H. McLeod | 40 |
| Alan Chadwick | 15 |
| Thomas Dingman | 5 |

WHEREAS, the Stockholders wish to agree that in the event of the death, disability, retirement or involuntary termination of employment of the Stockholder, his shares of stock, as listed above, and any such shares acquired hereafter (hereinafter collectively "Shares") will be sold to the Corporation, and further that if a Stockholder elects to sell his Shares during his lifetime, the Corporation shall have the right to purchase the shares, all upon the terms and conditions hereof.

NOW THEREFORE, the parties hereto mutually agree as follows:

136565-1

## I. SHARES OF STOCK

1.    No Stockholder shall, while this Agreement is in force, assign, encumber, pledge, transfer or otherwise dispose of any of the Shares of the stock of the Corporation now owned or hereafter acquired by him except pursuant to the terms of this Agreement or with the written consent of the Corporation.  Upon the execution of this Agreement, the following shall be endorsed on all certificates of stock of the Corporation now owned or hereafter owned by any of the Stockholders:

> "This certificate and the shares of stock represented hereby are subject to the terms of a Stock Purchase Agreement among  Donald D. McLeod, Robert H. McLeod, Alan Chadwick, Thomas Dingman  and Carter-McLeod Paper and Packaging Company, Inc."

## II. LIFETIME TRANSFERS OF STOCK

1.    In the event any Stockholder should desire to dispose of any of his Shares during his lifetime to a third party, he must first offer in writing to sell his Shares to the Corporation at the lesser of:

(a)  The value determined as provided for in Section VII; or

(b)  The price at which he proposes to sell his Shares to any prospective buyer thereof who has made a bona fide offer to purchase such Shares.

2.    If the Corporation shall not accept such offer in writing within thirty (30) days of receipt of such offer, the offering Stockholder shall have the right to sell such Shares offered to the prospective buyer.

### III. PURCHASE OF STOCK ON DEATH

1.     Upon the death of a Stockholder, the Corporation shall purchase and the estate of the deceased Stockholder shall sell all of the Shares of stock of the Corporation owned by the deceased Stockholder at the time of his death. The purchase price shall be determined in accordance with  the valuation in effect at the date of death provided in Section VII and shall be paid as provided in Section VIII of this Agreement.

2.     Upon the death of a Stockholder, the purchase price (in cash or in cash and a note, as provided for in Section VIII (1))  shall be paid promptly to such person as may be designated in writing by the deceased Stockholder during his lifetime or, if none is designated, to the legal representative of the estate of the deceased Stockholder, and all the stock of the Corporation owned by the deceased Stockholder shall be transferred to the Corporation upon such payment.

### IV. DISABILITY OR RETIREMENT

1.     In the event that a Stockholder shall become disabled so as to qualify for at least fifty percent (50%) of the maximum disability benefits under the Social Security Act or shall retire from employment with the Corporation at any time after becoming sixty (60) years of age, the disabled or retiring Stockholder shall sell, and the Corporation shall purchase, the Shares of the Corporation owned by (i) the disabled Stockholder thirty (30) days after the date of the disability qualification referred to above or (ii) the retiring Stockholder upon retirement, as the case may be. The purchase price shall be determined in accordance with the valuation in effect at the date of purchase as provided in Section VII and shall be paid as provided for in Section VIII of this Agreement. By executing this Agreement the Stockholders agree to retire from employment with the Corporation no later than December 31 in the year in which the Stockholder reaches age 65.

136565-1

3

### V. INVOLUNTARY TERMINATION OF EMPLOYMENT

In the event that a Stockholder shall be involuntarily terminated as an employee of the Corporation before reaching sixty (60) years of age except for death, disability or a termination for cause, the terminated Stockholder shall sell, and the Corporation shall purchase, the Shares of Stock of the Corporation owned by the terminated Stockholder upon the date of such termination. The purchase price shall be determined in accordance with the valuation in effect at the date of termination as provided in Section VII and shall be paid on the terms provided in Section VIII of this Agreement thirty (30) days after termination of employment. For purposes of this Agreement, the term "cause" shall mean gross misconduct, or unsatisfactory performance of his duties which continues for more than three (3) months after delivery of a written warning from the Board of Directors of the Corporation.

### VI. VOLUNTARY TERMINATION OF EMPLOYMENT

1.    In the event that a Stockholder shall voluntarily terminate his employment with the Corporation before reaching sixty (60) years of age or in the event that a Stockholder shall be terminated for cause, the Corporation shall have the option to purchase the Shares of the Corporation owned by such Stockholder at any time within five (5) years after the date of such termination of employment. The purchase price shall be determined in accordance with the valuation in effect at the date of termination as provided in Section VII and shall be paid as provided in Section VIII of this Agreement.

### VII. PURCHASE PRICE

For purposes of setting the purchase price hereunder, the parties agree that the fair market value of each share of stock of the Corporation owned by each Stockholder as of the date of this Agreement is Five Thousand Dollars ($5,000) per share. It is the intention of the parties to agree

136565-1                                    4

upon the fair market value of each share of stock of the Corporation held hereunder within ninety (90) days after the end of each fiscal year and at such other times during the year as the parties hereto shall agree. Such value shall be endorsed on Schedule A attached hereto and made a part hereof. If the parties fail to redetermine a value for one or more years, the price shall be determined by calculating the average annual earnings for the Corporation for the three fiscal years prior to the event triggering the sale of the shares of stock, multiplying that amount by four (4) and dividing the resulting total amount by the number of shares outstanding on the date of sale. In the event that an event triggering the sale of shares of stock takes place prior to the time that the Corporation has concluded three (3) fiscal years of existence, the foregoing calculations shall be based on earnings for the first fiscal year or the average earnings for the first and second fiscal years, as the case may be. For purposes of the foregoing calculation, earnings shall be determined after payment of annual salaries, including officers' salaries, but before payment of year-end bonuses. The foregoing calculations shall be made by the outside accountant then servicing the Corporation in accordance with Generally Accepted Accounting Principles except that depreciation shall be in accordance with the Internal Revenue Code.

## VIII. PAYMENT OF PURCHASE PRICE

1.     Upon the death of a Stockholder, the Corporation shall pay the purchase price in cash to the extent of any life insurance proceeds on the life of the deceased Stockholder payable to the Corporation and to execute and deliver to said designated person or his legal representative, as the case may be, its promissory note for any unpaid balance of said purchase price on the terms set forth in Subsection (3) below.

2.     In the event the Corporation purchases the stock of a Stockholder during his lifetime, whether as a result of his disability, retirement, termination of employment or

136565-1                                    5

otherwise, the Corporation shall pay twenty percent (20%) of the purchase price in cash and the balance in a note from the Corporation with the terms set forth in Subsection 3 below.

    3.     Any note given by the corporation as part of the purchase price pursuant to Subsection 1 or 2 above shall (i) bear interest, which shall be fixed as of the date of the note, at the prime rate of interest then being charged by the bank then servicing the Corporation, plus one percent (1%), but in no event more than eight percent (8%), for the entire term of the note; (ii) have a term determined by the Board of Directors but not more than five (5) years; (iii) provide for at least equal semi-annual installments or principal and interest; and (iv) reserve to the Corporation the right to anticipate payment of principal either in whole or in part at any time.

    IX.    PROVISIONS APPLICABLE ONLY TO ROBERT H. MCLEOD

    1.  Notwithstanding the provisions of Section VII of this Agreement, the minimum price to be paid for shares of stock owned by Robert H. McLeod shall be Five Thousand Dollars ($5,000.00) per share.

    2.  Notwithstanding the provisions of Section VIII (2) of this Agreement, Robert H. McLeod agrees that the entire purchase price for a lifetime purchase of his shares of stock shall be paid by a note from the Corporation with the terms set forth in Subsection VIII (3) of this Agreement.

    3.  The parties agree that during such time that Robert H. McLeod is a stockholder in the Corporation, no additional shares of stock in the Corporation shall be issued to any party except for *4.44* 11.2 shares of stock to be issued pursuant to an agreement with James Pollard.

    4.  The Corporation and Robert H. McLeod agree that after the sale and purchase of the shares of stock owned by Robert H. McLeod pursuant to this Agreement, Robert H. McLeod shall be employed by the Corporation as a salesperson for a period of four (4) years from the date

136565-1          6

of sale and purchase of stock. Compensation for such employment shall be on a commission-only basis plus such fringe benefits then being paid to other employee-salespersons of the Corporation. The commissions payable to Robert H. McLeod shall be based on the same schedule being used for other employee-salespersons as it changes from time to time.

## X. LIFE INSURANCE

1.    The Corporation has taken out insurance on the life of each of the Stockholders in the amount specified in Schedule B attached to and made a part of this Agreement. Such proceeds shall be used to purchase the Shares of the deceased Stockholder. The Corporation shall have the right to take out additional insurance on the life of any Stockholder whenever additional insurance may be reasonably required to carry out its obligations under this Agreement. Any additional policies shall be listed in Schedule B and shall otherwise be subject to the terms of this Agreement.

2.    The Corporation shall be the owner of the policies of insurance described in Schedule B. The Corporation shall have the exclusive right to any or all privileges arising out of the ownership of said policies. The Corporation may not remove, amend, or cancel any of said policies without the consent of all of the Stockholders. All cash value, dividends and the like paid under said policies shall be the property of the Corporation and may be applied in the discretion of the Corporation toward the payment of premiums.

## XI. TERMINATION

1.    This Agreement shall terminate:

(a)    Upon the receivership, bankruptcy or dissolution of the Corporation;

(b)    If all Stockholders die within a thirty (30) day period;

136565-1                                    7

(c)    Upon the Agreement in writing of all parties who are, at the time of such termination, bound by the terms hereof.

## XII.  ARBITRATION

1.    Any controversy or claim arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of Springfield, in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.  Such an award shall be final and binding on all parties hereto.  Each party to the arbitration will be responsible for his own costs and expenses related to the arbitration and the cost of the arbitration itself shall be borne equally by the two parties.

## XIII.  GENERAL PROVISIONS

1.    This Agreement shall be binding upon the parties hereto, their heirs, legal representatives, trustees, successors and assigns.  The parties agree to execute any instrument in writing which may be necessary or desirable to carry out the purposes and intent of this Agreement.

2.    This Agreement and the construction and interpretation of all provisions hereof shall be governed by the laws of the Commonwealth of Massachusetts.

136565-1                              8

IN WITNESS WHEREOF, the parties have executed and sealed this Agreement as of the

day and year first written above.

_____
Witness

_____
Witness

_____
Witness

_____
Witness

_____
Witness

_____
Donald D. McLeod

_____
Robert H. McLeod

_____
Alan Chadwick

_____
Thomas Dingman

CARTER-MCLEOD PAPER
AND PACKAGING COMPANY, INC.

By_____
Its_____

SCHEDULE A

Pursuant to Section VII of this Stock Purchase Agreement, the Shareholders agree that the per share purchase price of the Common Stock in the Corporation for the year _____ is _____ Dollars ($000.00) per share.

## SCHEDULE B

### LIFE INSURANCE

[company, policy number,
and amount for each stockholder]

| | |
|---|---|
| Robert H. McLeod | General American Life Insurance<br>Policy # 3403482<br>$100,000.00 |
| Donald D. McLeod | General American Life Insurance<br>Policy # 3395359<br>$250,000.00 |
| Alan Chadwick | None |
| Thomas Dingman | None |

TAB 10

# Carter-McLeod Paper and Packaging Company, Inc.

## <u>Minutes for Directors' Meeting</u>

**Date:**          December 15, 2004

**Location:**      Offices of Bulkley, Richardson and Gelinas, LLP
                   1500 Main Street, Suite 2700, Springfield, Massachusetts


The meeting called to order by Robert McLeod, Chairman at 2:23 PM pursuant to oral notice duly given. The following directors were present Robert McLeod, Alan Chadwick, Thomas Dingman and Donald McLeod. In addition, Ronald P. Weiss, Esq., James Martin, Esq., Julie A. Dialessi-Lafley, Esq. and Scott W. Foster, Esq. were also present.

Upon motion duly made and seconded it was

VOTED:          To elect the following officers, to serve according to law and the bylaws:

               Robert H. McLeod, President and Treasurer
               Alan Chadwick, Secretary
               Thomas Dingman, Assistant Secretary

     Voting in favor:  Robert McLeod, Alan Chadwick, Thomas Dingman

     Voting against: Donald McLeod

Following a brief discussion regarding Mr. Crogan's qualifications, upon motion duly made and seconded it was

VOTED:          To appoint Tom Crogan, CPA of C. F. Crogan, P. C. as the Company's accountant.

     Voting in favor:  Robert McLeod, Alan Chadwick, Thomas Dingman

     Voting against: Donald McLeod

Whereas, due to circumstances that have come to the attention of the Board, the Board has determined that it is in the best interest of the Company to terminate the employment of Donald McLeod without cause, upon motion duly made and seconded, it was

VOTED:          To terminate without cause the employment of Donald McLeod from all positions with the Company and to redeem the 40 shares of Common Stock no par value of the Company owned by Donald McLeod in accordance with the Stock Purchase Agreement among Donald McLeod and the Company, among others, dated May 29, 2003 and to hereby

authorize the President, and the President is hereby authorized, to take such actions as he deems appropriate to effectuate this vote.

Voting in favor:  Robert McLeod, Alan Chadwick, Thomas Dingman

Voting against: Donald McLeod

Upon motion duly made and seconded, it was

VOTED:    To remove Donald H. McLeod as a signatory for the Company on all of the Company's accounts with Country Bank for Savings and to add Alan Chadwick as a signatory for the Company on all of the Company's accounts with Country Bank for Savings, and that each of the officers of the Company be, and each hereby is, authorized to execute such documents and to take such actions as he deems appropriate to effectuate this vote.

Voting in favor:  Robert McLeod, Alan Chadwick, Thomas Dingman

Voting against: Donald McLeod

Upon motion duly made and seconded, the meeting was adjourned.

Voting in favor:  Robert McLeod, Alan Chadwick, Thomas Dingman

Voting against: Donald McLeod


The meeting was adjourned at 2:34 PM.

TAB 11

# Carter-McLeod Paper and Packaging Company, Inc.

### Minutes for Directors' Meeting

**Date:**         **December 28, 2004**

**Location:**     **Offices of Bulkley, Richardson and Gelinas, LLP**
                  **1500 Main Street, Suite 2700, Springfield, Massachusetts**

The meeting called to order by Robert H. McLeod, Chairman at 10:03 AM pursuant to oral and written notice duly given. The following directors were present: Robert H. McLeod, Alan Chadwick, Thomas Dingman and Donald McLeod. In addition, Ronald P. Weiss, Esq. and James Martin, Esq. were also present.

Upon motion duly made and seconded it was

> **VOTED:**     That the corporation waive any mandatory retirement requirements placed on Robert H. McLeod by the Stock Purchase Agreement dated May 29, 2003 among Robert H. McLeod, Alan Chadwick, Thomas Dingman, Donald McLeod and Carter-McLeod Paper and Packaging Company, Inc. and that Robert H. McLeod shall not be considered to have breached the Stock Purchase Agreement if he does not retire on or before December 31, 2004.

> Voting in favor: Robert H. McLeod, Alan Chadwick, Thomas Dingman

> Voting against: Donald McLeod

Upon motion duly made and seconded it was

> **VOTED:**     That the corporation borrow up to $75,000 on a term loan basis and up to $400,000 on a line of credit basis from Chicopee Savings Bank (the "Bank") on such terms as the President of the corporation deems appropriate and, in conjunction therewith, grant a security interest in the assets of the corporation to the Bank; and that the President is hereby authorized to execute such documents and instruments and to take such further actions as he deems appropriate to effectuate such loan, his execution of any document to be determinative that he deems the terms thereof to be appropriate.

> Voting in favor: Robert H. McLeod, Alan Chadwick, Thomas Dingman

> Voting against: Donald McLeod

Upon motion duly made and seconded and unanimously adopted, the meeting was adjourned at 10:06 AM.